UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., ) | Case. No. 1:14-cv-01047-RMC |
| Plaintiffs, ) | |
| *Ex rel.* [UNDER SEAL], ) | Judge Rosemary M. Collyer |
| Plaintiff-Relator, ) | **FIRST AMENDED COMPLAINT** |
| v. ) | |
| [UDER SEAL], ) | |
| Defendants. ) | |

**FILED IN CAMERA AND UNDER SEAL**

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, MASSACHUSETTS, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, RHODE ISLAND, TENNESSEE, VIRGINIA, AND THE DISTRICT OF COLUMBIA., | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case. No. 1:14-cv-01047-RMC  Judge Rosemary M. Collyer |
| Plaintiffs, | ) ) ) | |
| *Ex rel.* LAURENCE SCHNEIDER, | ) ) ) | **FIRST AMENDED COMPLAINT** |
| Plaintiff-Relator, | ) ) ) | |
| v. | ) ) ) | |
| J.P. MORGAN CHASE BANK, NATIONAL ASSOCIATION, J.P. MORGAN CHASE & COMPANY; AND CHASE HOME FINANCE LLC, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**FILED IN CAMERA AND UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

**EXHIBIT A**

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................2

      A.    Defendants' Fraud .................................................................2

      B.    Damages to the Government Related to the NMSA ..........................8

      C.    Damages to the Government Related to the HAMP Program..........................10

II.   JURISDICTION AND VENUE ................................................................11

III.  PARTIES ........................................................................................12

      A.    Relator ...............................................................................12

      B.    Defendants...........................................................................13

IV.   BACKGROUND ................................................................................14

      A.    Massive Mortgage Wrongdoing By Chase And Other Banks .......................... 14

      B.    Bank's History of Regulatory Settlements and Enforcement Actions ............. 15

      C.    National Mortgage Settlement Agreement ....................................... 16

            1.   Servicing Standards ..................................................... 18

            2.   Implementation of Servicing Standards ................................... 21

            3.   Consumer Relief............................................................25

            4.   Implementation of Consumer Relief ..................................... 27

      D.    The HAMP Program ..................................................... 28

            1.   Servicing Guidelines .....................................................30

            2.   Implementation of Servicing Guidelines...................................31

            3.   Compliance With Servicing Guidelines ...................................33

            4.   Relationship Manager A/K/A SPOC.........................................37

            5.   Incentive Payments........................................................40

i

**EXHIBIT A**

V.     CHASE FALSELY CLAIMED COMPLIANCE WITH SERVICING STANDARDS
       AND CONSUMER RELIEF REQUIREMENTS OF THE CONSENT JUDGMENT
       AND THE SERVICING REQUIREMENTS OF THE HAMP ........................................41

       A.     The Secondary System of Loans: Recovery One ................................................41

       B.     The "2nd Lien Extinguishment Program" ..........................................................46

              1.     The RCV1-SOR Collection Agencies .......................................................50

              2.     "DOJ: Default: Recovery 2nd Lien Credit Initiative,
                     Financial Impact   Overview, November 14, 2012" ..................................52

              3.     "DOJ: Default: Recovery 2nd Lien Credit Initiative,
                     3rd Mailing Portfolio Selection, January 23, 2013" ..................................54

       C.     Chase Mails Thousands of Letters from their RCV1-SOR ..............................54

       D.     Chase Admits to Misconduct Utilizing 2nd Lien Forgiveness Letters ...............57

       E.     Chase's "Alternative Foreclosure Program" Violates
              the Requirements of the Servicing Standards ....................................................60

VI.    DOCUMENTATION CONTAINING FALSE CLAIMS .................................................63

VII.   CAUSES OF ACTION ..................................................................................................65

PRAYER FOR RELIEF ...................................................................................................88

**EXHIBIT A**

1.      This is an action to recover damages and civil penalties on behalf of the United

States and on behalf of Plaintiff/Relator Laurence Schneider ("Relator"), based on violations of

the National Mortgage Settlement Agreement ("NMSA") entered into between the United States

and Defendants, J.P. Morgan Chase Bank, National Association, J.P. Morgan Chase & Company

and Chase Home Finance LLC (collectively "Chase" or "Defendant" or "Company").  Under the

NMSA, Chase was required to meet certain loan servicing standards and consumer relief

provisions.  When Chase failed to meet those conditions, it was required to make certain

payments to the United States and also was subject to penalties.  In order to avoid these

payments and penalties, Chase filed false reports and certifications with the Court appointed

Monitor of the NMSA.  These false certifications are actionable "reverse" false claims under 31

U.S.C. § 3729(a)(1)(G), which prohibits the submission of "a [knowingly] false record or

statement material to an obligation to pay or transmit money or property to the Government, or

[that] knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay

or transmit money or property to the Government."

2.      This action also seeks to recover damages and civil penalties on behalf of the

United States and on behalf of the Relator based on violations of the "Amended and Restated

Commitment to Purchase Financial Instrument and Servicer Participation Agreement"

("Commitment" or "SPA") entered into between the United States and Chase.   Under the

Commitment, Chase was required to meet servicing standards specified in the Home Affordable

Modification Program ("HAMP") and provide loan modifications to its borrowers.  Chase was

paid various amounts for each loan modification by the Government.  Chase also received

additional incentive payments based on its performance.   Payments were conditioned upon

Chase certifying that it was in compliance with the HAMP servicing standards.  Chase falsely

1

**EXHIBIT A**

certified that it was in compliance with those standards and created false records to support each certification.   These false certifications and records are actionable under 31 U.S.C. § 3729(a)(1)(A) & (B), which prohibit knowingly submitting "a false or fraudulent claim for payment or approval" or the use of "a false record or statement material to a false or fraudulent claim."

## I.   INTRODUCTION

### A.   Defendant's Fraud

3.      Defendant Chase's fraud arises out of its response to efforts by the United States Government ("Government" or "Federal Government") and the States (the "States")[1]  to remedy the misconduct of Chase and other financial institutions whose actions significantly contributed to the consumer housing crisis.

4.      Defendant's misconduct resulted in the issuance of improper mortgages, premature and unauthorized foreclosures, violation of service members' and other homeowners' rights and protections, the use of false and deceptive affidavits and other documents, and the waste and abuse of taxpayer funds.   Each of the allegations regarding Defendant contained herein applies to instances in which one or more, and in some cases all, of the defendants engaged in the conduct alleged.

5.      In March 2012, after a lengthy investigation (in part due to other *qui tam* plaintiffs) under the Federal False Claims Act, the Government, along with the States, filed a

---

[1] States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, and Wyoming; the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of Columbia.

**EXHIBIT A**

complaint against Chase and the other banks responsible for the fraudulent and unfair mortgage practices that cost consumers, the Federal Government, and the States tens of billions of dollars. Specifically, the Government alleged that Chase, as well as other financial institutions, engaged in improper practices related to mortgage origination, mortgage servicing, and foreclosures, including, but not limited to, irresponsible and inadequate oversight of the banks' quality control standards.

6.     These improper practices had previously been the focus of several administrative enforcement actions by various government agencies, including but not limited to, the Office of the Controller of the Currency, the Federal Reserve Bank and others.  Those enforcement actions resulted in various other Consent Orders that are still in full force and effect.

7.     In April 2012, the United States District Court for the District of Columbia approved a settlement between the Federal Government, the States, the Defendant and four other banks, which resulted in the NMSA. The operative document of this agreement was the Consent Judgment ("Consent Judgment" or "Agreement").  The Consent Judgment contains, among other things, Consumer Relief provisions.  The Consumer Relief provisions required Chase to provide over $4 billion in consumer relief to their borrowers.  This relief was to be in the form of, among other things, loan forgiveness and refinancing.  Under the Consent Judgment, Chase received "credits" towards its Consumer Relief obligations by forgiving or modifying loans it maintained as a result of complying with the procedures and requirements contained in Exhibits D and D-1 of the Consent Judgment.

8.     The Consent Judgment also contains Servicing Standards in Exhibit A that were intended to be used as a basis for granting Consumer Relief.  The Servicing Standards were tested through various established "Metrics" and were designed to improve upon the lack of

**EXHIBIT A**

quality control and communication with borrowers.  Compliance was overseen by an independent Monitor.

9.      The operational framework for the Servicing Standards and Consumer Relief requirements of the NMSA was based on a series of Treasury Directives that were themselves designed as part of the Making Home Affordable (MHA) program.  The MHA program was a critical part of the Government's broad strategy to help homeowners avoid foreclosure, stabilize the country's housing market, and improve the nation's economy by setting uniform and industry wide default servicing protocols, policies and procedures for the distribution of federal and proprietary loan modification programs.

10.      Before the Consent Judgment was entered into, Chase sold a significant amount of its mortgage obligations to individual investors.  Between 2006 and 2010, the Relator bought the rights to thousands of mortgages owned and serviced by Chase.  Unbeknownst to the Relator, these mortgages were saturated with violations of past and present regulations, statutes and other governmental requirements for first and second federally related home mortgage loans.

11.      After both the Consent Judgment was signed and the MHA program was in effect, numerous borrowers, whose 2nd lien mortgages had been sold by Chase to the Relator, received debt-forgiveness letters from Chase that were purportedly sent pursuant to the Consent Judgment.

12.      Relator, through his contacts at Chase, was made aware that 33,456 letters were sent by Chase on September 13, 2012 to second-lien borrowers.  On December 13, 2012 another approximately 10,000 letters were sent, and on January 31, 2013 another approximately 8,000 letters were sent, for a total of over 50,000 debt-forgiveness letters.  These letters represented to the recipient borrowers that, pursuant to the terms of the NMSA, the borrowers were discharged

**EXHIBIT A**

from their obligations to make further payments on their mortgages, which Chase stated, it had

forgiven as a "result of a recent mortgage servicing settlement reached with the states and federal

government." None of these borrowers made an application for a loan modification as required

by the Consent Judgment. These letters were not individually reviewed by Chase to ensure that

Chase actually owned the mortgages or to ensure the accuracy and integrity of the borrower's

information but instead were "robo-signed"; each of the letters sent out was signed by "Patrick

Boyle" who identified himself as a Vice President at Chase.

13.     Relator's experience with Chase's baseless debt-forgiveness letters was not

unique. Several other investors were also affected by Chase choosing to mass mail the "robo-

signed" debt-forgiveness letters to thousands of consumers from its hidden system of records in

order to earn credits under the terms of the Consent Judgment and to avoid detection of its illegal

and discriminatory loan servicing policies and procedures.

14.     In addition to the debt forgiveness letters sent, and after both the Consent

Judgment was signed and the MHA program was in effect, numerous borrowers, whose 1st

mortgages had been sold by Chase to the Relator, had their 1st mortgages liens quietly released.

15.     Relator, through his third party servicer, which was handling normal and

customary default mortgage servicing activities, was made aware that several lien releases were

filed in the public records on mortgage loans that were owned by Relator in the fall of 2013.

Through Relator's subsequent investigation of the property records for 1st mortgage loans that

Chase had previously sold to Relator, scores of additional lien releases were also discovered.

16.     During the course of Relator's investigation of Chase's servicing practices, he

discovered that Chase maintains a large set of loans outside of its primary System of Records

("SOR"). The hidden system of records is known as the Recovery One population ("RCV1" or

**EXHIBIT A**

"RCV1 SOR"). The RCV1, essentially a "back room" operation, was disclosed neither to the Monitor of the NMSA nor to Freddie Mac as compliance agent for the Federal Government under the MHA, and it is still only known to those select few that are directly involved with it within Chase. The accuracy and integrity of the information pertaining to the borrowers' accounts whose loans are in the RCV1 population was and is fatally and irreparably flawed. Furthermore, the loans in the RCV1 were not serviced according to the requirements of Federal law, the Consent Judgment, the MHA programs or any of the other consent orders or settlements reached by Chase with any government agency prior to the NMSA.

17. Chase's practice of sending unsolicited debt-forgiveness letters to intentionally pre-selected borrowers of valueless loans did not meet the Servicing Standards set out in the Consent Judgment to establish eligibility for credits toward its Consumer Relief obligations. This practice enabled Chase to reduce its cost of complying with the Consent Judgment and MHA program, while at the same time enhancing its own profits through unearned Consumer Relief credits and MHA incentives. Chase sought to take credit for valueless charged-off and third-party owned loans instead of applying the Consumer Relief under the NMSA and MHA loan modification programs to properly vetted borrowers who could have applied for and benefitted from the relief and modification programs, those borrowers that were originally intended by the Government to receive the benefit of the Government's bargains with Chase.

18. The Servicing Standards and the Consumer Relief Requirements of the Consent Judgment are set forth in Exhibits A and D of that document. The Consent Judgment is governed by the underlying Servicer Participation Agreements of the MHA program, which required mandatory compliance with the Treasury Directives under the MHA Handbook ("Handbook"). Chase is required to demonstrate compliance with the Handbook's guidelines in

**EXHIBIT A**

the form of periodic certifications to the government.  Chase ignored the requirements of Exhibits A and D of the Consent Judgment, especially with respect to the RCV1 population of loans.  Therefore, Chase has been unable to service with any accuracy the charged-off loans it owns and to segregate those loans that it no longer owns. As such, any certifications of compliance with the Consent Judgment or the Services Participation Agreement ("SPA") are false claims.

19.     Relator conducted his own investigations and found that the Defendant sent loan forgiveness letters to consumers for mortgages that Chase no longer owns or that were not eligible for forgiveness credit.  Further, Chase continues to fail to meet its obligations to service loans and to prevent blight as required by both the Consent Judgment and SPA.  Chase's intentional failure to monitor, report and/or service these backroom loans, and its issuance of invalid loan forgiveness letters and lien releases, evidence an attempt to thwart the goal of the Consent Judgment and the MHA program.  The purpose of this scheme was to quickly satisfy the Defendant's Consumer Relief obligations as cheaply as possible, without actually providing the relief that Chase promised in exchange for the settlement that Chase reached with the Federal Government and the States.  In addition, Chase applied for and received MHA incentive payments without complying with the MHA mandatory requirements. In short, Chase decreased its liabilities, increased its revenues, avoided its obligations, and provided little to no relief to consumers.

20.     The mere existence of RCV1 makes all claims by Chase that it complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment false.  Likewise, the existence of RCV1 makes all claims by Chase that it complied with the SPA of the MHA program false.

7

**EXHIBIT A**

**B.      Damages to the Government Related to the NMSA**

21.      Exhibit E of the Consent Judgment provides for penalties of up to $5 million for

failure to meet a prescribed Metric of the Servicing Standards.  Exhibit E, ¶ J.3(b) at E15.

22.      Exhibit D of the Consent Judgment provides:

> If Servicer fails to meet the commitment set forth in these Consumer Relief
> Requirements within three years of the Servicer's Start Date, Servicer shall pay an
> amount equal to 125% of the unmet commitment amount, except that if Servicer
> fails to meet the two year commitment noted above, and then fails to meet the
> three year commitment, the Servicer shall pay an amount equal to 140% of the
> unmet three-year Commitment amount.

Exhibit D, ¶10.d. at D-11.

23.      The required payment set out in Exhibit D, ¶10.d is made either to the United

States or the States that are parties to the Consent Judgment.  Fifty percent of any payment is

distributed to the United States.  Consent Judgment, Exhibit E, ¶ J.c.(3)c. at E-16.

24.      As explained in more detail below, Chase was required to certify that it was in

compliance with the Servicing Standards and the Consumer Relief Requirements.  Many, if not

all, of the loans that Chase identified for credits against the $4 billion Consumer Relief

provisions were not eligible for the credit, because Chase did not comply with the Servicing

Standards or the Consumer Relief Requirements.  Specifically, all loan modification programs

must be made available to all borrowers, who may then apply to determine eligibility.  Hundreds

of thousands of borrowers' accounts, hidden in the RCV1 system of records, were not considered

for all eligible loss mitigation options (even though they could likely have qualified).  Due to this

omission none of the loan modification programs qualified for Consumer Relief Credit.  Thus,

Chase did not and does not qualify for any of the Consumer Relief Credit for which it applied.

25.      For these reasons, each of Chase's certifications to the Federal Government of

compliance represents a "reverse" false claim to avoid paying money to the Government.

**EXHIBIT A**

26.     Under the FCA a person is liable for penalties and damages who:

> [k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G).

27.     Each of Chase's false certifications is actionable under 31 U.S.C. §3729(a)(1)(G), because they represent a false record or statement that concealed, avoided or decreased an obligation to transmit money to the Government.

28.     The Federal Government and the States agreed to the NMSA with Chase, with the understanding that Chase would meet its obligations under the Consent Judgment.

29.     As set out in the Consumer Relief Requirements, the measure of the Federal and State Governments' damages is up to 140 percent of the credits that Chase falsely claimed met the requirements of the Consent Judgment and up to $5 million for each Metric the Chase failed to meet.

30.     These damages are recoverable under the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. (the "FCA"), and similar provisions of the State False Claims Acts of the States of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, the Commonwealths of Massachusetts and Virginia, and the District of Columbia.

31.     The Federal Government and the States are now harmed because they are not receiving the benefit of the bargain for which they negotiated with Chase due to the false claims for credit that have been made by the Defendant.

**EXHIBIT A**

**C.      Damages to the Government Related to the HAMP**

32.      The Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement between the United States Government and Chase provided for the implementation of loan modification and foreclosure prevention services ("HAMP Services").

33.      The value of Chase's SPA was limited to $4,532,750,000 ("Program Participation Cap").

34.      The value of EMC Mortgage Corporation's ("EMC") SPA (Chase is successor in interest) was limited to $1,237,510,000.

35.      As explained in more detail below, Chase must certify that it is in compliance with the SPA and the MHA program and must strictly adhere to the guidelines and procedures issued by the Treasury with respect to the programs outlined in the Service Schedules ("Program Guidelines"). The Program Guidelines pursuant to the Treasury Directives are cataloged in the MHA Handbook ("Handbook"). None of the loans that Chase and EMC identified and submitted for payment against their respective Participation Caps were eligible for the incentive payment, because neither Chase nor EMC complied with the SPA and Handbook guidelines. Specifically, all loan modification programs must be made available to all borrowers, who must then apply to determine eligibility. Hundreds of thousands of borrowers' mortgage loan accounts hidden in the RCV1 system of records were not offered and thereby unable to be considered for all eligible loss mitigation options (even though they likely could have qualified). Due to the omission of the RCV1 population for any loss mitigation options, none of the modifications that Chase provided qualified for HAMP incentives. Thus, Chase does not qualify for any of the HAMP incentives for which it applied and received funds.

**EXHIBIT A**

36.     Therefore, Chase's certifications of compliance and its creation of records to support those certifications represent both the knowing presentation of false or fraudulent claims for a payment and the knowing use of false records material to false or fraudulent claims.

37.     Under the FCA, a person is liable for penalties and damages who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

31 U.S.C. § 3729(a)(1)(A)

> and

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 U.S.C. § 3729(a)(1)(G).

38.     Each of Chase's false certifications is actionable under either 31 U.S.C. §3729(a)(1)(A) and (B), because they represent a false or fraudulent claim for payment or approval of a false record or statement material to a false or fraudulent claim.

39.     Under HAMP, the Federal Government entered into the Commitment with Chase, with the understanding that Chase would meet its obligations under the SPA and related Treasury directives.   The Federal Government is now harmed because it is not receiving the benefit of the bargain for which it negotiated with Chase due to the false claims for payment that have been made by the Defendant.

## II.     **JURISDICTION AND VENUE**

40.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(a) and supplemental jurisdiction over the counts related to the State False Claims Acts pursuant to 28 U.S.C. § 1367.

41.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant transacts the business that is the subject matter of this lawsuit in the District of

**EXHIBIT A**

Columbia and numerous acts proscribed by 31 U.S.C. § 3729 occurred in the District of Columbia.

## III.    <u>PARTIES</u>

### A.    **Relator**

42.     Relator, Laurence Schneider, submits this complaint on behalf of the Federal Government, pursuant to 31 U.S.C. §§ 3729-3733, and on behalf of the States of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, Commonwealths of Massachusetts and Virginia, and the District of Columbia, pursuant to their respective State False Claims Acts.  Relator is an experienced real estate and mortgage investor who works and resides in Boca Raton, Florida.  Because of his ownership of thousands of mortgage loans and hundreds of rental housing units, Relator has acquired extensive knowledge of banking practices, laws and regulations.  Relator has direct and personal knowledge of the fraudulent scheme described herein.  Relator, as President of S&A Capital Partners, Inc., 1st Fidelity Loan Servicing, LLC, and Mortgage Resolution Servicing, LLC, has purchased mortgage notes from Chase since 2005.   Relator has over 20 years of experience in mortgage loan origination and servicing.  In that time, he has built relationships and purchased mortgage loans from over 40 different loss mitigation representatives in three different loan servicing centers operated by Chase in Wisconsin, Arizona and Texas.  In the process, he has learned intimate details of Chase's loss mitigation activities and gained an understanding of Chase's overall loan servicing policies and procedures.

43.     S&A Capital Partners, Inc. ("S&A") is a Florida corporation located at 6810 N. State Road 7, Coconut Creek, Florida.  Relator is the President and shareholder of S&A.  From

**EXHIBIT A**

2005 to 2010, S&A purchased First Lien and Second Lien mortgages owned by Defendant Chase.

44.     1st Fidelity Loan Servicing, LLC ("1st Fidelity") is a Florida Limited Liability Company located at 6810 N. State Road 7, Coconut Creek, Florida.  Relator is the President and managing member of 1st Fidelity.  From 2007 to 2010, 1st Fidelity purchased First Lien and Second Lien mortgages owned by Defendant Chase.

45.     Mortgage Resolution Servicing, LLC ("Mortgage Resolution") is a Florida Limited Liability Company located 6810 N. State Rd. 7, Coconut Creek, Florida.  Relator is the President and managing member of Mortgage Resolution.  Mortgage Resolution purchased a pool of what were purported and represented to be 3,529 First Lien mortgages from Defendant Chase on February 25, 2009.

46.     By letter dated March 28, 2013, the Relator voluntarily provided information on which this action is based prior to the filing of his original Complaint on May 6, 2013.  The Relator served his statement of material information regarding this action on the Government together with the Complaint in accordance with 31 U.S.C. § 3730(b)(2).

**B.     Defendants**

47.     Defendants JP Morgan Chase Bank, National Association and Chase Home Finance LLC are subsidiaries of Defendant JP Morgan Chase & Co..  Chase's headquarters is located at 270 Park Avenue, New York, New York.  Defendant JP Morgan Chase & Co. is a Delaware corporation.  On September 25, 2008, Washington Mutual Bank., F.S.B., a federal savings bank headquartered in Henderson, Nevada, failed, and J.P. Morgan Chase Bank, N.A., purchased substantially all of the assets and assumed all deposit and substantially all other liabilities of Washington Mutual Bank., F.S.B., pursuant to a Purchase and Assumption

13

**EXHIBIT A**

Agreement with the Federal Deposit Insurance Corporation ("FDIC") and the FDIC as Receiver

for Washington Mutual Bank, F.S.B.  On March 16, 2008, Chase acquired EMC Mortgage

Corporation as part of its acquisition of Bear Stearns Companies, Inc.  The business of

Defendant J.P. Morgan and its subsidiaries and affiliates includes the origination and servicing of

mortgage loans.

## IV.    BACKGROUND

### A.    Massive Mortgage Wrongdoing By Chase And Other Banks

48.    In 2008, Congress enacted the Emergency Economic Stabilization Act (EESA) in

response to the Great Recession. The EESA included the Troubled Asset Relief Program (TARP)

which charged the Secretary of the Treasury with developing a program to provide relief to

struggling homeowners while offering incentives to the loan servicers of homeowner mortgages.

49.    In February 2009, the Government introduced the MHA, a plan to stabilize the

housing market and help struggling homeowners get relief and avoid foreclosure.

50.    The U.S. Department of the Treasury ("Treasury") established the HAMP

pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008, as

section 109 of the Act has been amended by section 7002 of the American Recovery and

Reinvestment Act of 2009.

51.    In March 2009, Treasury issued uniform guidance for loan modifications across

the mortgage industry and subsequently updated and expanded that guidance in a series of policy

announcements and Treasury Directives.    On June 26, 2014, the Government extended the

application deadline for MHA programs to December 31, 2016.

52.    On March 12, 2012, the Federal Government, 49 individual States, and the

District of Columbia jointly filed a complaint against numerous banks and loan servicing

**EXHIBIT A**

companies, including Chase, for misconduct related to their origination and servicing of single family residential mortgages (the "National Mortgage Complaint").

53.     The National Mortgage Complaint was the capstone on a series of enforcement actions brought against Chase and other servicers for certain deficiencies and unsafe or unsound practices in residential mortgage servicing.  These actions were brought by a wide variety of regulatory agencies including the Office of the Comptroller of the Currency, the Federal Reserve Bank, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and others. These prior actions resulted in various settlements and consent agreements, many of which remain in full force and effect.

54.     The National Mortgage Complaint, among other things, alleged that the misconduct of the defendants "resulted in the issuance of improper mortgages, premature and unauthorized foreclosures, violation of service members' and other homeowners' rights and protections, the use of false and deceptive affidavits and other documents, and the waste and abuse of taxpayer funds."  The National Mortgage Complaint also contained several allegations concerning unfair and deceptive trade practices engaged in by Chase and other financial institutions.

### B.     Bank's History of Regulatory Settlements and Enforcement Actions

55.     These unfair and deceptive trade practices engaged in by Chase and other financial institutions led to several enforcement actions both prior to and during the pendency of the National Mortgage Complaint action.

56.     These enforcement actions address the same core issues and unsafe or unsound servicing and mortgage practices.  In each instance, the government enforcement agency bringing the action required Chase to remediate its policies and procedures and to come into

**EXHIBIT A**

compliance "with each and every applicable provision of" the particular enforcement action. In each instance, Chase failed to address the problems on an institutional level because in each instance the RCV1 system of records was hidden and deliberately kept from regulatory oversight.

57.     Relator experienced many aspects of Chase's repeated and deliberate unfair and deceptive loan servicing practices prior to, during and after Chase entered into the SPA's with the federal government and the Consent Judgment.

### C.      National Mortgage Settlement Agreement

58.     On February 9, 2012, the Attorney General of the United States announced that the Federal Government and 49 states had reached a settlement agreement with the nation's five largest mortgage services to address mortgage servicing, foreclosure, and bankruptcy abuses. On April 4, 2012, the United States District Court for the District of Columbia entered a Consent Judgment approving the NMSA, officially making it the single largest consumer financial protection settlement in United States history, totaling approximately $25 billion dollars in monetary sanctions and relief.

59.     The resulting settlement attempted to address the primary goals of the attorneys general: to provide immediate relief to enable struggling homeowners to avoid foreclosure; to bring badly needed reform to the mortgage servicing industry; to ensure that foreclosures are lawfully conducted; and to penalize the banks for robo-signing misconduct. The settlement imposed monetary sanctions on the banks while seeking to provide immediate and continuing relief to homeowners.

60.     The settlement requires comprehensive reforms of mortgage loan servicing. The mandated standards cover all aspects of mortgage servicing, from consumer response to foreclosure documentation. To ensure that the banks meet the new standards, the settlement was

**EXHIBIT A**

recorded and is enforceable as a court judgment. Compliance was overseen by an independent monitor who reported to the attorneys general and the Court.

61.     The Consent Judgment is "expressly subject to, and shall be interpreted in accordance with, (a) applicable federal, state and local laws, rule and regulations, including, but not limited to any requirements of the federal banking regulations, (b) the terms of the applicable mortgage loan documents, (c) Section 201 of the Helping Families Save Their Homes Act of 2009, and (d) the terms and provisions of the Servicer Participation Agreement [SPA] with the Department of Treasury. . . ."  Consent Judgment, at A, IX A. 1.

62.     The principal statute governing mortgage servicing is the Real Estate Settlement and Procedures Act of 1974 (RESPA), as amended, 12 U.S.C. § 2601 *et. seq.*

63.     Nothing in the Consent Judgment relieved the Servicers of their obligation to comply with applicable state and Federal law and any pre-existing consent judgments and enforcement actions or agreements or programs, such as the SPA and HAMP.

64.     Additionally, the NMSA was intended to be interpreted consistent with the provisions of RESPA and related regulations.

65.     First among the requirements of the Consent Judgment was a payment of $1,121,188,661 directly to the Government.  *See* Consent Judgment at p. 3, ¶ 3.  This portion of the NMSA is termed the "Direct Payment Settlement Amount." *Id.*  Money paid in this method was transferred to an administrator to provide cash payments to borrowers whose homes were sold or taken by foreclosure between January 1, 2008 and December 31, 2011.  This timeline is consistent with prior enforcement actions and marks the height of the improprieties by the Banks.

**EXHIBIT A**

66.     After the Direct Payment, the Consent Judgment has two main intertwined components, new comprehensive Servicing Standards and wide spread Consumer Relief.  The first sentence of Exhibit A of the Consent Judgment, entitled <u>the Settlement Term Sheet</u>, states the major focus of the NMSA in a succinct manner that brings both components together.  Both the Servicing Standards and the Consumer Relief Credits "are intended to apply to loans secured by owner-occupied properties that serve as the primary residence of the borrower. . . ."

1.     <u>**Servicing Standards**</u>

67.     The first of these components requires Servicers to comply with new comprehensive Servicing Standards designed to improve upon the lack of quality control and continuity of communications with borrowers, issues that caused chaos in the housing market to date.  These Service Standards, as detailed under Exhibit A of the Consent Judgment, were first implemented under the HAMP.

68.     The NMSA Servicing Standards require, among other things, a single point of contact, adequate staffing levels and training, better communication with borrowers, and appropriate standards for executing documents in foreclosure cases, ending improper fees, and ending dual-track foreclosures for many loans.

69.     The Consent Judgment requires that "Defendant . . . comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms and Section A of Exhibit E, attached hereto."  Consent Judgment at p. 3 ¶ 2.  These Servicing Standards under the Consent Judgment were intended to redress the practices in mortgage servicing that led to the clams that resulted in the NMSA.

70.     The Servicing Standards are governed by the HAMP and apply to all federally related mortgage loans serviced by the Servicer.  Among others, they contained the following provisions:

**EXHIBIT A**

**a.   Integrity of Documents** – Servicers were required to affirm that documents

(affidavits, sworn statements, and declarations) filed in bankruptcy and

foreclosure proceedings:

- Are based on the affiant's personal knowledge;

- Fully comply with all applicable state law requirements;

- Are signed by hand of affiant (except for permitted electronic filings) and dated; and

- Shall not contain false or unsubstantiated information.

**b.   Single Point of Contact ("SPOC")**. – Servicers were required to maintain an

easily accessible and reliable Single Point of Contact ("SPOC") for each

potentially eligible borrower (those at least 30 days delinquent or at imminent

risk of default due to financial situation).  Specifically the SPOC:

- Contacts all eligible borrowers, explains programs and their requirements, and facilitates the loan modification application process;

- Obtains information throughout the loss mitigation, loan modification, and foreclosure processes;

- Coordinates receipt of documents associated with loan modification or loss mitigation;

- Notifies borrower of missing documents and provides an address or electronic means for document submission;

- Is knowledgeable and provides information about the borrower's status;

- Helps the borrower to clear any internal processing requirements; and

- Communicates in writing Servicer's decision regarding loan modification application and other loss mitigation activity;

- Ensures that a borrower who is not eligible for MHA programs is considered for proprietary or other investor loss mitigation options.

**EXHIBIT A**

c. **Customer Service** – Servicers were required to have other standards in place:

- Adequate staffing and systems to track borrower documentation and information and are making periodic assessments to ensure adequacy;

- Establish reasonable minimum experience, educational and training requirements for loss mitigation staff;

- Ensure that employees who are regularly engaged in servicing mortgage loans as to which the borrower is in bankruptcy receive training specifically addressing bankruptcy issues;

- Participate in the development and implementation of a nationwide loan portal to enhance communications with housing counselors; and

d. **Loss Mitigation** – Servicers were required to comply with all Loss Mitigation

initiatives:

- Have designed proprietary first lien loan modification programs to provide affordable payments for borrowers needing longer term or permanent assistance;

- Are not levying application or processing fees for first and second lien modification applications; and

- Are performing an independent evaluation of initial denial of an eligible borrower's complete application for a first lien loan modification.

e. **Service Member Protection** – Servicers were required to:

- Comply with the Service Members Civil Relief Act ("SCRA") and any applicable state law offering protections for service members; and

- Engage independent consultants to review all foreclosures in which an SCRA-eligible service member is known to have been a mortgagor and to sample to determine whether foreclosures were in compliance with SCRA.

f. **Other** – The Consent Judgment implemented various policies and procedures

including, but not limited to:

- Requirements concerning the accuracy and verification of a borrowers' account information;

- Notification requirements by servicers to provide to borrowers;

**EXHIBIT A**

- Information concerning chain of assignment procedures;

- Quality Assurance requirements of documents filed on behalf of servicers;

- Oversight over third-party providers including due diligence;

- General loss mitigation requirements including adequate staffing, caseload limits and documentation requirements, and

**g. Anti-Blight** – Servicers were required to report that they have developed and implemented policies to ensure that REOs (real estate owned by the Servicer) do not become blighted.

### 2.   Implementation of Servicing Standards

71.   The Servicing Standards were to be implemented and tested through a process involving various levels of checks and balances designed to ensure compliance with the requirements of the Consent Judgment.

72.   The first part of this process was the establishment of an internal quality control group called the Internal Review Group ("IRG"). This group was required to be, and remain, "independent from the line of business whose performance [was] being measured [] to perform compliance reviews each calendar quarter [] in accordance with the terms and conditions of the work plan and satisfaction of the Consumer Relief Requirements. . . ."  Exhibit E, ¶ 7 at E-3. The independence of the IRG ensures that the Servicer complies with the Consent Judgment and that its actions remain transparent and are regularly reviewed by Servicer's senior management and Company's Board of Directors.

73.   The IRG's independence is critical to the success of the entire implementation of the Consent Judgment.

74.   Internal Chase documents demonstrate that its IRG was not in fact independent of Chase's mortgage operations.  These internal communications demonstrate that there was direct

21

**EXHIBIT A**

communication between the servicing department and the IRG concerning which loans were appropriate for review by the Monitor and could be advanced for credits.

75.     The next part of the process, as defined under the Consent Judgment, was the appointment of a "Monitor", here Joseph A. Smith, who, as part of his tasks, was responsible for overseeing Servicer's implementation of and compliance with the Servicing Standards. The Monitor was subject to oversight by a Monitoring Committee, which was comprised of representatives of the U.S. Department of Housing and Urban Development, the U.S. Department of Justice and representatives of 15 states.

76.     The Consent Judgment then required the Monitor to engage professionals who possessed expertise in the areas of mortgage servicing, loss mitigation, business operations, compliance, internal controls, accounting and foreclosure and bankruptcy law. These professionals were known as the Primary Professional Firm ("PPF") and the Secondary Professional Firm ("SPF").

77.     The PPF operated in a supervisory capacity to review the SPF's work in assessing compliance among the Servicers to ensure consistency of work product across all Servicers.

78.     Separate SPFs were assigned to each of the Servicers to assist in the review of each of the Servicers' performance.

79.     Together, the Monitor, PPF, SPF and IRG designed a clearly defined plan of action ("Work Plan") to implement the Servicing Standards and to facilitate and implement an array of proprietary and government Consumer Relief programs, as discussed below.

80.     The Servicer implemented the Work Plan.  The Work Plan described in detail the performances that are to be measured and the procedures by which such measurements will be undertaken.

**EXHIBIT A**

81.     The Work Plans for all of NMSA Servicers were similar and applied the

Servicing Standards in a uniform manner across all Servicers. The NMSA established a general

framework for the formulation of each of the Servicers' work plans, to include:

- The testing methods and agreed procedures to be used in performing test work and computing Servicing Metrics for each quarter;

- The methodology and procedures utilized in reviewing and testing the work performed by the IRGs for both the Servicing Standards and Consumer Relief Requirements; and

- The description of the review process to be used by the IRGs and by the Professional Firms and the mechanisms for ensuring compliance.

82.     The Work Plan for Chase was reviewed and not objected to by the Monitoring

Committee.

83.     The NMSA required that implementation of the Servicing Standards by the

Servicer would be phased in over time and would be in full effect by October 2, 2012.

84.     To test the implementation of the Work Plan, the Monitor established 29 Metrics

to test the application and performance of the required Servicing Standards as they applied to the

entire population of the SOR.   The Work Plan mapped to these Metrics to determine whether the

Servicing Standards were being followed.

85.     Servicer's system of record, or SOR, consists of the Servicer's business records

related to and storage systems pertaining to Servicer's entire mortgage servicing operation and

related business operations.  The SOR is the electronic data entered and maintained on the

Servicer's servicing platforms and includes all of Servicer' s mortgage servicing platforms, home

equity line servicing platforms, and default processing platforms for mortgage loans, including

home equity lines.  The SOR also includes records maintained by either Servicer or third parties

for Servicer.

**EXHIBIT A**

86.     The Servicer provided the Professional Firms with information and explanations on those parts of the SOR that were sufficient for Metrics testing.

87.     The completeness and the integrity of the Servicer's entire SOR was integral to the proper implementation, compliance and testing of the Servicing Standards.

88.     The IRG was required to use the Servicer's SOR to compile the full population of loans related to each metric and then to test a statistically valid sample of each applicable population to determine whether the Servicer had passed the metric and was fully implementing and complying with the particular Servicing Standard tested.

89.     The Professional Firms relied on the IRG to select mortgage loan testing populations from the appropriate sources within the SOR.

90.     As a check and balance to the process, the SPF was then to review the results provided by the IRG and then retest a sub-sample of the IRG's test sample in a process overseen by the PPF and the Monitor.

91.     The results were set forth in Quarterly Reports and included reviews of Work Plans and confirmation of the IRG's selection of testing populations and the IRG's testing of Metrics.

92.     In short, the Monitor, through the chain of the process, relied on the IRG's testing of the metrics pursuant to the terms of the Consent Judgment to determine the Defendant's compliance with the Consent Judgment.

### 3.     <u>Consumer Relief</u>

93.     The second objective of the Consent Judgment, Consumer Relief, required Chase to provide over $4 billion in consumer relief in the form of loan forgiveness and refinancing. Under the Consumer Relief provisions of the Consent Agreement, Chase received "credits"

**EXHIBIT A**

towards its Consumer Relief obligations by forgiving or modifying loans it owns or services under a detailed and defined protocol, including a loan modification application. The process is set forth in Exhibits A, D and D-1 of the Consent Judgment.

94.     The Servicing Standards control the processes that lead to implementation of the Consumer Relief.

95.     A failure to meet the Servicing Standards would prevent proper determination and issuance of Consumer Relief pursuant to the Work Plans as required by the Consent Judgment, therefore would render any Consumer Relief Credits claimed by Chase invalid.

96.     As set forth in Exhibit A, eligible borrowers considered for Consumer Relief were tracked through a process, controlled by the Servicing Standards, which includes publicly available information, a single point of contact, a defined application procedure, and a strict timeline for evaluation, approval and implementation.  All conditions must be met for the relief for which they purported to qualify to merit credits under the NMSA.

97.     Under the terms of the Judgment, Servicer is obligated to provide $4,212,400,000 in Consumer  Relief.  Servicer's  Consumer  Relief  Requirements  were  allocated  as follows:

- $3,675,400,000 of relief to consumers who meet the eligibility requirements in paragraphs 1-8 of Exhibit D; and

- $537,000,000 of refinancing relief to consumers who meet the requirements of paragraph 9 of Exhibit D.

*See* Consent Judgment ¶ 5 at 4.

98.     As reflected in Exhibit D of the Consent Judgment, each of the forms of Consumer Relief had unique eligibility criteria and modification requirements.  In order for the

**EXHIBIT A**

Servicer to receive credit with respect to Consumer Relief activities performed, these eligibility criteria and modification requirements had to be satisfied and validated by the Monitor in accordance with Exhibits D, D-1 and E.  Credits earned could vary based on timing, the form of Consumer Relief, and the transaction type within each form.

99.     Servicer receives additional credit in the amount of 25% above the actual credits earned on the foregoing activities completed and implemented on or before February 28, 2013.

100.     In contrast, the Servicer incurred a debt payment of 125% of its unmet Consumer Relief Requirements if it did not meet all of its Consumer Relief Requirements within three years of March 1, 2012. That payment increased to 140% of its unmet Consumer Relief Requirements in cases in which Servicer also has failed to complete 75% of its total Consumer Relief Requirements within two years of March 1, 2012.

101.     Under the Consent Judgment, a Servicer received credit when it:

- Allowed borrowers to make First Lien and Second Lien Modifications;

- Allowed borrowers to make Second Lien Portfolio Modification;

- Provided borrowers Enhanced Transitional Funds;

- Facilitated Short Sales for borrowers;

- Provided borrowers Deficiency Waivers;

- Provided Forbearance for Unemployed Borrowers; and

- Assisted in Anti-Blight efforts.

*See* Exhibit D at D1 to D7.

**EXHIBIT A**

4. **Implementation of Consumer Relief**

102.    As described above, the Servicer, SPF, PPF and Monitor agreed upon a Work Plan that sets out the testing methods, procedures and methodologies for validation of Servicer's claimed Consumer Relief under Exhibits D and D-1.

103.    The Consumer Relief programs were required to be implemented through an application process that is facilitated and dependent on coordination with the SPOC as defined under the Servicing Standards as per Exhibit A of the Consent Judgment.

104.    The Consumer Relief programs were required to be made available to all eligible borrowers and thus vetted against the entire population of the SOR.

105.    Eligible borrowers applied by submitting a completed loan application and all other required information through the SPOC.

106.    Based on the Servicer's evaluation of a completed loan modification application, the Servicer determined which loan modification programs borrowers were eligible.

107.    Servicers then used the forgiveness or remediation to apply for Consumer Relief based on the structure and status of each mortgage.  The Servicer was entrusted to determine the amount of credit given to itself.  *See* Exhibit D at D1 to D7 and Exhibit D-1 at D1-1 to D1-5.

108.    The IRG performed a Satisfaction Review after Servicer asserted that it had satisfied its Consumer Relief Requirements. The IRG was required to report the results of that work to Monitor through an IRG Assertion.

109.    The IRG's testing of Servicer's Consumer Relief Report required the IRG randomly selecting valid samples from the testing populations based on data provided by Defendant utilizing a simple Excel spreadsheet.  The data reporting did not require providing original documentation.

**EXHIBIT A**

110.    The Professional Firms reviewed the work by the IRG and tested the same sample set per the Work Plan.

111.    The Consent Judgment required that Monitor determine whether Defendant had satisfied the Consumer Relief Requirements and report Monitor's findings to the Court in accordance with the provisions of Sections D.3 through D.5 of Exhibit E.

### D.    The HAMP Program

112.    As stated above, the government relied on the certifications of compliance with HAMP when entering into the Consent Judgment.

113.    To implement and help facilitate the uniform servicing guidelines and provide various government sponsored loan modification programs, Treasury incentivized participating servicers under a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae").

114.    The Treasury established a variety loan of modification programs under the Act to further stabilize the housing market by facilitating first and second lien mortgage loan modifications and extinguishments, providing home price decline protection incentives, encouraging foreclosure alternatives, such as short sales and deeds in lieu of foreclosure, and making other foreclosure prevention services available to the marketplace (collectively, together with the HAMP Services, the "Services").  These programs included;

- The Home Price Decline Protection Incentives (HPDP) initiative.

- The Principal Reduction Alternative (PRA).

- The Home Affordable Unemployment Program (UP).

- The Home Affordable Foreclosure Alternatives Program (HAFA).

28

**EXHIBIT A**

- The Second Lien Modification Program (2MP).

- The FHA-HAMP Program.

- The Treasury/FHA Second-Lien Program (FHA2LP).

- Housing Finance Agency Hardest Hit Fund (HHF).

115.    The SPA provides various types of Servicer Incentive Payments depending on the various governments loan modification programs:  These incentives include;

- Completed one-time Modification Incentives

- Pay-for-Success Incentives

- Full Extinguishment Incentives

- Borrower Incentive Compensation

116.    To participate in HAMP a Servicer was required to register using the HAMP registration form and HAMP Reporting Tool.

117.    Fannie Mae was designated by the Treasury as the financial agent of the United States in connection with the implementation of the Programs.  Its responsibilities were general administration and record keeper for the Programs, standardization certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Programs, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury.

118.    In addition to the Commitment, Chase simultaneously executed and delivered to Fannie Mae numerous schedules describing the various loan modification initiatives ("Services") to be performed by Servicer pursuant to the Agreement ("Service Schedule") which are numbered sequentially as Exhibit A of the Commitment.

**EXHIBIT A**

119.   On March 24, 2010, Henry John Beans, SVP of Default Servicing for Chase registered and executed a Servicer Participation Agreement and Service Schedules (SPA) with the Program Administrator. The SPA governs servicer participation in MHA.

### 1.   Servicing Guidelines

120.   Servicers participation in the MHA program included strictly adhering to the guidelines and procedures issued by the Treasury with respect to the Programs outlined in the Service Schedules ( "Program Guidelines"); and any supplemental documentation, instructions, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies and duties of the Participating Servicers in connection with the Programs outlined in the Service Schedules ("Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation").  The SPA's Servicing Standards in the MHA handbook were intended to be used as the specific basis for granting Consumer Relief in the National Mortgage Settlement Agreement.

121.   Chase was required to perform the Services described in the Financial Instrument ("Financial Instrument"); referenced as Exhibit B of Commitment.  Servicer's represented, warranted, and acknowledged its agreement to fulfill its duties and obligations, with respect to its participation in the Programs and under the Agreement were set forth in the Financial Instrument.

122.   The Commitment between the Government and Chase was $4,532,750,000, which is referred to as the Program Participation Cap.

123.   The Commitment between the Government EMC, with Chase as successor in interest to EMC, was $1,237,510,000.

**EXHIBIT A**

124.     Fannie Mae, in its capacity as the financial agent of the United States, remitted payments described in the Program Documentation to Chase for its successful compliance with the Treasury Directives and subsequent successful modifications of distressed mortgages.

125.     In April 2012, the Department of the Treasury issued guidelines regarding which Consumer Redress Activities may be considered "qualified loss mitigation plan[s]" for purposes of Section 201 of the Helping Families Save Their Homes Act of 2009 ("HFSTHA").  As part of HSFTHA, Congress amended the Truth in Lending Act such that each residential loan modification, deed-in-lieu of foreclosure transaction, short sale, refinancing, or principal reduction transaction identified in the Settlements, including those specific to individual servicer settlements, is a "qualified loss mitigation plan."

126.     In addition to entering into the qualified loss mitigation plans, mortgage servicers were required to satisfy other requirements of HFSTHA, including the following:

- The mortgage must have been originated before May 20, 2009;

- Default on the payment of such mortgage has occurred, is imminent, or is reasonably foreseeable;

- The mortgagor occupies the property securing the mortgage as his or her principal residence;

- The servicer reasonably determines, consistent with these guidelines, that the application of the qualified loss mitigation plan will likely provide an anticipated recovery on the outstanding principal mortgage debt that will exceed the anticipated recovery through foreclosure.

### 2.  <u>Implementation of Servicing Guidelines</u>

127.     Servicers were required to maintain complete and accurate records of, and supporting documentation for, all Services provided in connection with the Programs including, but not limited to, data relating to borrower payments (e.g. principal, interest, taxes, homeowner's insurance), loan modification and extinguishment agreements.  The documentation

**EXHIBIT A**

was relied upon by Fannie Mae when calculating the Purchase Price to be paid by the Treasury for each certified modification.

128.    Servicers certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument were provided annually in the form of a certification (the "Certifications"), beginning on June 1, 2010 and again on June 1of each year thereafter during the term of the SPA.

129.    The requirements of the SPA applied to all mortgage loans Chase serviced, whether it serviced such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities.

130.    Servicers were required to report periodic loan-level data for all transactions related to HAMP using the HAMP Reporting Tool.  Servicers upload data tapes of borrowers loan level data including the type of modification performed.

131.    The HAMP Compensation Matrix provides details on the incentive amount, frequency, timing and conditions required for incentive payments in the form of the official monthly report ("OMR").

132.    The HAMP requirements are now set out in "The Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages" ("Handbook").  The Handbook was intended to provide a consolidated resource for guidance related to the HAMP Program for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages).

**EXHIBIT A**

### 3.   **Compliance With Servicing Guidelines**

133.    The Federal Home Loan Mortgage Corporation ("Freddie Mac") was designated by the Treasury as a financial agent of the United States in its capacity as compliance agent of the Programs and oversight of Servicers performance of the Services and implementation of the Programs.

134.    As Compliance Agent for the elements of HAMP that are addressed in the Handbook, Freddie Mac created an independent division, Making Home Affordable-Compliance (MHA-C) for this purpose. MHA-C conducts independent compliance assessments and servicer reviews to evaluate servicer compliance with the requirements of MHA.  During the course of conducting compliance assessments, it requests such documentation, policies, procedures, loan files, and other materials necessary to conduct the review.

135.    These are similar responsibilities as those of the Monitor pursuant to the NMSA.

136.    Servicers were required to maintain appropriate documentary evidence of their HAMP-related activities, and to provide that documentary evidence upon request to MHA-C. Servicers must maintain required documentation in well-documented servicer system notes or in loan files for all HAMP activities, for a period of seven years from the date of the document collection.  Required general documentation applicable to all MHA Programs.

137.    The Handbook set forth the requirements for documentation required.  It stated that:

> • Servicers are required to maintain appropriate documentary evidence of their MHA-related activities, and to provide that documentary evidence upon request to MHA-C. Servicers must maintain required documentation in well-documented servicer system notes or in loan files for all MHA activities, for a period of seven years from the date of the document collection. Required general documentation applicable to all MHA Programs includes but is not limited to:

**EXHIBIT A**

\*        \*        \*

- The servicer's process for pre-screening non-performing loans against the basic program requirements prior to referring any loan to foreclosure or conducting scheduled foreclosure sales.

- For charged off mortgage loans not considered for HAMP, evidence that the servicer has released the borrower from liability for the debt and provided a copy of the release to the borrower.

- For loans not considered for HAMP or UP due to property condition, evidence that the property securing the mortgage loan is in such poor physical condition that it is uninhabitable or condemned.

\*        \*        \*

- Information relating to the borrower's payment history.

\*        \*        \*

- All policies and procedures related to clearing Dodd-Frank Certification, Borrower Identity and Owner-Occupancy Alerts and for addressing any potential irregularities that may be identified independently by the servicer, including the process the servicer will take to notify the borrower, methods for borrower communication, and the process to verify the accuracy of information disputed by a borrower.

138.    In short, servicers were required to establish and maintain internal controls that provide reasonable assurance that they are in compliance with MHA Program requirements. Further, servicers are required to certify that they have developed and implemented an internal controls program to monitor compliance with applicable consumer protection and fair lending laws, among other things, as described in the SPA.

139.    Servicers review the effectiveness of the internal controls program on a quarterly basis throughout the period covered by the related Certification. Servicers are also required to develop and execute a quality assurance program to assess documented evidence of loan evaluation, loan modification and accounting processes and to confirm adherence to MHA

**EXHIBIT A**

Program requirements. The quality assurance program includes of internal control processes, and should be assessed to ensure that it: (i) includes loans from all potentially relevant categories (ii) is independent from the business lines; (iii) applies appropriate sampling methodology; (iv) reaches appropriate conclusions; (v) distributes reports to appropriate members of management.

140.    Each servicer must develop, document and execute an effective quality assurance ("QA") program that includes independent reviews of each MHA program in which the servicer is participating pursuant to an executed SPA to ensure that the servicer's implementation and execution of such program(s) conforms to the requirements of the SPA and this Handbook.

141.    The QA function must establish an internal QA function that:

- Is independent of the servicer's mortgage related divisions (a/k/a an "Internal Review Group");

- Is comprised of personnel skilled at evaluating and validating the processes, decisions and documentation utilized throughout the implementation of each program;

- Has the appropriate authority, privileges, and knowledge to effectively conduct internal QA reviews;

- Coordinates activities and validates results with other risk and control units within the servicer's organization including, but not limited to, internal audit, compliance, and operational risk;

- Evaluates whether management, at varying levels, is receiving appropriate information on a timely basis which would allow for the identification of process failures, backlogs, or unexpected results or impacts; and

- Evaluates the completeness, accuracy and timeliness of the servicer's response to MHA-C servicer-level review reports.

142.    The established QA function evaluated all components of the servicer's participation in applicable MHA programs, including, but not limited to:

- Availability and responsiveness of servicing personnel to borrower inquiries, questions, and complaints , including Escalated Cases;

- Solicitation and outreach to potentially eligible borrowers;

**EXHIBIT A**

- Determination of borrower eligibility for any MHA program;

- Pre-screening practices exclusion from solicitation due to known eligibility failures or automated programs used to target and identify potentially eligible or qualified individuals for MHA programs;

- Tracking and retention of documentation submitted by borrowers;

- Compliance with the requirements concerning Borrower Notices;

- Reporting of Government Monitoring Data;

- Adherence to prohibitions on referral of loans to foreclosure and conducting of scheduled foreclosure;

- Underwriting, including assessment of imminent default and hardship circumstances, calculation of borrower income, debts and escrow analysis; valuation of property; application of each applicable standard modification waterfall and, if required, the applicable alternative modification waterfall(s);

- Documentation of a request for and approval of a modification (or other loss mitigation option) by the mortgage insurer, investor and/or other interested party in a loss position;

- Timely consideration of alternative loss mitigation options, as well as other foreclosure alternatives when a permanent modification is not appropriate;

- Reconciliation and distribution of incentives payments;

- Maintenance of documentation appropriate to support MHA requirements and decisions; and

- Reporting of MHA data timely and accurately for recording in the HAMP Reporting Tool, including data related to incentive payments, and the process used to map program data from the servicer's loss mitigation system to the HAMP Reporting Tool.

143.     QA reviews must occur at least quarterly and the report must be distributed to the appropriate executives or board-level committees, including senior management independent of the area under review. (a/k/a Monitor Reports).

144.     Results of QA activities required support by adequate work papers and other documentation that is well organized and sufficiently detailed to allow a knowledgeable third

**EXHIBIT A**

party who did not participate in the review to assess the documentation and understand how the conclusions reached in the associated report are substantiated (a/k/a Professional Firms).

### 4. **Relationship Manager A/K/A SPOC**

145.     Servicers that have a Program Participation Cap of $75,000,000 or more as of May 18, 2011, were required to establish and implement a process through which borrowers who potentially are eligible for HAMP are assigned a relationship manager to serve as the borrower's single point of contact.  The relationship manager's functions were similar to the SPOC under the NMSA.

146.     Each servicer was required to have clear and comprehensive internal written policies for identification and solicitation of borrowers who are potentially eligible based on information in the servicer's possession.

147.     The same relationship manager was responsible for managing the borrower relationship throughout the entire delinquency or imminent default resolution process, including any home retention and non-foreclosure liquidation options, and, if the loan was subsequently referred to foreclosure, had to be available to respond to borrower inquiries regarding the status of the foreclosure.

148.     Each such servicer must assign a relationship manager to a delinquent borrower or a borrower who requests consideration under a designation of imminent default immediately upon the successful establishment of Right Party Contact with the borrower and (i) the determination by the servicer of a borrower's potential eligibility for HAMP based on information disclosed during the initial telephone interview or other oral communication, or (ii) upon receipt from the borrower of any completed or partially completed Initial Package (as defined in Section 4 of Chapter II of the Handbook) signed by the borrower.

**EXHIBIT A**

149.   The relationship manager's responsibilities included, without limitation:

- Communicating the options available to the borrower for resolving the delinquency or imminent default, the actions the borrower must take to be considered for those options, the timing requirements for completion of actions by the borrower and the servicer, and the status of the servicer's evaluation of the borrower for those options;

- Coordinating maintenance and tracking of documents provided by the borrower and that the borrower is notified promptly of the need for additional information;

- Being knowledgeable about the borrower's situation and current status in the entire delinquency or imminent default resolution process, including any home retention or non-foreclosure liquidation options; and

- Coordinating with other personnel responsible for ensuring that a borrower who was not eligible for MHA programs be considered for other available proprietary loss mitigation options.

150.   The relationship manager had primary responsibility for coordinating the servicer's actions to resolve the borrower's delinquency or imminent default until all available home retention and non- foreclosure liquidation options had been exhausted and for communicating those actions to the borrower.

151.   A servicer evaluated a borrowers loan modification options after its relationship manager receives the borrowers Initial Package.

The Initial Package included:

- Request for Modification Assistance ("RMA") Form;

- Either (i) IRS Form 4506-T or 4506T-EZ or (ii) a signed copy of the borrower's tax return for the most recent tax year;

- Evidence of income; and

- Dodd-Frank Certification

152.   Servicers could require use of the RMA by all borrowers requesting consideration for HAMP or may use other proprietary financial information forms that are substantially similar in content to the RMA.

**EXHIBIT A**

153.    Included in the RMA was a Hardship Affidavit.  Every borrower seeking a modification, regardless of delinquency status was required to sign a Hardship Affidavit that attests that the borrower is unable to continue making full mortgage payments and describes the type of hardship.

154.    Servicers were required to use HAMP as the first loss mitigation option for each borrower.

155.    Each servicer was required to have written standards for determining imminent default that are consistent with applicable contractual agreements and accounting standards and must apply the standards equally to all borrowers.  The mortgage file and/or servicing system had to contain evidence of this determination.

156.    A servicer had to document in its servicing system and/or mortgage file the basis for its determination that a payment default is imminent and retain all documentation used to reach this conclusion.

157.    Servicers were required to include in their internal quality assurance plan appropriate assessments of relationship manager activities.  These assessments included, but were not limited to, coverage of the following areas:

1.    Timing of communications to borrowers about relationship manager assignment and changes;

2.    Relationship manager access to information, including the borrower's current status in the delinquency or imminent default resolution process, and appropriate training to understand the information;

3.    Relationship manager coordination of document and information flow to and from borrowers;

4.    Relationship manager's access to individuals with the ability to stop foreclosure proceedings;

5.    Organizational structure and staffing levels such that relationship managers can properly carry out responsibilities; and

**EXHIBIT A**

6.   Relationship manager input on the certification prior to foreclosure sale.

158.   Servicers were required to maintain evidence of the control testing activities conducted in order to assess compliance and submit the annual certification.

159.   The SPA required a servicer to submit an annual certification (Annual Certification) as to its continued compliance with, and the truth and accuracy of, the representations and warranties set forth in the SPA on June 1, 2010.  On June 1 of each year thereafter during the term of the SPA, servicers are required to submit Subsequent Certification. The Form of Certification is attached to the original SPA as an exhibit.

160.   If a servicer became aware of any information that would cause them to be unable to certify to the truth and accuracy of the representations and warranties included in the applicable, the servicer was required to notify MHA-C promptly and amend its Certification to include that information.

161.   These included any representations and warranties, or covenants that ceased to be true and correct or any deficiencies in the design or operating effectiveness of the internal controls, including the servicer's quality assurance program.

### 5.   <u>Incentive Payments</u>

162.   Under the HAMP Chase received incentive compensation for each eligible loan modification.  This compensation varied based on the delinquency period of the loan and the continued success of the loan modification effort.  The specific conditions for these incentive payments are set out in Chapter 1, Section 13 of the HAMP Handbook.

**EXHIBIT A**

## V.   CHASE FALSELY CLAIMED COMPLIANCE WITH SERVICING STANDARDS AND CONSUMER RELIEF REQUIREMENTS OF THE CONSENT JUDGMENT AND THE SERVICING REQUIREMENTS OF HAMP

### A.   The Secondary System of Loans: Recovery One

163.   As stated, Chase maintains a hidden secondary set of loans stored outside of its primary SOR.  The secondary set of loans is known as the RCV1 or RCV1-SOR.  The RCV1 – essentially a "back room" operation – was not disclosed or reported to Freddie Mac or the Monitor, and is still only known to those select few working in it within Chase.  This RCV1-SOR is essentially a collection of various federally regulated mortgage loans whose documentation has been corrupted, ignored or allowed to fall into disarray.  It includes various levels of defaulted and charged off loans in both first and second lien positions.  It also includes mortgages that are subject to bankruptcies and post-foreclosure deficiencies.

164.   In short, the RCV1-SOR is a loose collection of once compliant loans that Chase has relegated to the No Man's Land of the bank where these mortgage loans and the associated borrowers are ignored to the point where compliance with any regulatory body is impossible.

165.   The RCV1 population of loans is comprised of loans that Chase has removed from its primary SOR upon a determination that the loans were valueless based on General Acceptable Accounting Principles (GAAP) and other internal methods of bookkeeping.

166.   Upon the determination that a loan is valueless, Chase removes the loan from its balance sheet and adjusts its accounting entry, thus charging off the loan as a bad debt expense.

167.   This "charge off," as it is commonly known, is generally defined as a creditor having little expectation of collection of the debt.  However, the loan's "charge off" status does not relieve a mortgage servicer of its federally required servicing responsibilities.

168.   Chase's policies and procedures regarding loan charge-offs included both first and second lien mortgages.

**EXHIBIT A**

169.    These charge-offs included proprietary bank owned mortgage loans and loans which are serviced on behalf of others, including Residential Mortgage Backed Securities (RMBS) and loans serviced on behalf of Government Sponsored Entities (GSE) such as FNMA, Freddie Mac and the Federal Housing Authority (FHA).

170.    The motivating factors for moving charged off mortgages from the primary SOR to the RCV1-SOR includes the high cost – in terms of both financial and human resources – of properly servicing these federally regulated mortgages that require a single point of contact, timely and accurate information, adequate and knowledgeable staffing, communications with law firms, code enforcement, compliance with all Federal and State laws and other associated activities.

171.    Other motivating factors included servicing contracts between the Servicer and third party investors that did not provide for reimbursement of third party expenses such as those for property preservation, insurance, payment of taxes, costs of foreclosure and disposition fees.

172.    Loans in RCV1 are not serviced as defined by RESPA, Treasury Directives, the Consent Judgment or HAMP.

173.    These loans remain subject to collection actions by collection agencies and the liabilities were not released.

174.    The failure to service the loans in the RCV1 population and the failure to disclose the existence of the RCV1 population is a violation of the applicable Servicing Guidelines of the MHA and Servicing Standards of the NMSA that apply to all loans serviced by Chase.

175.    The existence of RCV1, and the fact that its universe of loans was not included in the compliance statistics reported to Freddie Mac or the Monitor, made it impossible for Chase to be in compliance with the Treasury Directives of the HAMP or the Servicing Standards of the

**EXHIBIT A**

Consent Judgment.  Thus, any assertion by Chase that Chase met those directives and standards represented a false claim.

176.    Throughout the time Chase was creating the Work Plan, Chase knew the existence of the RCV1 as a hidden system of records and that the integrity and accuracy of the data in the RCV1 population was irreparably corrupted and, thus, would fail every Metric for Servicing Standards if provided for Metric testing.

177.    The practice of porting loans out of the primary SOR and into the RCV1-SOR began as early as 2000 when JP Morgan & Company merged with Chase Manhattan Corporation.

178.    Chase's policy of porting charged off home loans into the RCV1-SOR damaged its ability to properly document the loans due to the complete lack of any servicing, and thus a complete corruption of the accuracy and integrity of the records for these mortgage loans.

179.    While the Handbook allowed a Servicer to not consider certain "charged off loans" for HAMP, this carve out itself had specific requirements that Chase did not meet.  The borrowers of the charged off loans that were not considered must have been released from all "liability for the debt" and provided with a copy of the release.  The Servicer was then required to keep copies of those releases in the file and/or system of record.

180.    As the internal documentation entitled "Chase Home Loan Servicing and Default: Daily Agency Recovery Summary" (and as described below) demonstrated, these borrowers, whose loans were in the RCV1 population, were not released of the "liability for the debt" but instead were still the subject of collections efforts by various collection agencies who did not service these federally regulated mortgages. These mortgage loans were therefore subject to all HAMP servicing requirements.

**EXHIBIT A**

181.    The Servicing Standards of the Consent Judgment state that:

> Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format.

*       *       *       *

> Servicer shall take appropriate action to promptly remediate any inaccuracies in borrowers' account information, including:
>
> a.    Correcting the account information;
> b.    Providing cash refunds or account credits; and
> c.    Correcting inaccurate reports to consumer credit reporting agencies.

Exhibit A at A-4, A-6

182.    The HAMP servicing guidelines and the NMSA Servicing Standards required that Servicer's systems to record account information be periodically independently verified for accuracy and completeness by an independent reviewer.

183.    Internal documents of Chase demonstrate that the RCV1 contains mortgage loans whose borrowers have had no contact with Chase since as far back as 2000, more than a decade before such loans were then vetted for potential inclusion within the Consumer Relief portions of the Consent Judgment.

184.    The entire population of loans sold to the Relator's entity Mortgage Resolution came directly from the RCV1-SOR, a small portion of the hundreds of thousands of loans contained within it.

185.    After the transfer to Mortgage Resolution of 3,529 loans from the RCV1-SOR, Chase sent no transfer letters to the borrowers as required by RESPA.  Chase did not provide any complete or accurate servicing information. The reason for this failure is simply explained; Chase did not possess the records necessary to determine whose loan had been transferred.

**EXHIBIT A**

Loans included in the HAMP population sold to Relator included loans which were foreclosed during 2009 and were eligible for NMSA payments.

186.     As recently as March 2014, over 5 years after the completion of the sale, Chase admitted in writing that it was unable to determine which loans it had included in the sale to Mortgage Resolution.

187.     Since the loans contained in the RCV1 population are not maintained or serviced according to any Servicing Standards, they fail to meet any of the requirements set forth in the MHA Commitment and its accompanying HAMP Handbook and the NMSA Consent Agreement, the past standards under prior laws and regulations or the standards set forth in the Dodd-Frank legislation.

188.     Due to Chase's total disregard of the HAMP Handbook, the Consent Judgment Servicing Standards and  servicing requirements under RESPA, none of the borrowers in the RCV1-SOR were considered for eligibility for any proprietary or government loan modification programs offered to borrowers in the primary system of records.  In contrast, none of the borrowers in the primary SOR's were considered for eligibility for Chase's 2nd Lien Extinguishment Program.

189.     Pursuant to the SPA and Consent Judgment, all loan modification programs must be made available to all eligible borrowers.  Since Chase did not make its proprietary or government loan modification programs available to all eligible borrowers, none of the incentive payments paid in accordance with HAMP or Consumer Relief credits claimed in accordance with the NMSA are attributable to such programs cannot be paid or credited.

190.     The Commitment for MHA Incentive Payments and the Consent Judgment Consumer Relief credit are both conditioned on Chase complying with the Treasury Directives

**EXHIBIT A**

pursuant to SPA.  Chase did not report the existence of RCV1 to the United States Government

or the Monitor; therefore, all of its claims for MHA Incentive payments and NMSA Consumer

Relief credits are false.

**B.     The "2nd Lien Extinguishment Program"**

191.    Pursuant to the terms of the Consumer Relief requirements of the Consent

Judgment:

> A write-down of a second lien mortgage will be creditable where such write-down
> facilitates either (a) a first lien modification that involves an occupied Property for
> which the borrower is 30 days delinquent or otherwise at imminent risk of default
> due to the borrower's financial situation; or (b) a second lien modification that
> involves an occupied Property with a second lien which is at least 30 days
> delinquent or otherwise at imminent risk of default due to the borrower's financial
> situation.

Exhibit D, ¶ 2(b) at D-4.

192.    Instead of following the requirements of the Consent Judgment, Chase set out –

in an internal document ("DOJ July 2012") – its own standards used to grant relief for second

liens:

- Loans were primary selected based on aging collectability performance.
  "Arguably, those with the smallest likelihood to pay also represent the
  populations that need relief the most."

- Loans were rank ordered using a variety of factors that included aging,
  balance size and probability of payment.

- Loans were then segmented and binned into 5 distinct groups, each
  offering its own benefits and opportunity cost collections.

- Each bin contains an estimated lifetime recoveries sum that was used to
  determine the impacts to the line of business and 2012 recovery budget.

193.    Using these criteria, Chase tasked its Mortgage Banking Recovery with

identifying second mortgage home loans for DOJ credit in the amount of Three Hundred,

Ninety-Seven Million Dollars ($397,000,000.00).  The credit amounts assumed:

**EXHIBIT A**

- Ten (10%) percent credit for every dollar forgiven;

- Twenty-Five (25%) percent additional credit (12.5% total credit) for all dollars forgiven by the end of year 2012; and

- Three Billion Dollars ($3,000,000,000.00) in second lien balances needed to be identified for forgiveness to accomplish the task.

194.     Proper application of the criteria for credits under the Consent Judgment would have excluded from eligibility for credit any of these loans selected by Chase.  Instead, Chase simply "forgave" loans that did not qualify for credit under the Consent Judgment and then sought credit under the Consent Judgment for those loans' forgiveness.

195.     Instead of applying the specific criteria set forth in the MHA Handbook and Consent Judgment, Chase substituted its own self-serving algorithm, referencing criteria such as the number of months since charge-off, last payment date and age of loan to determine the least valuable loans in its portfolio.

196.     After running its queries through the RCV1 population, Chase identified 38,407 potential loans for the program.  Among those loans were:

- There were 93 second mortgage loans totaling $5,653,705.00 in principal balance that were more than 2 years since claims were filed under various legal issues (i.e. probate, SCRA and FEMA);

- There were 780 second mortgage loans totaling $38,370,019.00 in principal balance that were behind first loans that themselves were already identified for the "Alternative Foreclosure Program." (As described below);

- There were 4901 second mortgage loans totaling $506,522,752.00 in principal balance that were one year charged off and had balances of greater than $50,000.00;

- There were 8685 second mortgage loans totaling $1,291,337,758.00 in principal balance that were charged off more than 3 years prior and had balances of greater than $75,000;

**EXHIBIT A**

- There were 2815 second mortgage loans totaling $229,049,085.00 in principal balance that were discharged chapter 7 bankruptcies with charge off dates older than December 2008;

- There were 2073 second mortgage loans totaling $351,963,169.00 in principal balance that were discharged chapter 7 bankruptcies with charge off dates between January and December 2009 and with balances greater than $100,000;

- There were 361 second mortgage loans totaling $20,321,941.00 in principal balance that were active probate cases with charge off dates older than 2 years; and

- The last group was 11,329 second mortgage loans totaling $644,541,049.00 in principal balance that were termed "inactive".

197.     In several Chase internal documents, Chase specifically references excluding from the loans considered for Consumer Relief those loans that could provide a larger monetary benefit to Chase than the value of the Consumer Relief credit would have.  Examples of loans not included are:

- Those loans whose properties were MLS listed;

- Those loans that had been charged off in the last six months; and

- Those loans whose borrowers were making payments in the last year.

198.     In short, Chase specifically excluded those homeowners for whom the Consumer Relief would have meant the most.

199.     To implement this scheme, on or about September 13, 2012, Chase mailed 33,456 letters to borrowers with charged off second mortgage loans whose loans were stored within the RCV1-SOR.

200.     Each letter contained the same basic language and stated in part:

We are writing to let you know that we are cancelling the amount you owe Chase on the loan referenced below, totaling [X] amount, ***as a result of the recent mortgage servicing settlement reached with the states and federal government***.

**EXHIBIT A**

> This means you will owe nothing more on the loan and your debt will be
> cancelled. You don't need to sign or return anything for this to happen.

(Emphasis added.)

201.    Each letter included the: 1) name of the borrower; 2) amount left on the loan; and

3) account number assigned to the mortgage.  Each letter was "robo-signed" by Patrick Boyle,

Vice President.

202.    The loans chosen for this mailing were selected based solely on internal queries of

the RCV1-SOR.  In other words, they were loans from the backroom with the least possibility of

collection, no servicing history and not in compliance with the objectives of the Consent

Judgment.

203.    Among these loans were loans sold to the Relator's entities.

204.    The letters were the result of efforts by Chase to minimize the cost of the NMSA

credits and to maximize its own profitability from the implementation of the Consumer Relief by

circumventing the application process and ignoring the MHA Servicing Guidelines and the

NMSA Servicing Standards.

205.    Using historical data from past performance, Chase calculated that by applying

the Consumer Relief in the manner described above, it converted this pool of approximately $3

billion in loans, whose lifetime collectability was only $4.2 million – a collection ratio calculated

by Chase to be 0.14 percent – into credits equal to $397 million dollars.  In a single move –

based on this calculation – Chase increased its rate of return on these defaulted loans by nearly

100 times.

206.    Ultimately, Chase claimed credits of $308,672,792 for second lien modifications.

207.    Because all of the loans used to claim credits for second lien consumer relief

came from RCV1 which were not serviced according to the MHA Handbook or NMSA

**EXHIBIT A**

Servicing Standards and because they were not included in the primary SOR and were selected according to the criteria set out in the Consumer relief requirements, all claims for credits for second lien consumer relief were false.

208.   As the internal Chase documents reveal, the bulk of these borrowers were no longer living in the homes originally securing their loans.

209.   Additionally, liens on a large percentage of these loans were no longer valid due to foreclosure on the homes by first lien mortgage holders.  In many cases, Chase itself owned or was servicing the first lien that was foreclosed, wiping out the second lien that Chase was attempting to use as a credit.

210.   Chase's attempt to take credit for the forgiveness of these loans undermined major objectives of the Consent Judgment.  As plainly stated on the first page of Exhibit A, the major objective was retained homeownership and prevention of community blight.

### 1.      The RCV1-SOR Collection Agencies

211.   Chase established policies and procedures for those mortgage loans in the RCV1-SOR that included the rapid transfer of these borrowers' accounts through several levels of third party collections activity, from primary agencies through quinary agencies, based on their collection success.

212.   Through the use of these serial collection agencies, Chase increased the profitability of these defaulted home loans and lowered costs on the funds collected because these agencies were compensated based on a percentage collected.

213.   Because the collection agencies did not service the federally regulated mortgage loans, the RCV1 loan portfolio was not capable of being serviced as required by the MHA Program and NMSA Consent Judgment.

**EXHIBIT A**

214.    The use of collection agencies was reserved for the worst portion of the RCV1-SOR.  It was in essence a "back closet" located in the "back room".

215.    These collection agencies are unlicensed, unregulated and do not possess the servicing platforms to provide any mortgage servicing functions.   This institutional unwillingness to service loans properly placed Chase in violation of its legal obligations regarding the servicing of hundreds of thousands of mortgage loans.

216.    Six months after the deadline for full implementation of the Servicing Standards of the Consent Judgment, and years after Chase certified continued compliance with the Commitment, an internal Chase document from April 2013 entitled "Chase Home Loan Servicing and Default: Daily Agency Recovery Summary" stated Chase had 160,309 loans with a total aggregate outstanding balance of $12,296,131,671.00 assigned to collection agencies for servicing.

217.    These loans included 130,204 bank-owned loans.

218.    These loans also included 30,105 service-only loans that were under contractual servicing agreements, such as mortgage backed security loans.

219.    This pool of 160,309 loans is but a portion of the total population included in the RCV1.  Based on information and belief the total number of such loans exceeds 500,000.

220.    This serial use of collection agencies added to the data corruption already inherent in the design of the RCV1.  The data was incomplete, inconsistent and, in many places, irreparably corrupted by the collection agencies' involvement in the management of the data.

**EXHIBIT A**

### 2. "DOJ: Default: Recovery 2nd Lien Credit Initiative, Financial Impact Overview, November 14, 2012"

221.     In an internal document entitled "DOJ: Default: Recovery 2nd Lien Credit Initiative, Financial Impact Overview, November 14, 2012" ("DOJ November 2012"), Chase began by admitting to itself that the data from the RCV1 pool was "challenged."

222.     The DOJ November 2012 document is broken down between identifying issues from the first Chase mailer and identifying loans to be included in the second mailer.

223.     Chase went on to state that the mailing that it had sent out on September 13, 2012 had encountered issues, including "confusion over letters sent (bankruptcy and unsecured customers)" and that "[r]emediation efforts are still in progress."  Those remediation efforts primarily addressed the issues caused by mailing borrowers of non-Chase owned loans.

224.     Among the non-Chase owned loans were several loans owned by the Relator's entities.

225.     The DOJ November 2012 document also set forth the series of admissions as to the failings:

Data issues resulted in four high level gaps:

- Lien status issues exist within the population;

- Inactive loans included in the pool did not include updated bankruptcy information;

- Loans previously sold to investors lacked proper coding in Recovery One system, causing these loans to be included in the pool in error; and

- Loans previously settled as part of the "repurchase/make whole" process were not identified in Recovery One system, causing these loans to be included in the pool in error.

**EXHIBIT A**

226.     The document acknowledged that 108 loans were owned by 21 different investors, with 83 out of 108 loans (78 percent) purchased by 8 investors.  Relator owns 3 of the eight identified companies.

227.     Within the pool of loans to which Chase sent the first mailing were several hundred active bankruptcies of various types and more than 12,000 discharged bankruptcies, in which the borrower no longer owed the debt.

228.     The DOJ November 2012 document also stated that the "[m]ethodology would be to tier older, never paid loans as first into the 2nd mailer pools."

229.     This rationale sought to remove the necessity of borrowers applying for the credits that would fulfill the objective of keeping people in their homes.  Instead, Chase weighed the financial benefits to its own program higher than meeting the objectives of the Consent Agreement.

230.     In evaluating the loans, Chase designed the searches to focus on various criteria that would rid Chase of loans that had no possibility of future payments and that had low life time collectability, thus increasing Chase's profitability and focusing on borrowers who were more likely not to need the benefit because their debt was uncollectable.

231.     Chase had had no contact with these borrowers in over ten years and had no knowledge of the status of the loans.  Due to the corruption of the data in the RCV1 population, Chase had no information about these loans and could not have applied the required criteria under the Consent Judgment.

232.     Chase, in complete disregard for the requirements of the MHA Commitment and the NMSA Consent Judgment, made no effort to apply the criteria to any of the borrowers to whom they sent debt forgiveness letters.

53

**EXHIBIT A**

233.     Chase followed up this first mailing with a second mailing of approximately 10,000 loans, which were selected from a pool of 57,860 loans.

### 3.     "DOJ: Default: Recovery 2nd Lien Credit Initiative, 3rd Mailing Portfolio Selection, January 23, 2013"

234.     In an internal document entitled "DOJ: Default: Recovery 2nd Lien Credit Initiative, 3rd Mailing Portfolio Selection, January 23, 2013" ("DOJ January 2013"), reviewed "21,985 bankruptcy and non-bankruptcy loans are the base population for the next mailing."

235.     Based on this review, Chase identified approximately 8,000 loans for the third mailing from the pool of 21,985 loans.

### C.     Chase Mails Thousands of Letters from their RCV1-SOR

236.     As noted, the Consumer Relief requirements of the Consent Judgment provided:

> A write-down of a second lien mortgage will be creditable where such write-down facilitates either (a) a first lien modification that involves an occupied Property for which the borrower is 30 days delinquent or otherwise at imminent risk of default due to the borrower's financial situation; or (b) a second lien modification that involves an occupied Property with a second lien which is at least 30 days delinquent or otherwise at imminent risk of default due to the borrower's financial situation.

Exhibit D, ¶ 2(b) at D-4.

237.     Aside from the obvious requirements set forth in ¶ 2(b) of Exhibit D, that the property be occupied, which could only be determined through communications with the borrower, the loan forgiveness letters sent by Chase failed to meet the requirements for receiving Consumer Relief credits under the Consent Judgment for several other reasons.

238.     Chase provided forgiveness letters to individuals on a second lien mortgage, where the first lien with Chase was current at the time the letters were sent.  No modification had occurred and therefore the second liens were not eligible to be forgiven for credit under the terms of the Consent Judgment.

**EXHIBIT A**

239.     Chase also provided forgiveness letters to individuals on their second lien despite the fact that the borrower's first lien was current, which was serviced by lenders other than Chase and thus forgiveness of the mortgage was not eligible to qualify for credit under the terms of the Consent Judgment.

240.     Similarly, Chase provided forgiveness letters to mortgages with first liens that had not been modified but rather were delinquent, thus making them ineligible for credit if forgiven under the terms of the Consent Judgment.

241.     Also, numerous mortgages for which Chase provided debt forgiveness letters had been recently foreclosed upon by Fannie Mae.  This indicates that the underlying first lien mortgages were not recently modified and thus could not qualify for credit under the Consumer Relief Matrix.

242.     Chase also provided debt forgiveness letters to individuals who had already paid off the mortgage loan.

243.     Chase also sent debt forgiveness letters to borrowers who had sold their interest in the property.

244.     In addition to the issues with their own borrowers, Chase also caused issues with other lenders' borrowers when recipients of the September 13, 2012 mailing included borrowers for whom Chase neither owned nor serviced their mortgages.

245.     These Recipients included borrowers whose loans were owned and serviced by Relator's entities, S&A and 1st Fidelity.

246.     Between 2005 and 2010, S&A entered into several agreements to purchase non-performing first and second mortgage loans from Chase.

**EXHIBIT A**

247.    Between 2009 and 2010 1ˢᵗ Fidelity entered into several agreements to purchase non-performing closed end first and second mortgage loans from Chase.

248.    As a result, starting in September 2012, after receiving Chase's baseless forgiveness letters, borrowers informed the Relator that they would no longer be making payments on their mortgages.  For example, one borrower informed the Relator that he would no longer be making the $520 monthly payments he had been making since October 2009.

249.    Another borrower engaged legal counsel and stated they would call the attorney general if the loan was not released pursuant to the terms of the fraudulent Chase letter he received.

250.    Each of the letters sent by Chase states that forgiveness of the loan at issue is "as a result of the recent mortgage servicing settlement reached with the states and federal government."

251.    The Relator's entities' loans were not the only ineligible loans whose borrowers received these letters.

252.    Chase sent debt forgiveness letters to the borrowers of at least 21 note-sale buyers, like Realtor, who had purchased these mortgage loans from Chase in the past.  Some of these purchases had occurred as long ago as 2003.

253.    In total Chase reviewed over 100,000 charged-off, second loans for inclusion in the three mailings done for the Consumer Relief initiative.  During this same period, Chase reported to the Monitor that it had only 3,736 second mortgage loans that were 180+ days delinquent for its servicing metric.  Chase later reported on or about December 31, 2012 that it had 3,406 second mortgage loans that were 180+ days delinquent.

**EXHIBIT A**

254.     Chase sent Relator several data tapes containing over 25,000 loans for his review and opinion based on his experience as a note-buyer.  It later became apparent that Chase personnel were seeking help to determine whether such loans could be included in the second lien extinguishment program.

255.     Said data tapes included many of Relator's own loans.  Relator warned Chase personnel in writing that these loans were owned by the Relator and should be removed from their lists.

256.     During the period where the IRG group for Chase reported servicing compliance to the Monitor, the amounts reported were a bare fraction of the total loans reviewed for inclusion in their population for Consumer Relief credit under their proprietary second lien extinguishment program.

257.     Chase purposely did not report its RCV1 SOR to the Monitor and Professional Firms when asserting compliance with Servicing Standards Metrics, while at the same time it asserted that loans in the RCV1 SOR qualified for consumer credit.  Essentially, Chase used its primary SOR to test compliance for its Servicing Standards while using a small portion of its secondary hidden RCV1 SOR for its consumer credits related to loan forgiveness.

**D.     Chase Admits to Misconduct Utilizing 2nd Lien Forgiveness Letters**

258.     In response to Defendant's baseless forgiveness letters, Relator emailed Omar Kassem, Vice President and Portfolio Manager for Mortgage Banking at Chase.  Relator explained that borrowers, whose mortgage notes he held, received loan forgiveness letters, all signed by Patrick Boyle as Vice President of Chase.

259.     Significantly, Chase does not dispute that it had forgiven loans it did not own. Rather than correcting the misrepresentations to borrowers, Chase offered to buy back the mortgages it sold to S&A and 1st Fidelity.

**EXHIBIT A**

260.    On December 5, 2012 Chase sent the Relator two letters offering to buy back over 20 mortgages which were improperly forgiven.

261.    These letters stated in relevant part:

> *As part of the recent mortgage servicing settlement reached with the states and federal government*, JPMorgan Chase Bank, N.A. (Chase) elected to participate in a second lien extinguishing program.  Because of this, we sent letters to certain customers notifying them that we were extinguishing their debt with Chase and releasing the associated lien.  *However, we subsequently found that several of your customers received this letter in error because of an incorrect coding entry.*  These customers and their respective loans were identified and are appended to this letter and referenced as "Exhibit A." We apologize for any inconvenience this may have caused you.

(Emphasis added.)

262.    The letter regarding the loans sold to S&A acknowledged that Chase had inaccurately and without authorization sent the S&A borrowers the debt forgiveness letter.

263.    The letter regarding the loans sold to 1st Fidelity acknowledged that Chase had inaccurately and without authorization sent the 1st Fidelity borrowers the debt forgiveness letter.

264.    Chase claimed that the erroneous letters were caused by a "coding error".

265.    The forgiveness letters were sent by Chase in an effort to circumvent the Consent Judgment.  Relator's borrowers were pulled into this scheme due to the complete corruption of the data within the RCV1 population from which Chase obtained the names and loans for their mailings.

266.    Chase's pattern of forgiving loans it no longer owns or services was not only limited to those loans it sold to the Relator.  Through Relator's extensive experience and relationship with Chase, he was provided a list of mortgages for which Chase provided loan forgiveness letters.  Through Relator's investigation it became apparent that many of the

**EXHIBIT A**

mortgages were forgiven despite the fact that Chase had sold, or otherwise no longer maintained ownership or servicing rights to the loans.

267.    After months of negotiation between Chase and the Relator, the Relator sold back some of the loans that were erroneously sent loan forgiveness letters.  However the Relator declined to sell back several of the loans.

268.    In an attempt to conceal Chase's fraudulent scheme, and only after Relator refused to sell back, and only after borrowers had filed complaints with various enforcement agencies, Chase agreed to repurchase certain affected loans at the full balance owed on each mortgage.

269.    Chase stated that other loans were not a "big enough problem" to resolve and ignored Relator's request for resolution on the matters.

270.    Chase is under an affirmative obligation to report any failure to meet its metrics to the Monitor and to the MHA-C.  Chase did not report that it sent loan forgiveness letters to borrowers whose loans Chase did not own.

271.    In an internal email sent by Jason Oquendo, Project Manager (Second Lien Extinguishment Program), on December 2, 2013, he describes the process by which Chase notates accounts that have been chosen for the 2nd Lien Extinguishment Program.  The email describes a "DCL" note code indicating an intact lien exists where RECOVERY can take DOJ credit.  He refers to an internal communication:  "ARD text confirmed DOJ eligible from 2nd mailer – process account for DOJ NonBK Process".  He then describes the final coding process.  "Then append a DOJ note code to all accounts to move them through the RCV1/POTS interface to process the lien releases."

**EXHIBIT A**

272.    This email clearly acknowledges the existence of the RCV1 System of Records, which he refers to as "interface".  He then describes the process for sending 1099-Cs, which he wants backdated to prior year.  "Finally move the accounts to the "R1099C" queue and back date the "date assigned" to 12/31/2012.

273.    Relator obtained a partial list of borrowers that received IRS Form 1099C in connection with debt forgiveness.   These were specifically coded as "R1099C".

274.    The documentation of the 1099C forms demonstrates Chase's intention to use these forgiven mortgages to earn credits under the Consent Judgment.

275.    Numerous other mortgages listed on R1099C debt forgiveness list had already been foreclosed by Chase or another company and therefore precluded Chase from applying for any consumer credit.

276.    Almost the entire population of loans, for which Chase asserted Consumer Relief Credit under the 2nd Lien Extinguishment program, is identified in the "CLTR" data field on the RCV1 "back-room" SOR.

   E.    **Chase's "Alternative Foreclosure Program" Violates
          the Requirements of the Servicing Standards**

277.    Chase maintains a policy of not foreclosing on first lien loans that are secured by properties located in blighted neighborhoods and where the underlying property has little or no value.  These loans are least likely to be repaid, represent the highest reputational risk and the highest servicing costs to Chase.  Instead, Chase seeks another path aimed at circumventing the issues related to these properties.  This internal Chase policy is known as the "Alternative Foreclosure Program" ("AFP").

**EXHIBIT A**

278.    The AFP process is an ongoing effort to conceal legal violations, relieve Chase of liabilities, mitigate losses and circumvent the objectives and requirements of the Consent Judgment to prevent community blight.

279.    Under Chase's AFP, thousands of mortgage loans have been, and continue to be, quietly released, with no notice to any interested parties, no documentation or correspondence with homeowners or others, and no outside indication of any type to alert interested parties of this action.

280.    Chase simply files releases of liens to appear as if the borrower had paid off the underlying loan.

281.    These lien releases are not individually reviewed by Chase to ensure that Chase actually owned or serviced the mortgages or to ensure the accuracy and integrity of the borrower's information but instead were "robo-signed"; many of which signed by Amy Knight, who identified herself as a Vice President at J.P. Morgan Chase Bank and others signed by Ingrid Whitty and Arocla Whitty who identified themselves as Vice President and Asst. Secretary respectively of JPMorgan Chase Bank N.A, Successor In Interest By Purchase From The FDIC As Receiver of Washington Mutual Bank, FA F/K/A Washington Mutual Home Loans, Inc, Successor By Merger to Homeside Lending, Inc.  All of the lien releases indicated that "the instrument was signed on behalf of its corporation, by authority from its board of directors."

282.    Prior to the implementation of the AFP, the underlying loans remained in collection as unsecured debts despite their status as federally related loans with all related attributes.

283.    Chase applied the AFP to valueless RCV1 first mortgage loans, which it had not serviced in accordance with law, thus creating and enhancing community blight.

**EXHIBIT A**

284.    The use of the RCV1-SOR population in the application of the AFP meant that, once again, Chase's malfeasance affected loans that it neither owned nor serviced.

285.    Relator's investigation has revealed that Chase's practices under AFP violated the terms of the anti-blight requirements of the Consent Judgment.  As a result, Chase has rapidly enhanced blight, rather than limited it, in many of the country's hardest hit areas, including areas within Detroit, Michigan, St. Louis, and St. Louis County, Missouri. This directly violated government policies and publications, such as Fannie Mae's Property Preservation Matrix and Reference Guide, that mandated that throughout the default process, servicers are responsible for performing all property maintenance functions to ensure that the condition and appearance of properties are maintained.

286.    Pursuant to the terms of the Consent Judgment, servicers such as Chase were required to take certain measures to deter community blight.  Specifically Exhibit states:

1.  Servicer shall develop and implement policies and procedures to ensure that Real Estate Owned by the Servicer ("REO") properties do not become blighted;

2.  Servicer shall develop and implement policies and procedures to enhance participation and coordination with state and local land bank programs, neighborhood stabilization programs, nonprofit redevelopment programs, and other anti-blight programs, including those that facilitate discount sale or donation of low-value REO properties so that they can be demolished or salvaged for productive use;

3.  As indicated in I.A.18, Servicer shall (a) inform borrower that if the borrower continues to occupy the property, he or she has responsibility to maintain the property, and an obligation to continue to pay taxes owed, until a sale or other title transfer action occurs; and (b) request that if the borrower wishes to abandon the property, he or she contact Servicer to discuss alternatives to foreclosure under which borrower can surrender the property to Servicer in exchange for compensation; and

**EXHIBIT A**

4. When the Servicer makes a determination not to pursue foreclosure action on a property with respect to a first lien mortgage loan, Servicer shall:

    a. Notify the borrower of Servicer's decision to release the lien and not pursue foreclosure, and inform borrower about his or her right to occupy the property until a sale or other title transfer action occurs; and

    b. Notify local authorities, such as tax authorities, courts, or code enforcement departments, when Servicer decides to release the lien and not pursue foreclosure.

Exhibit A at A-40.

287. Because of Chase's policies and procedure in implementing the AFP, Chase merely released liens in many of the hardest hit areas rather than foreclosing. Despite electing not to pursue foreclosure, Chase has failed to abide by the Consent Judgment's mandate requiring a Servicer who decides not to pursue foreclosure to notify both the borrower and local authorities so that the property can be adequately maintained and not contribute to community blight. Additionally, Chase continues to pursue the underlying debt for those loans in the AFP which require them to be accounted for through HAMP in the primary SOR.

## VI.   <u>DOCUMENTATION CONTAINING FALSE CLAIMS</u>

288. Pursuant to the Consent Judgment, the IRG for each of the Servicers are required to submit quarterly reports to Monitor concerning their adherence to the Servicing Standards and progress towards their Consumer Relief Requirements. The Monitor is then required to submit reports regarding the Servicers compliance to the U.S. District Court for the District of Columbia. The reports submitted to the Monitor and subsequently submitted from the Monitor to the Court contained False Claims.

289. On June 18, 2013, Monitor submitted to the Court as Document 72, "Monitor's Report Regarding Compliance By Defendants J.P. Morgan Chase & Company and J.P. Morgan

**EXHIBIT A**

Chase Bank, N.A. for The Measurement Periods Ending September 30, 2012 and December 31, 2012." This Report identified a Quarterly Report submitted by the IRG to the Monitor on November 14, 2012. This Quarterly Report contained False Claims.

290.    On October 16, 2013, Monitor submitted to the Court as Document 106, "Monitors Interim Consumer Relief Report Regarding Defendant J.P. Morgan Chase Bank, N.A." On February 14, 2013, after completing a Satisfaction Review, the IRG submitted to the Monitor an IRG Assertion setting out the amount of Consumer Relief earned from March 1, 2012 through December 31, 2012 dated September 11, 2013, signed by Nicole L. Hoboppl, IRG Manager. This IRG Assertion was filed with the Monitor's Report as Document 106-B. The IRG Assertion contained false claims.

291.    On December 4, 2013, Monitor submitted to the Court as Document 119, "Monitor's Report Regarding Compliance By Defendants J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.  For The Measurement Periods Ending March 31, 2013 and June 30, 2013." This Report identified Quarterly Reports submitted by the IRG to the Monitor on May 15, 2013 and August 14, 2013. Each of these Quarterly Reports contained False Claims.

292.    On March 18, 2014, Monitor submitted to the Court as Document 143, "Monitors Final Consumer Relief Report Regarding Defendant J.P. Morgan Chase Bank, N.A." Filed with the Monitor's Report as Document 143-2 was an IRG Assertion setting out the amount of Consumer Relief earned from January 1, 2013 through April 15, 2013. The IRG Assertion was dated January 6, 2014 and signed by Nicole L. Hoboppl,  IRG Manager. The IRG Assertion contained false claims.

293.    On May 14, 2014, Monitor submitted to the Court as Document 160, "Monitor's Report Regarding Compliance By Defendants J.P. Morgan Chase & Company and J.P. Morgan

**EXHIBIT A**

Chase Bank, N.A.   For The Measurement Periods Ending September 30, 2013 and December 31, 2014."  This Report identified compliance reports submitted by the IRG to the Monitor on November 14, 2013 and February 14, 2014.   Each of these compliance reports contained False Claims.

294.    On September 10, 2010, Chase filed a Certification of compliance with its "Commitment to Purchase Financial Instrument and Servicer Participation Agreement."  This Certification contained False Claims.

295.    On September 10, 2010, Chase's subsidiary, EMC, filed a Certification of compliance with its "Commitment to Purchase Financial Instrument and Servicer Participation Agreement."  This Certification contained False Claims.

## VII.    CAUSES OF ACTION

### COUNT I
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Against All Defendants

296.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

297.    The Relator seeks relief against Chase under Section 3729(a)(1)(G) of the FCA, 31 U.S.C. § 3729(a)(1)(G).

298.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the United States, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.  These false

**EXHIBIT A**

statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and Consumer Relief Requirements of the Consent Judgment.

299.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the government required by the Consent Judgment.

300.     By reason of the forgoing, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A) & (B)
### Against All Defendants

301.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

302.     The Relator seeks relief against Chase under Section 3729(a)(1)(A) & (B) of the FCA, 31 U.S.C. § 3729(a)(1)(A) & (B).

303.     As set forth above, Chase knowingly presented, or causes to be presented, a false or fraudulent claim for payment or approval and knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.  These false claims and false records were made in the form of certifications of compliance with its "Commitment to Purchase Financial Instrument and Servicer Participation Agreement" and records and documents used to support those certifications.

304.     Chase's use of false reports and certifications enabled it to obtain payments from the Government for which it was not entitled.

66

**EXHIBIT A**

305.    By reason of the forgoing, the United States has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

### COUNT III
### California False Claims Act
### Cal. Govt. Code § 12651 (a)(7)
### Against All Defendants

306.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

307.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Govt. Code § 12650 *et seq.*

308.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of California, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of California. These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

309.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of California required by the Consent Judgment.

310.    By reason of the payments and approvals, the State of California has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

## COUNT IV
**Delaware False Claims Act**
**Del. Code Ann. Tit. 6, § 1201(a)(7)**
**Against All Defendants**

311.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

312.    This is a claim for treble damages and civil penalties under the Delaware False Claims Act, Del. Code Ann. Tit. 6, § 1201 *et seq.*

313.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Delaware, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of North Carolina.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

314.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Delaware required by the Consent Judgment.

315.    By reason of the payments and approvals, the State of Delaware has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

## COUNT V
**District of Columbia False Claims Act**
**D.C. Code Ann. § 2-308.14 (a)(7)**
**Against All Defendants**

316.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

317.     This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code Ann. § 2-308.14 *et seq.*

318.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the District of Columbia, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

319.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the District of Columbia required by the Consent Judgment.

320.     By reason of the payments and approvals, the District of Columbia has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

<u>**COUNT VI**</u>
**Florida False Claims Act**
**Fla. Stat. Ann. § 68.081 (2)(g)**
**Against All Defendants**

321.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

322.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*

323.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Florida, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Florida.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

324.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Florida required by the Consent Judgment.

325.    By reason of the payments and approvals, the State of Florida has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

<u>COUNT VII</u>
**Georgia False Claims Act**
**Georgia (O.C.G.A. § 23-3-121(7)**
**Against All Defendants**

326.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

327.     This is a claim for treble damages and civil penalties under the Georgia False Claims Act, O.C.G.A. §§ 23-3-120 to 127.

328.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Georgia, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Georgia.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

329.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Georgia required by the Consent Judgment.

330.     By reason of the payments and approvals, the State of Georgia has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT VIII**
**Hawaii False Claims Act**
**Haw. Rev. Stat. § 661-21 (a)(6)**
**Against All Defendants**

331.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

332.    This is a claim for treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

333.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Hawaii, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Hawaii.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

334.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Hawaii required by the Consent Judgment.

335.    By reason of the payments and approvals, the State of Hawaii has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

<u>COUNT IX</u>
**Illinois Whistleblower Reward and Protection Act**
**740 Ill. Comp. Stat. § 175/3(a)(1)(G)**
**Against All Defendants**

336.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

337.     This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*

338.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Illinois, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Illinois.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

339.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Illinois required by the Consent Judgment.

340.     By reason of the payments and approvals, the State of Illinois has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT X**
**Indiana False Claims and Whistleblower Protection Act**
**Ind. Code § 5-11-5.5-2(b)(6)**
**Against All Defendants**

341.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

342.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

343.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Indiana, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Indiana.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

344.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Indiana required by the Consent Judgment.

345.     By reason of the payments and approvals, the State of Indiana has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XI**
**Iowa False Claims Act**
**Iowa Code § 685.2.2.g**
**Against All Defendants**

346.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

347.     This is a claim for treble damages and civil penalties under the Iowa False Claims and Whistleblower Protection Act, Iowa Code § 685.

348.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Iowa, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Iowa.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

349.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Iowa required by the Consent Judgment.

350.     By reason of the payments and approvals, the State of Iowa has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

## COUNT XII
**Massachusetts False Claims Act**
**Mass. Ann. Laws Ch. 12, § (9)**
**Against All Defendants**

351.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

352.     This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act, Mass. Ann. Laws Ch. 12, §§ 5(B)(1)-(B)(4), 5(B)(8).

353.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the Commonwealth of Massachusetts, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Commonwealth of Massachusetts.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

354.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the Commonwealth of Massachusetts required by the Consent Judgment.

355.     By reason of the payments and approvals, the Commonwealth of Massachusetts has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XIII**
**Minnesota False Claims Act**
**Minn. Stat. § 15C.02(a)(7)**
**Against All Defendants**

356.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

357.    This is a claim for treble damages and civil penalties under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*

358.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Minnesota, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Minnesota. These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

359.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Minnesota required by the Consent Judgment.

360.    By reason of the payments and approvals, the State of Minnesota has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XIV**
**Montana False Claims Act**
**Mont. Code Ann. § 17-8-403(1)(g)**
**Against All Defendants**

361.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

362.    This is a claim for treble damages and civil penalties under the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

363.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Montana, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Montana. These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

364.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Montana required by the Consent Judgment.

365.    By reason of the payments and approvals, the State of Montana has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XV**
**Nevada False Claims Act**
**Nev. Rev. Stat. § 357.040 (1)(g)**
**Against All Defendants**

366.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

367.     This is a claim for treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*

368.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Nevada, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Nevada.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

369.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Nevada required by the Consent Judgment.

370.     By reason of the payments and approvals, the State of Nevada has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XVI**
**New Hampshire False Claims Act**
**N.H. Rev. Stat. § 167:61-b I. (e)**
**Against All Defendants**

371.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

372.    This is a claim for treble damages and civil penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. § 167:61-b I. (e) *et seq.*

373.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of New Hampshire, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Hampshire.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

374.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of New Hampshire required by the Consent Judgment.

375.    By reason of the payments and approvals, the State of New Hampshire has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

## COUNT XVII
### New Jersey False Claims Act
### N.J. Stat. § 2A:32 C-3 (g)
### Against All Defendants

376.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

377.     This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. § 2A:32 C-1 *et seq.*

378.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of New Jersey, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Jersey.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

379.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of New Jersey required by the Consent Judgment.

380.     By reason of the payments and approvals, the State of New Jersey has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

## COUNT XVIII
**New Mexico False Claims Act**
**N.M. Stat. Ann. § 27-14-5(G)**
**Against All Defendants**

381.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

382.    This is a claim for treble damages and civil penalties under the New Mexico False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*

383.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of New Mexico, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Mexico. These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

384.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of New Mexico required by the Consent Judgment.

385.    By reason of the payments and approvals, the State of New Mexico has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

## COUNT XIX
### New York False Claims Act
### N.Y. State Fin. L. § 189.1.(g)
### Against All Defendants

386.     Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

387.     This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. St. Fin. L. § 187 *et seq.*

388.     As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of New York, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New York.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

389.     Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of New York required by the Consent Judgment.

390.     By reason of the payments and approvals, the State of New York has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XX**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-607(a)(7)**
**Against All Defendants**

391.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

392.    This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*

393.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of North Carolina, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of North Carolina.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

394.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of North Carolina required by the Consent Judgment.

395.    By reason of the payments and approvals, the State of North Carolina has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XXI**
**Rhode Island False Claims Act**
**R.I. Gen. Laws § 9-1.1-3(a)(7)**
**Against All Defendants**

396.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

397.    This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 *et seq.*

398.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Rhode Island, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Rhode Island. These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

399.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Rhode Island required by the Consent Judgment.

400.    By reason of the payments and approvals, the State of Rhode Island has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

**COUNT XXII**
**Tennessee Fraud Against Taxpayers Act**
**Tenn. Code Ann. §4-18-1-3(a)(7)**
**Against All Defendants**

401.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

402.    This is a claim for treble damages and civil penalties under the Tennessee Fraud Against Taxpayers Act, Tenn. Code Ann. §§ 4-18-101, *et seq.*

403.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of Tennessee, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Tennessee. These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

404.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the State of Tennessee required by the Consent Judgment.

405.    By reason of the payments and approvals, the State of Tennessee has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

**EXHIBIT A**

## COUNT XXIII
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. § 8.01-216.3 (A)(7)**
**Against All Defendants**

406.    Relator realleges and incorporates herein by reference all the allegations set forth in paragraphs 1 through 295 of this Complaint.

407.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216 *et seq.*

408.    As set forth above, Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the Commonwealth of Virginia, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Commonwealth of Virginia.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and the Consumer Relief Requirements of the Consent Judgment.

409.    Chase's false reports and certifications enabled it to avoid penalties and claim credits to which it was not entitled.  By falsely claiming such credits, Chase avoided paying money to the Commonwealth of Virginia required by the Consent Judgment.

410.    By reason of the payments and approvals, the Commonwealth of Virginia has been damaged, and possibly continues to be damaged, in an amount yet to be determined.

87

**EXHIBIT A**

**PRAYER FOR RELIEF**

WHEREFORE, Relator Laurence Schneider requests that judgment be entered against Defendants, ordering that:

1.      Defendants pay an amount equal to three times the amount of damages the United States, the States of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, Virginia, and the District of Columbia have sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,000, and not more than $10,000 for each violation of 31 U.S.C. § 3729 and similar provisions of the State False Claims Acts;

2.      Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

3.      Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

4.      The United States, the States of California, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Tennessee, Virginia, and the District of Columbia and Relator be granted all such other relief afforded by law as the Court deems appropriate;

**EXHIBIT A**

## REQUEST FOR A TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands a trial by jury.

Dated: _____

                                       _____
                                       Joseph A. Black (D.C. Bar No. 414869)
Daniel E. Cohen (D.C. Bar No. 414985)
THE CULLENLAW FIRM, PLLC
1101 30th Street, NW
Suite 300
Washington, D.C. 20007
Tel. (202) 944-8600
Fax. (202) 944-8611


Roberto L. Di Marco
Jennifer M. Foster
WALKER & DI MARCO, P.C.
350 Main Street
First Floor
Malden, MA 02148
Tel. (781) 322-3700
Fax. (781) 322-3757

*Admitted Pro Hac Vice*

**EXHIBIT A**