# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, et al., ex rel. LAURENCE SCHNEIDER, | ) ) ) | Case No. 1:14-cv-01047-RMC |
| Plaintiffs, | ) ) | Judge Rosemary M. Collyer |
| v. | ) ) | |
| J.P. MORGAN CHASE BANK, N.A., et al., | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS RELATOR'S SECOND AMENDED COMPLAINT

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

    A.     The RCV1 Loans ..................................................................................... 4

    B.     Schneider's National Mortgage Settlement Claims ............................... 4

         1.     The consumer relief allegations ................................................ 5

         2.     The servicing standard allegations ........................................... 7

         3.     The False Claims Act allegations ............................................. 9

    C.     Schneider's HAMP Claims ................................................................... 10

         1.     The regulatory framework ...................................................... 10

         2.     Schneider's HAMP allegations ............................................... 11

    D.     Procedural history ................................................................................ 12

LEGAL STANDARD ...................................................................................................... 13

ARGUMENT .................................................................................................................. 14

I.     SCHNEIDER'S NMS CLAIMS FAIL ON PROCEDURAL GROUNDS. ..................... 14

    A.     The NMS's Alternative Dispute Resolution Provisions Bar This Action. ........... 14

    B.     Schneider's NMS Claims Are An Improper Collateral Attack On The
         Monitor's Determinations That Chase Complied With The NMS. ..................... 16

II.    SCHNEIDER'S NMS CLAIMS FAIL ON THE MERITS. ............................................. 17

    A.     Schneider's Consumer Relief Claims Should Be Dismissed. .............................. 18

         1.     The NMS does not require compliance with the servicing standards
             as a condition for earning consumer relief credit. .................................... 19

         2.     The NMS grants servicers discretion to select the borrowers who
             will receive consumer relief. ..................................................................... 23

    B.     Schneider's Servicing Standards Claims Should Be Dismissed. .......................... 25

1.      The NMS's "cure" provisions preclude Schneider's servicing standard claims.......................................................................................... 26

2.      The prospect of a civil penalties award is too contingent and uncertain to constitute an "obligation" under the FCA............................. 26

C.      Schneider's Remaining NMS Allegations Fail To State An FCA Claim............ 30

D.      Schneider's State-Law Claims Fail To State An FCA Claim............................... 31

III.    SCHNEIDER'S HAMP CLAIMS ARE DEFECTIVE. .................................................... 31

A.      Schneider Fails To Allege That Chase Made A False Claim. ............................. 32

B.      Schneider Fails To Allege The Necessary Element Of Scienter. ........................ 35

CONCLUSION...................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A-J Marine, Inc. v. Corfu Contractors, Inc.*,
  810 F. Supp. 2d 168 (D.D.C. 2011) ...................................................................22

*Amfac Resorts, L.L.C. v. U.S. Dep't of Interior*,
  142 F. Supp. 2d 54 (D.D.C. 2001) ....................................................................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................35

*Beal Mortg., Inc. v. Fed. Deposit Ins. Corp.*,
  132 F.3d 85 (D.C. Cir. 1998) .............................................................................17

*Cities of Bethany v. Fed. Energy Regulatory Comm'n*,
  727 F.2d 1131 (D.C. Cir. 1984)..........................................................................23

*Collier v. Dist. of Columbia*,
  46 F. Supp. 3d 6, 13 (D.D.C. 2014) ...................................................................13

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  53 F. Supp. 3d 1, 13-14 (D.D.C. 2014)..............................................................13

*Hoyte v. Am. Nat'l Red Cross*,
  439 F. Supp. 2d 38 (D.D.C. 2006) ..........................................................25, 26, 28

*Hoyte v. Am. Nat'l Red Cross*,
  518 F.3d 61 (D.C. Cir. 2008) .............................................................................29

*In re Celotex Corp.*,
  487 F.3d 1320 (11th Cir. 2007) ....................................................................21, 24

*Inst., Inc. v. The Limited, Inc.*,
  190 F.3d 729 (6th Cir. 1999) .............................................................................29

*McHugh v. DLT Solutions, Inc.*,
  618 F.3d 1375 (Fed. Cir. 2010)..........................................................................16

*Moses v. Howard Univ. Hosp.*,
  606 F.3d 789 (D.C. Cir. 2010) ...........................................................................16

*Neumann v. Prudential Ins. Co. of Am.*,
  367 F. Supp. 2d 969 (E.D. Va. 2005) .................................................................16

*Original Honey Baked Ham Co. of Ga., Inc. v. Glickman,*
   172 F.3d 885 (D.C. Cir. 1999) ....................................................................21, 34

*Si v. Laogai Research Found.,*
   71 F. Supp. 3d 73, 96-98 (D.D.C. 2014)....................................................25, 26

*U.S. ex rel. Becker v. Westinghouse Savannah River Co.,*
   305 F.3d 284 (4th Cir. 2002) .............................................................................35

*U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,*
   297 F. Supp. 2d 272 (D.D.C. 2004) ...................................................................35

*United States ex. rel. Bahrani v. Conagra, Inc.,*
   465 F.3d 1189 (10th Cir. 2006) .........................................................................29

*United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.,*
   251 F. Supp. 2d 28 (D.D.C. 2003) .....................................................................18

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.,*
   637 F.3d 1047 (9th Cir. 2011) ...........................................................................18

*United States ex rel. Marcy v. Rowan Cos.,*
   520 F.3d 384 (5th Cir. 2008) .............................................................................29

*United States ex rel. Morgan v. Sci. Applications Int'l Co.,*
   604 F. Supp. 2d 245 (D.D.C. 2009) ...................................................................15

*United States ex rel. Rockefeller v. Westinghouse Elec. Co.,*
   274 F. Supp. 2d 10 (D.D.C. 2003) .....................................................................15

*United States ex rel. Totten v. Bombardier Corp.,*
   286 F.3d 542 (D.C. Cir. 2002) ...........................................................................14

*United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.,*
   389 F.3d 1251 (D.C. Cir. 2004) .........................................................................13

*United States v. Bank of Am.,*
   78 F. Supp. 3d 520, 524 (D.D.C. 2015) .....................................................7, 16, 26

*United States v. Microsoft Corp.,*
   147 F.3d 935 (D.C. Cir. 1998) ...........................................................................21

*United States v. Okoye,*
   731 F.3d 46 (1st Cir. 2013)......................................................................21, 23, 24

*United States v. Q Int'l Courier, Inc.,*
   131 F.3d 770 (8th Cir. 1997) .............................................................................29

*United States v. Sci. Applications Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) .................................................................34, 35

**Statutes**

31 U.S.C. § 3729(a)(1) ........................................................................... *passim*

31 U.S.C. § 3729(b)(3) ...............................................................................29, 30

**Other Authorities**

155 Cong. Rec. S4539 (daily ed. Apr. 22, 2009) .........................................30

155 Cong. Rec. S4543 (daily ed. Apr. 22, 2009) .........................................30

Black's Law Dictionary (10th ed. 2014) .......................................................20

Commitment to Purchase Financial Instrument and Servicer Participation
   Agreement, *available at*
   https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/
   servicerparticipationagreement.pdf ..........................................................10

Definition of Determine by Merriam-Webster, *available at* http://www.merriam-
   webster.com/dictionary/determine ...........................................................16

Fed. R. Civ. P. 8(a) .......................................................................................32

Fed. R. Civ. P. 9(b) .........................................................................13, 14, 32

Fed. R. Civ. P. 12(b)(6) .................................................................................13

Defendants JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., and Chase Home Finance LLC (collectively, "Chase") respectfully submit this Memorandum in support of Chase's Motion to Dismiss Relator Laurence Schneider's Second Amended Complaint ("SAC").[1]

## INTRODUCTION

Relator Laurence Schneider asserts two distinct sets of claims under the False Claims Act: claims relating to the National Mortgage Settlement consent judgment (the "NMS"), and claims relating to the Home Affordable Modification Program ("HAMP"). Both sets of claims revolve around Chase's treatment of certain non-performing mortgage loans that reside on its Recovery One or "RCV1" system of record. According to the complaint, RCV1 loans are "valueless" loans that have been written off of Chase's books and that will not be foreclosed upon. Although Schneider alleges that Chase violated both NMS and HAMP requirements in connection with these loans, neither set of allegations gives rise to a cause of action.

**1.  The NMS Claims.**  Schneider's NMS claims assert that Chase violated the False Claims Act by making false certifications of compliance with certain NMS requirements in order to avoid financial penalties for non-compliance. Under the NMS, Chase was required to (1) provide a total of $4.4 billion in "consumer relief" to distressed mortgage borrowers, and (2) service its mortgage loans in accordance with an enumerated set of "servicing standards." Schneider alleges that Chase violated both of those requirements in connection with its RCV1 loans, but nevertheless certified that it complied with them.

---

[1] Chase Home Finance LLC merged into JPMorgan Chase Bank, N.A. in 2011 and no longer exists as a separate entity.

As an initial matter, Schneider's attempt to enforce the NMS's requirements through the vehicle of a False Claims Act action is barred by the procedural requirements of the NMS. To prevent the NMS settlement agreement from generating the very types of disputes that it was intended to resolve, the NMS requires that the parties engage in certain alternative dispute resolution procedures before attempting to enforce the settlement. Schneider does not allege— nor could he—that those procedures have been followed here. The NMS also attempts to minimize disputes by providing for the appointment of a third-party Monitor empowered to "determine" whether Chase complied with its settlement obligations. As Schneider reluctantly acknowledges, the Monitor has "determined" that Chase complied with all of its obligations, and none of those determinations has ever been challenged or set aside. Schneider's allegations that Chase breached its obligations under the NMS are thus an improper collateral attack on the determinations of the Monitor.

The NMS claims also fail on substantive grounds. Schneider's allegation that Chase violated the servicing standards fails because Chase never received notice and an opportunity to cure the alleged servicing violations—a pre-requisite to penalties liability under the NMS. Furthermore, Schneider's allegation that Chase violated the consumer relief requirements fails because it depends on a mistaken interpretation of those requirements. In particular, Schneider asserts that Chase was not entitled to consumer relief credit for forgiving RCV1 loans because those loans allegedly were not serviced in compliance with the NMS's servicing standards. Contrary to Schneider's assumption, however, the NMS does not limit eligibility for consumer relief credit solely to loans that were serviced in conformity with NMS servicing standards. For these reasons and the additional reasons set forth below, Schneider's NMS claims should be dismissed.

**2.  The HAMP Claims.**  Schneider's HAMP claims allege that Chase made false statements to the government in order to obtain HAMP incentive payments to which it was not entitled.  HAMP is a foreclosure relief program under which the government makes incentive payments to mortgage servicers in exchange for modifying eligible mortgage loans.  Subject to certain exceptions, HAMP rules require participating servicers to solicit all eligible borrowers to apply for HAMP loan modifications.  According to Schneider, Chase violated this solicitation requirement by failing to solicit RCV1 borrowers for loan modifications, but nevertheless certified in its annual HAMP certifications that it had complied with HAMP's requirements.  These allegations fail to state a claim under the False Claims Act for two independent reasons.

*First*, Schneider has not adequately alleged that Chase's annual HAMP certifications were false.  Those certifications do not assert that Chase achieved *perfect* compliance with HAMP's requirements, but only that it achieved *material* compliance.  Schneider's allegations, moreover, fall far short of alleging any material non-compliance.  As noted above, Schneider acknowledges that RCV1 loans are "valueless" and were not subject to foreclosures.  It is therefore unsurprising that the complaint fails to allege that material numbers of RCV1 borrowers (i) would have qualified for HAMP modifications, (ii) would have wanted such modifications even if they qualified, or (iii) suffered any actual harm from Chase's alleged failure to solicit them to apply for loan modifications.  Furthermore, the complaint essentially admits that the government was aware of Chase's non-solicitation of RCV1 borrowers at the time it made incentive payments to Chase.  That the government paid these incentives despite its knowledge of Chase's conduct confirms that there were no "material" violations of HAMP's requirements.

*Second*, Schneider has not adequately alleged that Chase *knowingly* made false statements to the government, as the FCA requires.  As numerous courts have observed, it makes no sense to suggest that a party knowingly made false statements to the government if the party also disclosed the truth of the matter to the government.  Here, Schneider essentially concedes that Chase disclosed its non-solicitation of RCV1 borrowers to the government, which negates any inference that Chase acted with the scienter required for an FCA claim.

## BACKGROUND

### A.    The RCV1 Loans

Schneider's claims arise almost exclusively from a set of non-performing mortgage loans that reside on Chase's RCV1 system of record.  According to the complaint, when Chase determines that a mortgage loan is "valueless" under Generally Accepted Accounting Principles, it writes off (or in industry parlance "charges off") the loan and then transfers the loan from its general system of record to RCV1.  *See* SAC ¶¶ 16, 172-76.

Schneider alleges that Chase is unable to service RCV1 loans according to its usual servicing standards because the data in the RCV1 system "is fatally and irreparably flawed."  *Id.* ¶¶ 16, 18, 181, 186-87.  Schneider does not allege, however, that charged-off RCV1 loans require the same level of servicing as active mortgage loans.  He does not allege, for example, that any interest charges or penalties accrue on RCV1 loans, that any of the RCV1 borrowers are making regular payments on their loans, or that Chases forecloses on those loans.  To the contrary, the complaint makes clear that Chase does *not* foreclose on RCV1 loans because it would make no financial sense to foreclose on "valueless" loans.  *See id.* ¶¶ 174-75, 286-292.

### B.    Schneider's National Mortgage Settlement Claims

Count I of the complaint asserts that Chase committed False Claims Act violations by falsely certifying its compliance with certain requirements of the NMS consent judgment.  *See*

4

SAC ¶¶ 307-08.  That consent judgment settled a civil action in which the federal government and forty-nine states accused Chase of "misconduct related to [its] origination and servicing of single family residential mortgages."  *See* Compl. [ECF 1] ¶ 1, *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Mar. 12, 2012).  Four other mortgage servicers—Bank of America, Citibank, Wells Fargo, and Ally Financial—entered into parallel NMS consent judgments.

Under the Chase consent judgment, Chase agreed to (1) provide $4.212 billion in consumer relief to distressed mortgage borrowers and (2) abide by over 300 servicing standards set forth in the NMS.[2]  Schneider alleges in Count I of the complaint that Chase violated each of those requirements but nonetheless certified that it complied with them.

### 1.    The consumer relief allegations

The NMS requires Chase to provide $4.212 billion in consumer relief in the form of loan forgiveness, loan modifications, and other types of relief.  *See* C.J. Ex. D.  Although Schneider (incorrectly) alleges that Chase fell slightly short of providing the full $4.212 billion in relief, he wholly ignores the procedures set forth in the NMS for making that determination.

The parties to the NMS recognized that disputes might arise in the course of determining whether Chase had fully satisfied its consumer relief obligations.  In an effort to minimize those disputes, the NMS provides for the appointment of a third-party Monitor empowered "to determine . . . whether Servicer has satisfied the Consumer Relief Requirements."  C.J. Ex. E § C(5).  The NMS also prescribes an elaborate, multi-step process to be used in making that determination.  Under the prescribed process:

---

[2] *See* Consent Judgment [ECF 10] ¶¶ 2-5 & Exs. A-D, *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Apr. 4, 2012) ("Consent Judgment" or "C.J.").

- The Monitor and the servicer must agree on a detailed Work Plan that specifies "the testing methods and agreed procedures" that will be used to judge compliance with the consumer relief requirements, C.J. Ex. E § C(13)-(15);

- An Internal Review Group ("IRG") within Chase must apply the agreed-upon procedures to audit and test Chase's compliance with the consumer relief requirements, *id.* Ex. E § C(7), (11);

- The Monitor and the professional firms appointed to support him must audit and test the IRG's findings, *id.* Ex. E § C(2), (16)-(21); and

- The Monitor must "determine . . . whether Servicer has satisfied the Consumer Relief Requirements" and then "report his or her findings" to the Court and to a Monitoring Committee composed of governmental parties to the NMS, *id.* Ex. E § C(5), D(3)-(5).

As shown by the numerous reports that the Monitor filed in this Court's docket, enormous effort was expended in carrying out this process.[3]  At the conclusion of the process, moreover, the Monitor found that Chase had provided a total of $4.463 billion in consumer relief—about $250 million more than the NMS required—and thus had "satisfied the minimum requirements and obligations . . . imposed upon it under . . . the [NMS] to provide Consumer Relief."  Monitor's Final Report at 20-22, 25.

Schneider nevertheless asserts that Chase fell approximately $50 million short of satisfying its consumer relief obligations.  That is so, he alleges, because Chase improperly received about $300 million in consumer relief credit for forgiving RCV1 loans.  *See* SAC ¶¶ 24, 99, 199, 203, 215-16.  According to Schneider, none of the RCV1 loans was eligible for consumer relief credit because none was serviced in compliance with NMS servicing standards.  *Id.* ¶¶ 18, 24, 216.  Nowhere in the complaint, however, does Schneider identify any language in the NMS indicating that consumer relief credit is available only for loans that were serviced

---

[3] *See, e.g.*, Monitor's Final Consumer Relief Report Regarding Defendant J.P. Morgan Chase Bank, N.A. [ECF 143] at 11-19, *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Mar. 18, 2014) ("Monitor's Final Report").

pursuant to the servicing standards.  Nor does he allege that the Monitor was unaware of Chase's RCV1 servicing practices.

Schneider also makes a few conclusory assertions that Chase violated the consumer relief requirements because it relied on its own discretion, rather than a non-discretionary application process, in selecting the loans that it forgave in exchange for consumer relief credit.  *See id.* ¶¶ 12, 17, 24, 97, 107-10, 204, 213.  Schneider fails, however, to point to an NMS provision requiring the use of a non-discretionary process in order to earn consumer relief credit.  He also implicitly acknowledges that the procedures used by Chase to distribute consumer relief were vetted and approved by both the Monitor and the Monitoring Committee.  *See id.* ¶¶ 83-86.

### 2.      The servicing standard allegations

Schneider next alleges that Chase failed to satisfy the NMS's servicing standards with respect to its RCV1 loans, *see* SAC ¶¶ 181, 186-87, 216, 222, but he makes that allegation without addressing the NMS's framework for assessing compliance with the servicing standards.

The servicing standards comprise "304 defined business practice requirements" set forth in Exhibit A to the NMS.  *United States v. Bank of Am.*, 78 F. Supp. 3d 520, 524 (D.D.C. 2015) (Collyer, J.).  These requirements touch on virtually all aspects of the servicing of residential mortgage loans.  *See* C.J. Ex. A.  Most of the servicing standards are tested under a detailed set of quantitative "metrics" set forth in the NMS.  *See Bank of Am.*, 78 F. Supp. 3d at 528.  There are many other servicing standards, however, that are not covered by metrics.  *See id.* at 528-29.

As it does for the consumer relief requirements, the NMS provides that "[i]t shall be the responsibility of the Monitor to determine whether Servicer is in compliance with the Servicing Standards."  C.J. Ex. E § C(5).  To make this determination, the Monitor must engage in a complex testing process involving (i) "compliance reviews" and "test work" conducted by Chase and its IRG, (ii) additional testing and compliance work conducted by the Monitor and his

professional firms, and (iii) the preparation of quarterly compliance reports by the Monitor and his professionals.  *See, e.g.*, *id.* Ex. E §§ C(2), (7), (11), (16)-(21), D(3).

As this Court has observed, the NMS "does not require absolute perfection in loan servicing."  *Bank of Am.*, 78 F. Supp. 3d at 533.  Thus, with respect to servicing standards that are not covered by metrics, only "non-monetary equitable relief" is available in the event of a violation.  *Id.* at 530 (citing C.J. Ex. E § J(3)(a)).  For servicing standards that *are* covered by metrics, a servicer will be cited for a "Potential Violation" if the servicer exceeds a specified "Threshold Error Rate" for a metric in a given quarter.  C.J. Ex. E § E(1).  If that happens, the servicer is guaranteed "a right to cure" the Potential Violation pursuant to procedures set forth in the NMS.  *Id.* Ex. E § E(2)-(3).  If the cure is unsuccessful, the servicer is potentially liable for monetary penalties.  *See id.* Ex. E § J(3)(b).  If the cure is successful, however, "no Party shall have any remedy" under the NMS.  *Id.* Ex. E § E(6).  Moreover, "the cure process for a Potential Violation must run its course before suit on an uncured Potential Violation can be filed" because a servicer "has a *right* to cure."  *Bank of Am.*, 78 F. Supp. 3d at 531.

Without ever addressing this compliance framework, Schneider makes the sweeping assertion that Chase has been in constant violation of "every" servicing metric from the very inception of the NMS because it failed to include the RCV1 loans in its compliance testing.  *See* SAC ¶¶ 187, 266.  That allegation, however, is flatly inconsistent with the Monitor's reports on Chase's compliance.  Far from finding that Chase violated "every" metric throughout the history of the NMS, the Monitor cited Chase for only three Potential Violations, and in all three instances, he found that Chase timely cured the problem.[4]

---

[4] *See* Monitor's Report Regarding Compliance by Defendants J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A. for the Measurement Periods Ended March 31, 2013 and June 30, 2013 [ECF 119] at 24-25, *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Dec. 4, (continued…)

Significantly, Schneider never alleges that the Monitor was unaware of Chase's servicing or testing practices with respect to its RCV1 loans.  Instead, he acknowledges in a footnote Chase's position that it informed the Monitor about those practices, SAC ¶ 16 n.2, and the materials referenced in the footnote clearly corroborate Chase's position, *see, e.g.*, Dunn Decl. Ex. 1.

### 3.       The False Claims Act allegations

Count I of the complaint asserts that Chase's alleged violations of the NMS also constitute violations of the False Claims Act.  *See* SAC ¶¶ 305-309.  A key premise of this allegation is that Chase falsely certified to the Monitor that it had complied with the NMS's servicing standards and consumer relief requirements when in fact it had not.  *See id.* at ¶¶ 1, 24-25, 198-99, 215-16, 297-303, 307.  By making these false certifications, Schneider argues, Chase avoided monetary penalties that it otherwise would have owed as a result of its alleged violations.  *See id.* ¶¶ 1, 31-33, 308.  Schneider thus concludes that Chase violated the FCA's "reverse" false claims provision, 31 U.S.C. § 3729(a)(1)(G), which, in pertinent part, imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government."  *Id.* Schneider also asserts that Chase violated similar provisions in the false claims statutes of various states.  *See* SAC ¶¶ 315-419.

All of these allegations depend entirely on Schneider's initial premise that Chase actually violated the NMS's requirements.  If there were no violations of those requirements, then there

---

2013); Monitor's Report Regarding Compliance by Defendant J.P. Morgan Chase Bank, N.A. for the Measurement Periods Ended September 30, 2013 and December 31, 2013 [ECF 160] at 18-20, *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. May 14, 2014).

were no false certifications of compliance, and Schneider lacks an essential element of his reverse false claims theory.

### C.     Schneider's HAMP Claims

Count II of the complaint asserts that Chase violated the False Claims Act by making false certifications of compliance with the requirements of the HAMP program.  The relevant background regarding these allegations is set forth below.

#### 1.      The regulatory framework

The Home Affordable Modification Program "provides eligible borrowers the opportunity to modify their first-lien mortgage loans to make them more affordable."[5]  Under HAMP, mortgage servicers receive incentive payments from the Treasury Department in exchange for agreeing to modify the terms of first-lien mortgages.  *See* MHA Handbook at 61-64, 135-36.  In order to participate in HAMP, a servicer must enter into a Servicer Participation Agreement ("SPA") with Fannie Mae, which serves as Treasury's financial agent for HAMP.[6]

Treasury Department guidance regarding HAMP has been collected in an "MHA Handbook."  Subject to certain exceptions, the Handbook requires servicers to "proactively solicit" eligible borrowers for HAMP loan modifications.  *See* MHA Handbook at 70.  One of these exceptions provides that solicitation is *not* required if "the servicer has released the

---

[5] MHA Program Handbook for Servicers of Non-GSE Mortgages ("MHA Handbook"), at 2 (version 4.5, June 1, 2015), *available at* https://www.hmpadmin.com/portal/ programs/docs/hamp_servicer/mhahandbook_45.pdf; *see also* SAC ¶¶ 18, 39, 136, 138, 141, 144, 166, 190, 197, 216 (referring to this document).

[6] *See* Commitment to Purchase Financial Instrument and Servicer Participation Agreement, *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/ serviceparticipationagreement.pdf; *see also* SAC ¶¶ 18-20, 36-39, 117, 119, 123-24, 133, 142, 144, 163, 199 (referring to this document).

borrower from liability for the debt and provided a copy of such release to the borrower." *Id.* at 64. Servicers also are not required to solicit borrowers in active bankruptcy cases. *Id.* at 68.

HAMP participants must submit annual compliance certifications to a division of Freddie Mac—Making Home Affordable-Compliance ("MHA-C")—which serves as Treasury's compliance agent for HAMP. *See id.* at 1, 34. A servicer must "report instances of noncompliance" with HAMP's requirements in these certifications if the servicer believes that the non-compliance had "a *material* effect on its ability to comply with . . . program requirements." *Id.* at 38 (emphasis added).

## 2. Schneider's HAMP allegations

According to the complaint, Chase violated HAMP's solicitation requirements because it failed to solicit RCV1 borrowers to apply for HAMP modifications. *See* SAC ¶¶ 39, 190-91, 198-99. Nowhere in the complaint, however, does Schneider allege that Chase failed to solicit HAMP applications from a material number of *qualified* and *interested* borrowers. For example, although HAMP is limited to first-lien mortgage loans, Schneider acknowledges that the vast majority of the loans in RCV1 are not first-lien loans. *See id.* ¶¶ 185, 205, 262. Similarly, although HAMP solicitation is not required for loans in bankruptcy, Schneider admits that substantial numbers of RCV1 loans were "subject to bankruptcies." *Id.* ¶ 172. Finally, Schneider concedes that Chase had no obligation to solicit borrowers whose loans had been forgiven, *id.* ¶ 190, and the complaint expressly alleges that Chase forgave substantial numbers of RCV1 loans, *see id.* ¶¶ 208, 242, 244; *see also id.* ¶ 249 ("Chase provided forgiveness letters to mortgages with first liens that . . . were delinquent.").

Schneider also acknowledges, at least tacitly, that the government was aware of Chase's solicitation practices with respect to RCV1 loans. In an earlier version of his complaint, Schneider alleged that Chase concealed from Treasury's compliance agent, MHA-C, both the

11

existence of RCV1 and "the way those [RCV1] loans were treated for purposes of HAMP solicitation." SAC ¶ 16 n.2. Tellingly, however, all such allegations have been excised from the Second Amended Complaint.[7]  In addition, Schneider now explicitly references Chase's position that it "repeatedly disclosed the relevant facts" in its communications with MHA-C, *see id.*, and he makes no contrary allegations in the complaint.

Schneider nevertheless asserts that Chase "knowingly" presented "false or fraudulent claims" for HAMP incentive payments. SAC ¶¶ 2, 40, 42, 312. Specifically, he asserts that Chase "falsely certified that it was in compliance" with HAMP requirements when it submitted annual certifications to MHA-C, thereby obtaining HAMP incentive payments to which it allegedly was not entitled. *Id.* ¶¶ 2, 39-40.

Although the complaint implies that Chase certified that it was in *perfect* compliance with HAMP's requirements, the annual certifications themselves reveal that Chase merely certified its belief that it had "*materially* complied with" those requirements. Karwhite Decl. Ex. 1 at 1-2 (emphasis added). As required by HAMP, moreover, Chase disclosed the list of "subjective factors" that it considered in deciding whether instances of non-compliance were "material." *Id.* Ex. 2 at 2. These factors included such matters as whether instances of non-compliance "substantially interfere[d] with the goals and objectives of the overall program." *Id.*

### D.    Procedural history

Schneider filed this action in May 2013 in the District of South Carolina. He later moved to transfer the action to this Court on the ground that, under the venue provision in the NMS,

---

[7] *Compare, e.g.*, First Am. Compl. [ECF 80] ("FAC") ¶¶ 13, 16, 24, 35, 56, 163, 174, 176, 190, 202, 214, 257, 276, *with, e.g.*, SAC ¶¶ 13, 16, 24, 39, 60, 172, 183-87, 211, 223, 266, 285. Attached as Exhibit 1 to the Declaration of Michael M. Maya is a comparison showing all of the changes between the FAC and the SAC.

"the parties to the [NMS] . . . must seek to enforce the [NMS] before" this Court.  *See* Mem. in Supp. of Mot. to Transfer Venue at 3 [ECF 57-1].

After his motion to transfer was granted, Schneider filed the operative Second Amended Complaint on October 2, 2015.  Both the federal government and the various states that Schneider purports to represent in this action have declined to exercise their statutory right to intervene.  *See* ECF 24, 25-38, 41, 43, 70, 71, 74, 75, 83, 96, 99, 104.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is 'plausible on its face.'"  *Collier v. Dist. of Columbia*, 46 F. Supp. 3d 6, 13 (D.D.C. 2014) (Collyer, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this standard, "the facts alleged 'must be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  "[A] court need not accept as true legal conclusions set forth in [the] complaint," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 14 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice."  *Id.* at 13 (citing *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007)).  The court may also consider documents that are "referred to in [the] complaint and [are] central to [the] plaintiff's claim."  *Detroit Int'l Bridge Co. v. Gov't of Canada*, 53 F. Supp. 3d 1, 13-14 (D.D.C. 2014) (Collyer, J.)

Because Schneider alleges that Chase engaged in fraudulent conduct, the SAC must comply with Federal Rule of Civil Procedure 9(b).  *See United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004).  In an FCA action, Rule 9(b)

requires a relator to allege "the time, place and content of the false misrepresentations, the fact

misrepresented and what was retained or given up as a consequence of the fraud," as well as "the

individuals allegedly involved in the fraud." *Id.* (internal quotations and citations omitted).  To

meet this standard, the relator "must set forth an adequate factual basis for his allegations that the

[defendant] submitted false claims (or false statements in order to get false claims paid),

including a . . . detailed description of the specific falsehoods that are the basis for his suit."

*United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (emphasis,

internal quotations, and citations omitted).

## ARGUMENT

## I.   SCHNEIDER'S NMS CLAIMS FAIL ON PROCEDURAL GROUNDS.

Schneider's NMS-based claims should be dismissed for the threshold reason that they

were filed in contravention of both the NMS's dispute resolution procedures and the Monitor's

controlling determinations that Chase complied with its settlement obligations.

### A.   The NMS's Alternative Dispute Resolution Provisions Bar This Action.

The NMS settlement agreement was intended to *resolve* disputes among the parties, not

to generate them.  It therefore provides for the appointment of a third-party Monitor empowered

to "determine" whether Chase complied with its settlement obligations.  C.J. Ex. E § C(5).  In a

further attempt to minimize disputes regarding the settlement, the NMS requires the parties to

engage in informal dispute resolution procedures before attempting to enforce the settlement

agreement.  *See id.* Ex. E §§ G, J(2).  Specifically, before an enforcement action may be filed,

Chase, the Monitor, and the Monitoring Committee must "engage in good faith efforts to reach

agreement on the proper resolution of any dispute."  *Id.* Ex E. § G.  If those efforts are

unsuccessful, the aggrieved party must notify the Monitoring Committee of its intent to file an

14

enforcement action and may file such an action only after the Monitoring Committee and the parties have had at least 42 days to consider the question.  *Id.* Ex. E § J(2).

Schneider filed this action in clear violation of these procedures.  Schneider does not allege—and cannot allege—that any of his NMS allegations were the subject of "good faith efforts" to resolve the dispute through the Monitor and the Monitoring Committee.  Nor does he allege that the requisite 42 days' notice was provided to the Monitoring Committee.  Failing to abide by these procedures would bar the federal government from filing this action, and it likewise bars Schneider from doing so because an FCA relator "stands in the shoes of the federal government as a plaintiff."  *United States ex rel. Morgan v. Sci. Applications Int'l Co.*, 604 F. Supp. 2d 245, 249 (D.D.C. 2009); *see also United States ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F. Supp. 2d 10, 16 (D.D.C. 2003) (although relator "[has] a stake in the lawsuit," he "represents the interests of the United States," and "the United States remains the real party in interest" even when it declines to intervene).

It makes no difference that Schneider seeks to enforce the NMS's requirements through the vehicle of an FCA action.  The NMS's dispute resolution procedures broadly apply to "*any* dispute concerning *any* issue arising under this Consent Judgment."  C.J. Ex. E § G (emphasis added).  Schneider's allegations plainly meet that standard:  he alleges that Chase breached its obligations under the Consent Judgment and owes financial penalties as a result of the breaches.  Furthermore, Schneider has already *admitted* that this action is an attempt to enforce the NMS:  he moved to transfer this action to this Court on the ground that "the [NMS] was entered in the District of Columbia and . . .  the parties to the [NMS], including the United States, *must seek to enforce the [NMS] before Judge Collyer.*"  Mem. in Supp. of Mot. to Transfer Venue at 3 [ECF 57-1] (emphasis added).  Having won his motion to transfer on the theory that this is an NMS

enforcement action, Schneider is judicially estopped from now arguing otherwise. *See Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 792 (D.C. Cir. 2010) (judicial estoppel applies "where a party assumes a certain position in a legal proceeding, succeeds in maintaining that position, and then, simply because his interests have changed, assumes a contrary position" (internal quotation marks omitted)).

**B.      Schneider's NMS Claims Are An Improper Collateral Attack On The Monitor's Determinations That Chase Complied With The NMS.**

Schneider's NMS claims also are barred by the Monitor's determinations that Chase complied with its settlement obligations.

The NMS provides that "[i]t shall be the responsibility of the Monitor to *determine* whether Servicer is in compliance with the Servicing Standards . . . and whether Servicer has satisfied the Consumer Relief Requirements."  C.J. Ex. E § C(5) (emphasis added).  "[T]he plain meaning of the word 'determine' is 'to settle or decide (a dispute, question, matter in debate) as a judge or arbiter.'"  *Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 975 (E.D. Va. 2005) (quoting 4 Oxford English Dictionary 550 (2d ed. 1989)).[8]  Thus, under the plain language of the NMS, the Monitor's determinations that Chase complied with its settlement obligations are controlling unless and until those determinations are reversed or overturned.  *See United States v. Bank of Am.*, 78 F. Supp. 3d 520, 526 (D.D.C. 2015) (Collyer, J.) (construing the NMS according to its "plain language").

---

[8] *See also* Definition of Determine by Merriam-Webster, *available at* http://www.merriam-webster.com/dictionary/determine (last visited November 10, 2015) (defining "determine" as, *inter alia*, "to officially decide (something) especially because of evidence or facts" or "to establish (something) exactly or with authority"); *McHugh v. DLT Solutions, Inc.*, 618 F.3d 1375, 1380 (Fed. Cir. 2010) (relying on Merriam-Webster online dictionary to define term in contract construed under federal law).

To be sure, in appropriate circumstances, the NMS reserves the parties' rights to challenge the Monitor's findings in this Court. *See, e.g.*, C.J. Ex. E § D(5) (reserving right to challenge Monitor's "findings and/or statements"). No such challenge has been brought here, however; nor does Schneider purport to bring one in this action. Schneider's FCA action is therefore an improper collateral attack on the Monitor's determinations that Chase complied with its settlement obligations.

Any other conclusion would allow Schneider simply to bypass the NMS's carefully-crafted framework for determining Chase's compliance with the settlement. As the Court is aware, thousands upon thousands of hours were spent by the Monitor, the Monitoring Committee, the Monitor's professional firms, Chase, and the Chase IRG in testing and evaluating whether Chase satisfied its obligations. Schneider nevertheless seeks to throw out all of those efforts, ignore the NMS's fact-finding framework, and litigate from scratch the question of whether Chase complied with the settlement. Adopting that approach would frustrate the clear intent of the settlement and deny Chase the procedural protections for which it bargained. *Cf. Beal Mortg., Inc. v. Fed. Deposit Ins. Corp.*, 132 F.3d 85, 88 (D.C. Cir. 1998) (contract should be read "to give meaning to all of its provisions and to render them consistent with each other" (internal quotation omitted)).

## II.    SCHNEIDER'S NMS CLAIMS FAIL ON THE MERITS.

Separate and apart from the procedural barriers to Schneider's NMS-based claims, those claims also fail on the merits. The claims relating to the consumer relief requirements fail because they rest on an erroneous interpretation of the NMS. The claims relating to the servicing standards fail because the alleged violations of those standards, even if proven, would not give rise to an "obligation" to pay money to the government, as required under the FCA.

**A.      Schneider's Consumer Relief Claims Should Be Dismissed.**

Schneider's consumer relief allegations rest on a fundamental misunderstanding of the

NMS.  According to Schneider, Chase violated the NMS's consumer relief requirements in two

different ways:

- it claimed consumer relief credit for forgiving loans that supposedly were ineligible for credit because they were not serviced in conformity with the NMS's servicing standards; and

- it used its own discretion rather than a non-discretionary application process to select the consumers to whom it granted consumer relief.

*Supra* at 5-7.  Schneider further asserts that these alleged violations of the consumer relief

requirements are actionable under the FCA because Chase falsely certified that it complied with

those requirements, thereby avoiding monetary penalties that otherwise would have been due.

*Supra* at 9.

These claims fail as a matter of law because neither of the alleged violations of the

consumer relief requirements is, in reality, a violation.  As a result, there was nothing "false"

about Chase's certifications that it complied with those requirements, thus leaving Schneider

without the "false record or statement" that he needs to support his False Claims Act theory.  *See*

31 U.S.C. § 3729(a)(1)(G) (requiring a "false record or statement" to support reverse false claims

cause of action based on false certification); *United States ex rel. Cafasso v. Gen. Dynamics C4

Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011) (relator fails to state reverse false claims cause of

action where he does not show "a false record or statement"); *United States ex rel. Barrett v.

Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 36 (D.D.C. 2003) (dismissing reverse

false claims count where relator failed to allege that defendant "[made] a false record or

statement").

**1.      The NMS does not require compliance with the servicing standards as a condition for earning consumer relief credit.**

According to the complaint, only those loans that were serviced in conformity with the NMS's servicing standards can be forgiven in exchange for consumer relief credit. *Supra* at 6-7. On that basis, Schneider asserts that Chase improperly claimed credit for forgiving RCV1 loans that had not been adequately serviced. *Id.* This assertion fails as a matter of law because the NMS does not actually limit consumer relief credit to loans that were serviced in compliance with the NMS's servicing standards.

As an initial matter, the plain language of the NMS forecloses Schneider's argument that consumer relief credit depends on compliance with the servicing standards. The servicing standards appear in Exhibit A to the NMS and carry their own distinct set of penalties if a servicer fails to comply with them. *See* C.J. Ex. A; *id.* Ex. E § J(3)(b). The consumer relief requirements, by contrast, appear in Exhibit D to the NMS and are backed by a separate set of penalties. *See id.* Ex. D. Furthermore, although Exhibit D contains an extensive list of requirements that loans must meet to qualify for consumer relief credit, nothing in Exhibit D gives even the slightest indication that a loan must be serviced in accordance with Exhibit A's servicing standards to be eligible for credit. *See id.*

Far from suggesting that consumer relief credit has anything to do with the servicing standards set forth in Exhibit A, Exhibit D makes clear that the criteria set forth therein are the *exclusive* criteria for granting consumer relief credit. It does so by providing that Chase "shall," "will," or "may" receive credit for forgiving or modifying loans provided only that the loans meet the requirements of Exhibit D. For example, Exhibit D states:

- "Servicer *will* receive credit . . . for first-lien mortgage loan modifications made in accordance with the guidelines set forth in this Section 1."  C.J. Ex. D § 1.[9]

- "A write-down of a second lien mortgage *will* be creditable" where the write-down complies with the guidelines set forth in Exhibit D and the accompanying Table 1.  *Id.* Ex. D § 2(a)-(b).

- "Servicer *may* receive credit, as described in Table 1, for providing additional transition funds . . . in connection with a short sale."  *Id.* Ex. D § 3.

- "Credit *shall* be provided in accordance with Table 1, Section 3.i" for incentive payments made in connection with short sales.  *Id.* Ex. D § 4(a).

- "Servicer *may* receive credit for waiving deficiency balances . . . subject to the cap provided in Table 1, Section 5.i."  *Id.* Ex. D § 5(a).

- "Servicer *may* receive credit for forgiveness of payment of arrearages . . . in accordance with Table 1, Section 6.i."  *Id.* Ex. D § 6(a).

- "Servicer *may* receive credit for certain anti-blight activities in accordance with and subject to caps contained in Table 1, Section 7."  *Id.* Ex. D § 7(a).

- "Servicer *shall* receive credit under Table 1, Section 4, for mandatory waivers of amounts under this Section 8.b."  *Id.* Ex. D § 8(b)(1).

- Refinancing relief "*shall* be credited under these Consumer Relief Requirements as follows. . . ."  *Id.* Ex. D § 9(e).

Under the plain language of these provisions, Chase is entitled to consumer relief credit for providing relief that satisfies the requirements of Exhibit D *regardless* of whether the loans in question were serviced in compliance with the servicing standards of Exhibit A.  *See Bank of Am.*, 78 F. Supp. 3d at 526 (where NMS is unambiguous, "the plain language of the [consent judgment] controls" (internal quotation omitted)); *see also* Black's Law Dictionary (10th ed. 2014) ("In dozens of cases, courts have held 'may' to be synonymous with shall or must, usu. in an effort to effectuate what is said to be legislative intent.").

---

[9] All emphasis in the bullet-point quotations is added.

The *expressio unius est exclusio alterius* canon of construction reinforces this conclusion. That canon "instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded." *United States v. Okoye*, 731 F.3d 46, 49 (1st Cir. 2013). Here, Exhibit D identifies numerous requirements that loans must satisfy to qualify for consumer relief credit. *See* C.J. Ex. D. Many of these requirements, moreover, refer explicitly to the types of loans that are "eligible" for credit. *See, e.g., id.* Ex. D §§ 1(b), 1(c), 1(j), 2(d), 8(a)(ii). Under the *expressio unius* canon, the express recitation of these requirements for consumer relief credit precludes any attempt to read into Exhibit D an additional, unwritten requirement that only those loans that were serviced in accordance with Exhibit A may be submitted for credit. *See, e.g., Okoye*, 731 F.3d at 49 (applying *expressio unius* canon in contract case); *In re Celotex Corp.*, 487 F.3d 1320, 1334 (11th Cir. 2007) (same); *Original Honey Baked Ham Co. of Ga., Inc. v. Glickman*, 172 F.3d 885, 887 (D.C. Cir. 1999) ("A statute listing things it does cover exempts, by omission, the things it does not list.").

Schneider's reading of the consumer relief provisions also would have the bizarre effect of discouraging servicers from providing relief to the very consumers who are most deserving of such relief—those whose loans were poorly serviced. Indeed, under Schneider's reading of the NMS, no rational servicer would ever grant relief to a consumer whose loan had not been serviced in accordance with the servicing standards because the servicer would earn no credit for providing such relief. Schneider thus asks this Court to turn a settlement that was intended to *help* the victims of defective mortgage servicing into one that *harms* those victims by treating them *worse* than consumers whose loans were serviced properly. The Court should reject any reading of the NMS that leads to such troubling results. *See, e.g.*, *United States v. Microsoft Corp.*, 147 F.3d 935, 946 (D.C. Cir. 1998) (in interpreting a consent decree, "[t]o find the

21

meaning of an ambiguous provision we look for the intent of the parties"); *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 186 (D.D.C. 2011) (Collyer, J.) (relying on "common sense" in interpreting contract).

Finally, to the extent Schneider suggests that a single violation of the servicing standards disqualifies a servicer from receiving *any* consumer relief credit under the NMS, even in connection with loans that were not affected by the violation, *see, e.g.*, SAC ¶ 99, his argument fails for yet another reason:  it conflicts with a longstanding course of performance under the NMS.  For example, on at least four occasions, the Monitor has filed compliance reports concluding that a servicer earned consumer relief credit during the very same period in which the servicer was cited for Potential Violations of the servicing standards.[10]  If Schneider were correct that violations of the servicing standards preclude servicers from earning any and all consumer relief credit, then the Monitor should not have reached those conclusions, and the fact that he did so should have generated objections from the governmental parties to the consent judgments. That no such objections were ever made confirms that Schneider's reading of the NMS is badly

---

[10] Although the Monitor cited Chase for a Potential Violation of one of the servicing metrics in the third quarter of 2012, and although he likewise cited Bank of America, Citibank, and Wells Fargo for such violations in the first half of 2013, he nevertheless concluded—before the Potential Violations were cured—that each of those servicers earned the consumer relief credit that it claimed for the very same periods.  *See* Monitor's Report Regarding Compliance by Defendants J.P. Morgan Chase & Co. and J.P. Morgan Chase Bank, N.A. for the Measurement Periods Ended September 30, 2012 and December 31, 2012 [ECF 72] at 29, *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. June 18, 2013) (finding Potential Violation); Monitor's Interim Consumer Relief Report Regarding Defendant J.P. Morgan Chase Bank, N.A. [ECF 106] at 34, *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Oct. 16, 2013) ("Monitor's Interim Report") (awarding consumer relief credit); Monitor's metrics compliance reports for Bank of America, N.A. [ECF 120]; Citibank, N.A. and CitiMortgage, Inc. [ECF 121]; and Wells Fargo & Co. and Wells Fargo Bank, N.A. [ECF 123], *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Dec. 4, 2013) (finding Potential Violations); Monitor's consumer relief reports for Bank of America, N.A. [ECF 144]; CitiMortgage, Inc. [ECF 145]; and Wells Fargo & Co. and Wells Fargo Bank, N.A. [ECF 146], *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Mar. 18, 2014) (awarding consumer relief credit).

mistaken.  *See Cities of Bethany v. Fed. Energy Regulatory Comm'n*, 727 F.2d 1131, 1144 (D.C.

Cir. 1984) ("The parties' course of performance under a contract may give meaning to otherwise

unclear contract terms").

For all these reasons, Schneider's interpretation of the consumer relief requirements

should be rejected.

### 2.      The NMS grants servicers discretion to select the borrowers who will receive consumer relief.

Schneider also alleges that "[t]he Consumer Relief programs were required to be

implemented through an application process" under which relief would be available "to all

eligible borrowers."  SAC ¶¶ 107-08.  According to Schneider, Chase violated this requirement

by using its own discretion, rather than a non-discretionary application process, to select the

loans that it forgave or modified in exchange for consumer relief credit.  *See id.* ¶¶ 12, 17, 24, 97,

100, 107-10, 199, 213, 216.  As a result, Schneider argues, "Chase did not and does not qualify

for any of the Consumer Relief Credit for which it applied."  *Id.* ¶ 24.

If this extraordinary interpretation of the consumer relief provisions were correct, then

*none* of the five servicers that entered into NMS consent judgments would have earned a single

penny of consumer relief credit, because none distributed relief through the type of process that

Schneider envisions.  For several reasons, Schneider's interpretation is plainly erroneous.

*First*, Schneider's assertion that Chase should have used some sort of "application

process" to distribute consumer relief is made up out of thin air.  Despite the detailed consumer

relief provisions set forth in the NMS, there are *no* indications in those provisions that relief

should be doled out through an application process; nor are there *any* indications of how such a

process would work.  *See* C.J. Ex. D.  This Court should therefore reject Schneider's effort to

read into the NMS a sweeping new requirement that does not appear there.  *See Okoye*, 731 F.3d

at 49 (*expressio unius* "instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded" (internal quotation omitted)); *Celotex*, 487 F.3d at 1334 (same).

*Second*, the NMS is equally devoid of any prohibition on a servicer's use of discretion in the distribution of consumer relief.  As discussed above, the NMS sets forth an extensive and exclusive list of criteria for earning consumer relief credit.  *See* C.J. Ex. D.  Nowhere in those criteria is there any suggestion that servicers are barred from using their discretion in selecting the loans that will be forgiven in exchange for credit.  *See id.*  Moreover, in the absence of any provision for an application process, there would be no way to distribute consumer relief *without* the exercise of discretion.[11]

*Third*, and finally, Schneider's lack-of-discretion theory is in stark conflict with the way that the parties have understood and applied the NMS from its inception.  The Monitor, the Monitoring Committee, and the governmental parties to the NMS have known all along that Chase was using its own discretionary criteria to "*select* the borrowers to whom it provided the Consumer Relief."  *See* Monitor's Interim Report at 31-33 (emphasis added); Monitor's Final Report at 24-25.  They likewise understood that the other four servicers that entered into NMS consent judgments were employing their own discretionary criteria to "select" the borrowers to whom they provided relief.[12]  Schneider thus suggests that (i) all five NMS servicers have been

---

[11] The non-discrimination language in the consumer relief provisions reinforces this reading of the NMS.  That language prohibits Chase from adopting consumer relief policies that are "intended" to discriminate against a particular geography or protected class.  *See* C.J. Ex. D at D-1.  The explicit inclusion of these two restrictions on Chase's discretion precludes any attempt to read other unwritten limitations on Chase's discretion into the settlement.  *See Okoye*, 731 F.3d at 49; *Celotex*, 487 F.3d at 1334.

[12] Monitor's interim consumer relief reports for Bank of America, N.A. at 25-27 [ECF 107]; CitiMortgage, Inc. at 26-28 [ECF 108]; and Wells Fargo & Co. and Wells Fargo Bank, N.A. at 25-27 [ECF 109], *United States v. Bank of Am. Corp.*, No. 12-361 (D.D.C. Oct. 16, 2013); (continued…)

operating in blatant violation of the consumer relief provisions from the outset, (ii) the Monitor

has known this and publicly reported on it for years, and (iii) the fifty governmental parties to the

consent judgments nonetheless have done *nothing* to correct these violations which, in

Schneider's view, would entitle them to several billions dollars' worth of monetary penalties.

There is nothing in the NMS to support this absurd conclusion.

      **B.**      **Schneider's Servicing Standards Claims Should Be Dismissed.**

      Schneider's claims based on the servicing standards also should be dismissed.  The

theory of these claims is that Chase avoided paying penalties to the government by falsely

certifying that it complied with the NMS's servicing metrics.  *See, e.g.*, SAC ¶¶ 1, 24-25, 198-

99, 215-16, 297-303, 307.  This theory fails because the complaint does not adequately allege

that Chase had an "obligation" to pay money to the government as a result of the alleged

servicing violations.  In the absence of such an "obligation," a claim under 31 U.S.C.

§ 3729(a)(1)(G) fails as a matter of law.  *See* 31 U.S.C. § 3729(a)(1)(G); *Si v. Laogai Research

Found.*, 71 F. Supp. 3d 73, 96-98 (D.D.C. 2014) (reverse false claims cause of action fails where

relator fails to allege existence of "obligation"); *Hoyte v. Am. Nat'l Red Cross*, 439 F. Supp. 2d

38, 43-45 (D.D.C. 2006) (same), *aff'd*, 518 F.3d 61 (D.C. Cir. 2008).

      The complaint fails to allege the existence of an "obligation" to pay money to the

government for two fundamental reasons.  *First*, the NMS does not impose monetary penalties

on servicers merely for failing to comply with the servicing metrics.  Rather, before a servicer

can be liable for penalties, (i) the Monitor must determine that the servicer has committed a

Potential Violation of a metric, and (ii) the servicer must be afforded an opportunity to cure the

---

Monitor's final consumer relief report for Residential Capital, LLC, Ally Financial, Inc., &
GMAC Mortgage, LLC at 13-15 [ECF 136], *United States v. Bank of Am. Corp.*, No. 12-361
(D.D.C. Jan. 23, 2014).

Potential Violation.  Schneider does not allege—nor could he—that either of those steps has occurred here.  *Second*, even when a servicer fails to cure a Potential Violation, penalties for metrics violations are still too discretionary and contingent to give rise to an "obligation" within the meaning of the FCA.

## 1. The NMS's "cure" provisions preclude Schneider's servicing standard claims.

All claims based on the servicing standards should be dismissed because the complaint fails to allege that the Monitor found any Potential Violations of the servicing metrics that went uncured by Chase.  As this Court recognized in *United States v. Bank of America*, there can be no monetary penalty for violating the servicing standards unless (1) the Monitor finds a Potential Violation of a Servicing Metric, and (2) the servicer fails to effect a cure of the Potential Violation.  *See* 78 F. Supp. 3d at 530-31.  "[T]he cure process for a Potential Violation must run its course before suit on an uncured Potential Violation can be filed" because a servicer "has a *right* to cure."  *Id.* at 531; *see also* C.J. Ex. E § E(2) ("Servicer shall have a right to cure any Potential Violation.").

Schneider does not allege—and cannot allege—that Chase's alleged violations of the servicing standards were cited as Potential Violations by the Monitor or that Chase failed to cure any such Potential Violations.  *See supra* at 7-9.  As a result, Chase had no "obligation" to pay a financial penalty related to the servicing standards that could sustain an FCA claim.  *See Si*, 71 F. Supp. 3d at 96-98; *Hoyte*, 439 F. Supp. 2d at 43-45.

## 2. The prospect of a civil penalties award is too contingent and uncertain to constitute an "obligation" under the FCA.

Schneider's servicing claims also fail because any servicing-related penalties that Chase theoretically might owe to the government are too uncertain and contingent to constitute an "obligation" to pay money to the government within the meaning of 31 U.S.C. § 3729(a)(1)(G).

The NMS does not invariably impose a monetary penalty if a servicer fails to cure a Potential Violation of a servicing metric.  Rather, before any penalty could be due, a party to the NMS would have to exercise its discretion to bring an enforcement action seeking a penalty, and the Court would have to exercise its discretion to grant the requested penalty.  *See* C.J. Ex. E § J(2) (party or Monitoring Committee "may" bring enforcement action seeking monetary penalties); *id.* Ex. E § J(3)(b) (Court "may" award penalties for uncured Potential Violations). Neither of these discretionary acts is automatic or self-executing, and unless and until such discretionary acts take place, a servicer has no obligation to pay a penalty.  *See* C.J. Ex. E § J; *Bank of Am.*, 78 F. Supp. 3d at 530.  Furthermore, before a penalty payment may be sought, (i) the Monitor must determine that a Potential Violation has occurred, (ii) the servicer must be given an opportunity to cure, (iii) the attempted cure must be unsuccessful, and (iv) informal dispute resolution must fail.  C.J. Ex. E §§ E, G, J; *Bank of Am.*, 78 F. Supp. 3d at 530-31. Accordingly, before Chase could be required to pay a penalty, *all* of the following contingencies would have to occur:

- the Monitor would have to find that Chase committed a Potential Violation of a servicing metric;

- Chase would have to fail to cure the Potential Violation;

- the dispute resolution procedures set forth in the NMS would have to be followed without success;

- a party to the NMS or the Monitoring Committee would have to exercise its discretion to bring an Enforcement Action; and

- the Court would have to exercise its discretion to award a penalty.

*Supra* at 7-9; C.J. Ex. E §§ E, G, J; *Bank of Am.*, 78 F. Supp. 3d at 530-31.  There are no allegations that *any* of these steps have occurred here.  Any potential liability to the government is therefore far too contingent and uncertain to give rise to an "obligation" that could sustain an

FCA claim.  *See, e.g., Hoyte*, 439 F. Supp. 2d at 44-45 (discretionary and contingent civil penalty does not constitute "obligation" under FCA).

 *Hoyte* addressed an FCA relator's claim that she was terminated in retaliation for alleging that her employer had violated a consent decree entered into with the Food and Drug Administration ("FDA") and had submitted false records to avoid paying penalties under the consent decree.  *See id.* at 42, 44.  The question for the Court was whether the relator's allegations "could lead to a viable . . . case" for false claims liability.  *Id.* at 42 (internal quotations omitted).  Judge Friedman held that they could not.  He began by recognizing that, to state a claim under the FCA, the relator would have to allege an "obligation" to the government that was "a present, existing debt or liability, owed at the time the alleged false statement is made, *and not some future or contingent liability*."  *Id.* at 43 (emphasis added).  Judge Friedman found that the relator could not make such an allegation because, under the consent decree, "[t]he decision whether to impose sanctions rests exclusively with the FDA, and no obligation will arise until the FDA decides to exercise its authority under the [consent decree]."  *Id.* at 44.  In light of the FDA's "discretion" to seek penalties or to "refrain from doing so," no "obligation" to pay money or property existed within the meaning of the FCA.  *Id.*

 Here, the penalty payments that Chase allegedly might owe for violating the servicing metrics are even more remote and contingent than in *Hoyte*.  Similar to the circumstances in *Hoyte*, no penalty could be due here unless and until a party exercised its discretion to bring an action seeking a penalty and this Court exercised its discretion to award a penalty.  Even before these exercises of discretion could occur, however, the Monitor would have to find a Potential Violation of a metric and Chase would have to fail to cure the Potential Violation.  Because

Schneider does not allege—nor could he—that these steps have taken place, he has not alleged that Chase had an "obligation" to pay money to the government for purposes of the FCA.

The 2009 amendments to the FCA, which added a definition of the term "obligation," do not alter this result. Prior to 2009, when the term "obligation" was undefined, courts consistently held that potential penalties that had not yet been assessed or enforced did not give rise to an "obligation" within the meaning of the FCA. *See Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008) ("[A]n unassessed potential penalty for regulatory noncompliance does not constitute an obligation that gives rise to a viable FCA claim."); *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 391 (5th Cir. 2008) ("potential and contingent" liability is outside scope of FCA); *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997) ("The obligation cannot be merely a potential liability.").

The definition added by Congress in 2009 did not change this understanding. Congress defined an "obligation" as "an **established** duty, whether or not fixed," arising from, *inter alia*, a contractual relationship, statute, or regulation. 31 U.S.C. § 3729(b)(3) (emphasis added). This definition resolved a disagreement among the courts about whether a debt to the government had to be "fixed" in amount for an "obligation" to arise.[13] The definition also makes clear, however, that a potential penalty that has not yet been assessed remains outside the scope of the statute, as no such penalty could be an "established" duty to pay money or property. *See id.* Nor does any other language in the statute suggest an intent on the part of Congress to alter the pre-2009 understanding that contingent penalties do not give rise to FCA liability. *See Amfac Resorts,*

---

[13] *Compare, e.g., Am. Textile Mfrs.' Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 734-36 (6th Cir. 1999) (requiring "a fixed sum that is immediately due"), *and Q Int'l*, 131 F.3d at 774 (same), *with United States ex. rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1201 (10th Cir. 2006) (obligation may arise even if "the sum has not been precisely determined").

*L.L.C. v. U.S. Dep't of Interior*, 142 F. Supp. 2d 54, 81 (D.D.C. 2001) (where statute is subject to "prevailing understanding," courts "presume that Congress was aware of and therefore adopted this view" by enacting legislation "without changing it").

The legislative history of the 2009 amendments confirms that contingent debts do not satisfy the statutory definition of the term "obligation."  Draft language that embraced "contingent" obligations appeared in an early version of what became Section 3729(b)(3), but it was struck in the final form of the legislation.  *See* 155 Cong. Rec. S4539 (daily ed. Apr. 22, 2009) (statement of Sen. Kyl).  The bill's sponsor explained that the reason for this change was to foreclose precisely the theory of contingent liability that Schneider has asserted here.  *See* 155 Cong. Rec. S4543 (daily ed. Apr. 22, 2009) (statement of Sen. Kyl) (legislative amendment introducing language now codified at 31 U.S.C. § 3729(b)(3) "modifies the bill's definition of the term 'obligation' as used in the reverse False Claims Act to exclude contingent obligations, thus precluding the possibility that conduct that makes a defendant liable for a penalty or a fine could become actionable under this law before that fine is actually established or assessed").

Because Schneider has not adequately alleged that any potential liability to pay penalties for the violation of a servicing standard would constitute an "obligation" to pay money to the government, Schneider's servicing standards claims should be dismissed.

### C.      Schneider's Remaining NMS Allegations Fail To State An FCA Claim.

Schneider makes two other vague allegations related to Chase's performance under the NMS that likewise fail to state a claim for relief.  Specifically, he alleges that Chase (1) purported to forgive certain loans and release certain liens that did not qualify for consumer relief credit and/or that previously had been sold to companies controlled by Schneider, *see* SAC ¶¶ 245-52, 253-64, 267-78, and (2) violated the NMS's anti-blight requirements by releasing liens without providing sufficient notice to "interested parties," *see id.* ¶¶ 286-95.  These

allegations do not support a cause of action under the FCA because Schneider does not adequately allege that this purported conduct resulted in (i) the submission of a false or fraudulent claim for payment, (ii) the creation of a false record or statement material to a false claim, or (iii) the avoidance of an obligation to pay money to the government.  *See* 31 U.S.C. § 3729(a)(1)(A), (B), (G).  Among other things, Schneider does not allege that Chase actually claimed or received any consumer relief credit for forgiving loans that did not qualify for credit; nor does he allege that the asserted anti-blight violations gave rise to an "obligation" to pay money to the government.  These allegations therefore add nothing to Schneider's claims.

### D.     Schneider's State-Law Claims Fail To State An FCA Claim.

In addition to asserting NMS-based claims under the False Claims Act, Schneider asserts virtually identical claims under 21 analogous state statutes.  *See* SAC ¶¶ 315-419.  Schneider makes no factual allegations specific to any of these causes of action, and he does not assert that any of the state statutes differ materially from the FCA.  Accordingly, Schneider's state-law claims should be dismissed for the same reasons as the parallel claims asserted under the FCA.

## III.   SCHNEIDER'S HAMP CLAIMS ARE DEFECTIVE.

Schneider separately alleges that Chase violated the FCA by "knowingly" submitting "false or fraudulent" annual certifications that it complied with the rules of the HAMP program. SAC ¶¶ 2, 40, 312; *see* 31 U.S.C. § 3729(a)(1)(A)-(B).  According to Schneider, these annual certifications were false because they failed to disclose that Chase did not solicit RCV1 borrowers to apply for HAMP loan modifications.  SAC ¶ 39.

This claim fails as a matter of law because Schneider does not adequately allege that Chase's non-solicitation of RCV1 borrowers constituted a "material" violation of HAMP's requirements.  The Treasury Department requires servicers to certify *material* compliance—not *perfect* compliance—with the rules of HAMP.  Schneider nevertheless fails to allege any facts

31

that demonstrate material non-compliance.  He does not allege, for example, that substantial

numbers of RCV1 borrowers would have wanted or qualified for HAMP modifications, that

Chase's failure to solicit those borrowers resulted in increased foreclosures, or that the Treasury

Department was unaware of Chase's practices at the time it approved Chase's HAMP payments.

Schneider's allegations that Chase's annual certifications were "knowingly false" therefore fail

to satisfy the basic pleading requirements of Rule 8(a), let alone the heightened requirements

applicable under Rule 9(b).

      **A.**      **Schneider Fails To Allege That Chase Made A False Claim.**

      Schneider's HAMP claims should be dismissed because he does not adequately allege

that Chase's annual HAMP certifications were "false."

      Under Treasury Department rules, HAMP certifications must disclose "instances of

noncompliance that [the servicer] believes have a *material effect* on its ability to comply with

MHA program requirements."  MHA Handbook at 38 (emphasis added).  Consistent with that

requirement, Chase was required to certify only that it was in "*material* compliance" with

HAMP.  *See* Karwhite Decl. Ex. 1 at 1-2 (emphasis added).  Chase also was required to disclose

the criteria that it used to determine whether any instances of non-compliance were material.  *See*

MHA Handbook at 38.  Accordingly, Chase disclosed a list of "subjective factors" that it

considered in making its annual certifications, a list that included whether any non-compliance

"resulted in substantial injury to a significant number of borrowers" or "substantially interfere[d]

with the goals and objectives of the overall program."  *See* Karwhite Decl. Ex. 2 at 2.

      Schneider must allege that Chase's purported violation of HAMP's solicitation

requirements was "material" within the meaning of these "subjective factors" in order to allege

that Chase's certifications were "false" for purposes of his FCA claim.  For several reasons, he has not met that burden.

*First*, Schneider does not assert that the alleged failure to solicit RCV1 borrowers to apply for HAMP modifications impacted a substantial number of borrowers.  Although the complaint asserts in conclusory terms that RCV1 borrowers might have qualified for HAMP modifications, the complaint's specific factual allegations do not support that conclusion.  For instance, only first-lien mortgages are eligible for HAMP, yet, as Schneider tacitly acknowledges, the vast majority of the loans in RCV1 are not first-lien loans.  *See* SAC ¶¶ 177, 184-85.  Schneider also acknowledges that Chase released and forgave large numbers of RCV1 loans, *see id.* ¶¶ 14, 208-09, 242, 244, 286-88, and it is undisputed that borrowers whose loans have been forgiven need not be solicited for HAMP.  *Id.* ¶ 190; MHA Handbook at 64.  Accordingly, the complaint's well-pleaded factual allegations thoroughly undermine the conclusion that Chase failed to solicit a material number of borrowers who could have qualified for HAMP.

*Second*, Schneider does not allege that Chase's non-solicitation of RCV1 borrowers resulted in injury to those borrowers or substantially interfered with the goals of the HAMP program.  The fundamental purpose of HAMP is to avoid unnecessary foreclosures.  *See* MHA Handbook at 1; SAC ¶ 9.  Schneider, however, concedes that Chase did not foreclose on RCV1 loans because it made no financial sense to foreclose on those "valueless" loans.  *See supra* at 4.  Nor does Schneider allege that substantial numbers of RCV1 borrowers—who faced no threat of foreclosure even though they were not paying their loans—would have *wanted* HAMP modifications even if they could have qualified for such modifications.  For these reasons as well, the complaint does not allege a "material" violation of HAMP's requirements.

*Third*, and finally, Schneider fails to allege that Treasury's compliance agent, MHA-C, was unaware of Chase's solicitation practices with respect to RCV1 loans.  Schneider's *original* complaint asserted that Chase "concealed from . . . MHA-C both the existence of the RCV1 charged-off [loans] and the way those loans were treated for purposes of HAMP solicitations." SAC ¶ 16 n.2; *see also* FAC ¶ 163 (RCV1 "was not disclosed or reported to Freddie Mac").  All such allegations, however, were (rightly) purged from Schneider's amended complaint.[14] Schneider thus concedes, as he must, that Treasury was well aware of Chase's treatment of the RCV1 loans at the time it approved Chase's HAMP incentive payments.

The alleged HAMP violations are therefore immaterial as a matter of law.  As the D.C. Circuit has explained, an allegedly false certification is "material" only if it impacts "the government's decision to pay."  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010).  In other words, a "false certification . . . is actionable . . . only if it leads the government to make a payment which, absent the falsity, it may not have made."  *Id.* at 1270 (quoting *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010)).  Here, there is no question that any alleged falsity in Chase's HAMP certifications was immaterial to the government's decision to pay:  Treasury knew about Chase's solicitation practices and approved its HAMP payments anyway.

In sum, Schneider pleads no facts supporting the conclusion that Chase's non-solicitation of RCV1 borrowers was "material," and as a result he has not adequately alleged that Chase's HAMP certifications were "false."

---

[14] *Compare, e.g.*, FAC ¶¶ 13, 16, 24, 35, 56, 163, 174, 176, 190, 202, 214, 257, 276, *with, e.g.*, SAC ¶¶ 13, 16, 24, 39, 60, 172, 183-87, 211, 223, 266, 285; *see also* Maya Decl. Ex. 1.

**B.      Schneider Fails To Allege The Necessary Element Of Scienter.**

Schneider's HAMP claims also fail because he has not adequately alleged that Chase

*knowingly* made a false statement, as the FCA requires.  *See* 31 U.S.C. § 3729(a)(1)(A)-(B).

Under the MHA Handbook, Chase was required to disclose instances of non-compliance

with HAMP requirements only if it "believed" that the non-compliance was "material."  *See*

MHA Handbook at 38.  Accordingly, in order to plead the scienter required for his FCA claim,

Schneider must allege facts supporting the conclusion that Chase *subjectively believed* that it was

in material non-compliance with HAMP's requirements at the time it made its annual

certifications to the government.  *See SAIC*, 626 F.3d at 1271.  The complaint contains no facts

that remotely support this conclusion.[15]

Any assertion that Chase knowingly made false certifications, moreover, is belied by

Schneider's implicit concession that Chase disclosed its non-solicitation of RCV1 borrowers to

the government.  *See supra* at 11-12.  It is well-established that "prior government knowledge of

an allegedly false claim can negate the scienter required for an FCA violation."  *U.S. ex rel.*

*Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (collecting

cases); *see also U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F. Supp. 2d 272,

286 n.22 (D.D.C. 2004) (explaining that the government's knowledge "is a circumstance that is

relevant to determining whether defendant lacked the requisite scienter"), *aff'd sub nom. U.S. ex*

*rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321 (D.C. Cir. 2005).  The

government's knowledge of Chase's solicitation practices thus rebuts the conclusion that Chase

---

[15] While Schneider conclusorily alleges that Chase "knowingly" made false statements, *see, e.g.*, SAC ¶ 312, such legal conclusions are not entitled to deference on a motion to dismiss.  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (internal quotation marks omitted)).

*knowingly* made false certifications to the government.  Indeed, it defies common sense to suggest that Chase was attempting to deceive the government in its annual HAMP certifications while simultaneously disclosing to the government the relevant facts.

## CONCLUSION

For the reasons set forth above, Chase's motion to dismiss should be granted.

Respectfully submitted,

November 12, 2015

   /s/ Robert D. Wick
Robert D. Wick (D.C. Bar No. 440817)
Christian J. Pistilli (D.C. Bar No. 496157)
Michael M. Maya (D.C. Bar No. 991742)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-6000
Fax: (202) 662-6291

*Attorneys for Defendants*

36