**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| United States of America, *et al.*, | ) | |
| *ex rel*. LAURENCE SCHNEIDER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-1047 (RMC) |
| | ) | |
| J.P. MORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

_____  )

**OPINION**

Pursuant to the Federal False Claims Act and similar State laws, Relator Laurence Schneider asserts that J.P. Morgan Chase Bank, N.A. (Chase) submitted false claims relating to the National Mortgage Settlement and false claims relating to the Home Affordable Modification Program (HAMP) to decrease its liability to the Federal Government.  However, the National Mortgage Settlement claims are barred because Mr. Schneider failed to engage in the alternative dispute resolution process mandated by the Settlement on which the claims are based.  Mr. Schneider also fails to state a claim that Defendant falsely certified HAMP compliance because he does not allege, with factual allegations in support, that the certifications were materially false.  The Complaint will be dismissed.

**I.  FACTS**

**A.     Background**

Following the burst of the housing bubble in 2008, the Federal Government began to institute measures designed to stabilize the housing and credit markets.  Those measures included the Troubled Asset Relief Program (TARP) and the Making Home Affordable Program, both programs in the Department of the Treasury.  *See* U.S. Department of the Treasury, *TARP*

*Programs* (Nov. 15, 2016), https://www.treasury.gov/initiatives/financial-stability/TARP-Programs/Pages/default.aspx; U.S. Department of the Treasury, *Making Home Affordable* (July 22, 2012), https://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Pages/hamp.aspx.  The Making Home Affordable Program included the Home Affordable Modification Program (HAMP), which used funds from TARP as incentives for banks to modify first-lien mortgages so that homeowners could lower their mortgage payments.  HAMP continues to this day; its goal is to encourage modification of loans that are at risk of default and make them more affordable.

In March 2012, the Federal Government, 49 States, and the District of Columbia filed complaint in the United States District Court for the District of Columbia against "numerous banks and loan servicing companies, including Chase, for misconduct related to their origination and servicing of single family residential mortgages."[1]  Second Am. Compl. [Dkt. 102] (SAC) ¶ 56.  Other defendant banks included Bank of America Corporation; Countrywide Bank, FSB; Citibank, N.A.; and Wells Fargo Bank, N.A.  Prior to filing the National Mortgage Complaint, its parties had negotiated a national settlement of its allegations, *i.e.*, the National Mortgage Settlement.  On April 4, 2012, this Court entered consent judgments approving the National Mortgage Settlement.  *See e.g.*, Consent Judgments, *United States v. Bank of America Corp.*, No. 12-361 (RMC) [Dkts. 10, 11, 12, 13, 14].

The National Mortgage Settlement was intended "to provide immediate relief to enable struggling homeowners to avoid foreclosure; to bring badly needed reform to the mortgage servicing industry; to ensure that foreclosures are lawfully conducted; and to penalize

---

[1] The March 2012 complaint will be referenced herein as the "National Mortgage Complaint" and the resulting settlement as the "National Mortgage Settlement."

the banks for robo-signing misconduct."  SAC ¶ 63.  The Court appointed Joseph A. Smith to

serve as Monitor of the Settlement and thereby to oversee implementation of the reforms of

mortgage loan servicing and evaluate compliance by the signatory banks.  Exhibit A to the

National Mortgage Settlement was a list of Servicing Standards, which included the following

kinds of standards:

1. Standards for documents used in foreclosure and bankruptcy
   proceedings;

2. Standards for qualifications, training and supervision of
   employees;

3. Requirements for accuracy and verification of borrower's
   account information;

4. Standards to ensure documentation of note, holder status and
   chain of assignment;

5. Loss mitigation requirements;

6. Requirements for an easily accessible and reliable single point
   of contact for potentially-eligible first lien mortgage borrowers;
   and

7. Restrictions on servicing fees.

*See* Consent Judgment, Ex. A, *United States v. Bank of America Corp., et al.*, No. 12-361 (RMC)

[Dkt. 10-1]; *see also* SAC ¶ 74.  The Servicing Standards were implemented through a work plan

for each signatory bank.  Compliance was ascertained by the Monitor using "29 Metrics to test

the application and performance of the required Servicing Standards."  SAC ¶ 88.  "[T]he

Monitor, through the chain of process, relied on the IRG's [Internal Review Group's] testing of

the metrics pursuant to the terms of the Consent Judgment to determine the Defendant's

compliance with the Consent Judgment."  *Id.* ¶ 96.  At the end of each quarter, Monitor Smith

submitted a report to the Court indicating "(i) the Metrics for that Quarter; (ii) Servicer's

progress toward meeting its payment obligations under th[e] Consent Judgment; [and] (iii)

general statistical data on Servicer's overall servicing performance." Consent Judgment, Ex. E, *United States v. Bank of America Corp., et al.*, No. 12-361 (RMC) [Dkt. 10-1] at E-9.[2]

In addition to the Servicing Standards, the National Mortgage Settlement required each Defendant to provide a specific dollar amount in consumer relief, which totaled about $25 billion overall. Chase was required "to provide over $4 billion in consumer relief in the form of loan forgiveness and refinancing." SAC ¶ 97. Specifically, Chase was required to provide "$3,675,400,000 of relief to consumers who me[t] the eligibility requirements in paragraphs 1-8 of Exhibit D" to the National Mortgage Settlement and "$537,000,000 of refinancing relief to consumers who me[t] the requirements of paragraph 9 of Exhibit D." *Id.* ¶ 101. Chase received credits toward its consumer relief amount when it:

- Allowed borrowers to make First Lien and Second Lien Modifications;

- Allowed borrowers to make Second Lien Portfolio Modifications;

- Provided borrowers Enhanced Transitional Funds;

- Facilitated Short Sales for borrowers;

- Provided borrowers Deficiency Waivers;

- Provided Forbearance for Unemployed Borrowers; and

- Assisted in Anti-Blight efforts.

---

[2] The participating state and federal agencies also "designate[d] an Administration and Monitoring Committee," which "serve[d] as the representative of the participating state and federal agencies in the administration of all aspects of . . . [the] Consent Judgment and the monitoring of compliance." Consent Judgment, *United States v. Bank of America Corp., et al.*, No. 12-361 (RMC) [Dkt. 10] ¶ 8. The responsibilities and authorities of Monitor Smith and the Monitoring Committee were detailed in Exhibit E to the Consent Judgment. *See* Consent Judgment, Ex. E.

*See* Consent Judgment, Ex. D, *United States v. Bank of America Corp., et al.*, No. 12-361 (RMC) [Dkt. 10-1] at D1-D7.

### B.    Relevant Terms of the National Mortgage Settlement

The National Mortgage Settlement also provided a process for notice and cure in the event a bank failed to satisfy a Servicing Standard.  If Monitor Smith determined that a bank had exceeded the "negotiated threshold error rate assigned to [any] Metric," he would notify that bank and trigger a corrective procedure.  *United States v. Bank of America*, 78 F. Supp. 3d 520, 528 (D.D.C. 2015); *see also* Consent Judgment, Ex. E at E-11-E-12.  "The [bank] ha[d] a right to cure a Potential Violation within a set cure period."  *Id*.  If the bank cured the errors then "no Party to the Consent Judgment can sue on the Potential Violation."  *Id*.

Parties and the Monitoring Committee were only permitted to "sue to enforce (a) uncured Potential Violations of Servicing Standards covered by a Metric and (b) Servicing Standards that are outside the Metric testing/Potential Violation process."  *Id*. at 532.  Prior to commencing any enforcement action arising out of the Consent Judgment a party was required to "provide notice to the Monitoring Committee of its intent to bring an action" and allow the Monitoring Committee 21 days to consider bringing the action itself.  Consent Judgment, Ex. E at E-15.  If the Monitoring Committee declined to bring an enforcement action, the party was obligated to wait an additional 21 days before filing suit.  *See id*.

### C.    Home Affordable Modification Program (HAMP)

HAMP is a federally-funded foreclosure relief program operated by the Department of the Treasury, which provides incentive payments to mortgage servicers[3] in

---

[3] A mortgage servicer receives mortgage payments from homeowners, maintains all records, and enforces the obligations to pay, then forecloses on the home if need be.  Mortgage servicers can

exchange for modifying eligible mortgage loans.  Eligibility for modification is determined

through an application process, subject to some exceptions.  Mortgage servicers participate in

HAMP through a Servicer Participation Agreement with the Federal National Mortgage

Association (Fannie Mae), Treasury's designated financial agent for HAMP.  Treasury also

provided guidance regarding HAMP through the Making Home Affordable Handbook (MHA

Handbook), which requires Servicers to solicit eligible borrowers for HAMP loan modification.

*See* MHA Handbook at 75-76 (version 5.1 May 26, 2016), *available at*

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook

_51.pdf.  The MHA Handbook provides exceptions to the solicitation requirement, including

when "the servicer has released the borrower from liability for the debt and provided a copy of

such release to the borrower," *id*. at 69, or in active bankruptcy cases.  *See id*. at 73.

Freddie Mac monitors compliance with HAMP through annual compliance

certificates from the Servicers.  In the compliance certificates, each Servicer must report any

instances of noncompliance that had "a material effect on its ability to comply with . . . program

requirements."  *Id*. at 39.

D.     **Chase Bank's Performance under the National Mortgage Settlement and HAMP**

Chase generally maintains records of the mortgage loans it services through an

electronic "System of Records."  However, loans considered uncollectable (usually because the

value of the property was much less than the outstanding loan) are put in the "Recovery One

population" (RCV1) and those records are maintained outside the primary System of Records.

RCV1 loans are those that Chase deems "valueless based on General Acceptable Accounting

---

include the originating bank which loaned the money and held the lien or the papers could be
sold to other banks or servicers.

Principles (GAAP) and other internal methods of bookkeeping."  SAC ¶ 174.  When Chase determines that a loan is valueless, it "charges off" the loan, *i.e.*, enters it as a loss on the bank's books, and then transfers the loan from its System of Records to RCV1.  Chase does not foreclose on RCV1 loans because it would make no financial sense to foreclose on a valueless loan; the cost to Chase of attempting foreclosure could never be regained since, by definition, the residence is worth less than the loan.  Both first and second lien mortgages may be transferred to RCV1, as well as "mortgages that are subject to bankruptcies and post-foreclosure deficiencies." *Id*. ¶ 172.  Once a loan is transferred to RCV1, its documentation often becomes "corrupted, ignored or allowed to fall into disarray," because it has no business value to Chase.  *Id*.

Monitoring for compliance with the National Mortgage Settlement continued for three years for the initial signatories.  At that point, Monitor Smith determined that Chase had provided $4.463 billion in consumer relief, thereby "satisf[ying] the minimum requirements and obligations . . . imposed upon it under . . . the [National Mortgage Settlement] to provide Consumer Relief."  Monitor's Final Consumer Relief Report Regarding Defendant J.P. Morgan Chase Bank, N.A., *United States v. Bank of America Corp., et al.*, No. 12-361 (RMC) (March 18, 2014) [Dkt. 143] at 20-22, 25.

E.      **Relator's Interest**

Relator's allegations arise from certain non-performing mortgage loans that were serviced by Chase.  Over 3,000 loans from Chase's RCV1 files were sold to companies owned by or affiliated with the Relator, including S&A Capital Partners, Inc., 1st Fidelity Loan Servicing, LLC, and Mortgage Resolution Servicing, LLC.  Chase later "charged off" or canceled the amount owed on numerous loans owned by Relator's entities.  In return, Chase received credit against the National Mortgage Settlement consumer relief amount it was required to provide because it had released the borrower from liability for the debt.

## II. LEGAL STANDARD

### A.      Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil

Procedure 12(b)(6) challenges the adequacy of a complaint on its face.  *See* Fed. R. Civ. P.

12(b)(6).  To survive a motion to dismiss, a complaint must contain sufficient factual

information, accepted as true, to "state a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

A court must assume the truth of all well-pleaded factual allegations and construe reasonable

inferences from those allegations in favor of the plaintiff.  *See Sissel v. Dep't of Health &*

*Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014).  A court need not accept inferences drawn by a

plaintiff if such inferences are not supported by the facts set out in the complaint.  *See Kowal v.*

*MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  Further, a court does not need to

accept as true legal conclusions set forth in a complaint.  *See Iqbal*, 556 U.S. at 678.  In deciding

a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents

attached to the complaint as exhibits or incorporated by reference, and matters about which the

court may take judicial notice.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C.

Cir. 2007).  A court may take judicial notice of public records from other proceedings.  *See id.* at

1059; *Covad Commc'ns Co. v. Bell Atlantic Co.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)

(permitting judicial notice of facts contained in public records of other proceedings); *Mintz v.*

*FDIC*, 729 F. Supp. 2d 276, 277 (D.D.C. 2010) (judicial notice of statement contained in an SEC

filing).

### B.      False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*

The False Claims Act's "chief purpose . . . is to prevent the commission of fraud

against the federal government and to provide for the restitution of money that was taken from

the federal government by fraudulent means." *United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 15-16 (D.D.C. 2011). The FCA imposes civil penalties for the submission of false claims to the United States government. Private parties, called relators, can sue for violations of the FCA in the name of the United States. *See* 31 U.S.C. § 3730(b)(1). Special procedures apply in such cases, which are called *qui tam* actions—"short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Vt. Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000). When a plaintiff-relator files an initial complaint, it is not immediately served on the defendant, but is instead served on the United States along with "written disclosure of substantially all material evidence and information the [plaintiff] possesses." 31 U.S.C. § 3730(b)(2). Thereafter, the case is stayed for a minimum of sixty days, plus any extensions, while the United States determines whether it will intervene—that is, whether it will "proceed with the action, in which case the action shall be conducted by the Government; or . . . decline[ ] to take over the action, in which case the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4). If the government declines to intervene, as happened here, the complaint is unsealed, and the plaintiff-relator may proceed with the case. Even in cases in which the government has declined to intervene, the government retains special rights atypical in traditional civil actions, such as the right to receive all pleadings, intervene at any time for good cause, *id.* § 3730(c)(3), and petition the Court for a stay of discovery, *id.* § 3730(c)(4).

### C.     Heightened Pleading Requirement for Fraud

Federal Rule of Civil Procedure 8 requires that every complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "[e]ach

allegation . . . be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1).  "[B]ecause the

False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must [also]

comply with Rule 9(b)."  *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52

(D.C. Cir. 2002) (noting uniform approach of circuit courts to this issue).  Rule 9(b) provides a

heightened pleading standard for a party alleging fraud or mistake, requiring any such party to

"state with particularity the circumstances constituting fraud or mistake.  Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P.

9(b).

 The D.C. Circuit has noted that Rules 8 and 9(b) are not contrary and should be

read in conjunction:

> [T]his means that the pleader must state the time, place and content
> of the false misrepresentations, the fact misrepresented and what
> was obtained or given up as a consequence of the fraud. The rule
> serves to discourage the initiation of suits brought solely for their
> nuisance value, and safeguards potential defendants from frivolous
> accusations of moral turpitude.  .  .  .  And because "fraud"
> encompasses a wide variety of activities, the requirements of Rule
> 9(b) guarantee all defendants sufficient information to allow for
> preparation of a response.

*United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (internal quotation

marks and citations omitted); *see also United States ex rel. Williams v. Martin-Baker Aircraft

Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004); *McQueen v. Woodstream Corp.*, 248 F.R.D. 73, 77

(D.D.C. 2008) ("Rule 9(b) simply requires the pleader to provide a higher degree of notice by

adequately alleging all of the requisite elements for the cause of action invoked.").  Rule 9(b) is

satisfied when the pleader "provide[s] the 'who, what, when, where, and how' with respect to the

circumstances of the fraud."  *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C.

2004).

Pleading on "information and belief" for claims subject to the strictures of Rule 9(b) is permitted when essential information lies uniquely within another party's control. *Kowal*, 16 F.3d at 1279 n.3 (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 646 (3d Cir. 1989)). To plead on information and belief, however, the plaintiff must allege "that the necessary information lies within the defendant's control" and include "a statement of the facts upon which the allegations are based." *Id.*; *see also Anderson*, 221 F.R.D. at 253.

### D.    Procedural History

On May 6, 2013, Mr. Schneider filed his initial Complaint as Relator under the False Claims Act, *see* 31 U.S.C. § 3730(b)(1), in the United States District Court for the District of South Carolina. *See* Compl. [Dkt. 1].   The Federal Government declined to intervene on January 13, 2014. *See* Notice [Dkt. 24].   The case was transferred to this Court on June 19, 2014. *See* Transfer Order [Dkt. 58].   Relator filed his First Amended Complaint on November 17, 2014. *See* FAC [Dkt. 80].   On August 31, 2015, the Federal Government again declined to intervene. *See* FAC Notice [Dkt. 96].   Relator filed a Second Amended Complaint on October 2, 2015. *See* SAC [Dkt. 102].   Defendant moved to dismiss on November 12, 2015. *See* Mot. [Dkt. 105].   Relator opposed, *see* Opp'n [Dkt. 110], and Defendant replied, *see* Reply [Dkt. 112].[4]

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730(a).   The Court also has supplemental jurisdiction over the State-law counts under the State False Claims Acts pursuant to 28 U.S.C. § 1367.[5]   This Court is the proper venue

---

[4] Relator filed a Notice of Supplemental Authority, *see* Notice of Supp. Auth. [Dkt. 116], to which Defendant responded, *see* Response [Dkt. 117].

[5] Section 1367 provides for supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).   The

because the underlying National Mortgage Settlement was approved by this Court and Defendant conducts business in the District of Columbia. *See* 31 U.S.C. § 3732(a).

### III. ANALYSIS

Relator alleges that Chase violated the False Claims Act by falsely claiming (1) that it met Servicing Standards and complied with the consumer relief requirements of the National Mortgage Settlement and (2) that it met the servicing standards specified in HAMP and, as required, provided loan modifications to sufficient numbers of eligible borrowers.[6]

### A.   National Mortgage Settlement Claims

Relator alleges that Chase's false claims regarding its compliance with the National Mortgage Settlement provided Chase with the benefit of credit for consumer relief that it otherwise should not have received. Chase moves to dismiss for procedural failures and failure to state a claim upon which relief may be granted.

Chase cites two issues that it contends preclude Relator's suit concerning the National Mortgage Settlement: (1) Relator failed to exhaust the dispute resolution procedures required by the National Mortgage Settlement before filing suit; and (2) Relator improperly attacks the Monitor's determinations that Chase complied with the National Mortgage Settlement. Indeed, the National Mortgage Settlement provided specific procedures before suit

---

State-law claims are State False Claims Act claims based on the same facts as the Federal False Claims Act claims, specifically false claims regarding compliance with the National Mortgage Settlement.

[6] Relator's State law claims rest on the same factual allegations as Count I, the federal False Claims Act claim based on alleged false statements regarding compliance with the National Mortgage Settlement. Relator provides no additional facts to support the State law claims and does not argue that any of the State laws would provide for liability in the absence of liability under the Federal False Claims Act. Therefore, each of the State-law counts will be dismissed for the same reasons as Count I.

or challenge to determinations made by the Monitor.  Because Relator stands in the position of

the Federal Government in this case, he is required to have exhausted all remedies the Federal

Government would have been required to exhaust prior to suit.  *See United States ex rel. Morgan*

*v. Sci. Applications Int'l Co.*, 604 F. Supp. 2d 245, 249 (D.D.C. 2009) (finding relator "stands in

the shoes of the federal government as a plaintiff").  Under the National Mortgage Settlement, a

party wishing to dispute compliance by a signatory bank was required to follow explicit steps:

(1) give notice to the allegedly noncompliant bank, the Monitor, and the Monitoring Committee;

and (2) "engage in good faith efforts to reach agreement on the proper resolution of any dispute."

Consent Judgment, Ex. E at E-14; *see also id.* at E-15.  If the aggrieved party were not assuaged,

it could then notify the Monitoring Committee of its intent to file an enforcement action.  The

Monitoring Committee was afforded 21 days to consider whether it would sue before any other

enforcement action could be filed and if the Committee decided not to sue, the moving party was

required to wait another 21 days before commencing litigation.  *See id.* at E-15.

Chase argues that because Relator failed to follow these mandatory pre-litigation

steps, which would have constrained the United States, any claims of noncompliance with the

Settlement must be dismissed.  Relator responds that the dispute resolution procedures in the

National Mortgage Settlement are not applicable to his FCA allegations because the National

Mortgage Settlement must be read in a manner consistent with the Servicer Participation

Agreement between Fannie Mae and Treasury under HAMP.[7]  The Servicer Participation

Agreement specifically provides that violations of its terms are subject to the FCA and states:

---

[7] The National Mortgage Settlement indicates that:

> The provision of consumer relief by the Servicer in accordance with
> this Agreement in connection with any residential mortgage loan is
> expressly subject to, and shall be interpreted in accordance with, as
> applicable, the terms and provisions of the Servicer Participation

> Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with any of the Programs or pursuant to the Agreement may constitute a violation of:  (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (3 I U.S.C. §§ 3729-3733).

Opp'n, Ex. 1 [Dkt. 110-1] (Amended and Restated Commitment to Purchase Financial

Instrument and Servicer Participation Agreement) at B-4.  Relator's confusion between the

National Mortgage Settlement and HAMP pervades his arguments.

Agreements, like statutes, should be read to avoid surplusage where possible.  *See*

*Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2043 (2012) ("[T]he canon against surplusage

merely favors that interpretation which avoids surplusage.").  While Relator would like the Court

to read the National Mortgage Settlement's alternative dispute resolution process as inconsistent

with the remedies under the HAMP Servicer Participation Agreement, the Court finds they can

readily be reconciled.  The National Mortgage Settlement is *sui generis* and the United States is a

signatory.  Relator, who acts on behalf of the United States, is simply bound to its terms in any

complaint of noncompliance.  Had Relator first completed the alternative dispute procedure in

the National Mortgage Settlement, he then might have sued.  Not having completed the former,

he cannot begin the later.

---

> Agreement with the U.S. Department of Treasury, . . . provided, however, that the inability of a Servicer to offer a type, form or feature of the consumer relief payments by virtue of an Applicable Requirement shall not relieve the Servicer of its aggregate consumer relief obligations imposed by this Agreement.

Consent Judgment, Ex. D at D-12.

**B.     HAMP Claim**

Relator argues that Chase violated the FCA by knowingly submitting false or fraudulent annual certifications that it had complied with HAMP, even though the certifications "failed to disclose that Chase did not solicit RCV1 borrowers to apply for HAMP loan modifications."  Opp'n at 31.  Chase responds that Relator's HAMP claims fail as a matter of law because he "does not adequately allege that Chase's non-solicitation of RCV1 borrowers constituted 'material' violation of HAMP's requirements" and "*material* compliance" is all that is required under HAMP.  *Id.* (emphasis in original).  Chase adds that Relator has failed to allege that any statements in the Chase HAMP compliance reports were false.  Chase also argues that Relator failed to allege that any false statements were made knowingly because the Federal Government knew that Chase had not solicited RCV1 borrowers before it wrote off their debts.

Chase identifies three reasons that its claims, even if "false," were not "material." First, Chase argues Relator fails to allege that a substantial number of borrowers was affected because RCV1 borrowers might not have qualified for HAMP at all, in that Chase wrote off second-lien mortgages and forgave others.  Chase also argues that Relator does not allege that "non-solicitation of RCV1 borrowers resulted in injury to those borrowers or interfered with the goals of the HAMP program," the fundamental purpose of which "is to avoid unnecessary foreclosures."  Mot. at 33.  Because Chase forgave many RCV1 loans, they were not foreclosed upon and HAMP was not implicated.  Finally, Chase argues Relator failed to allege that Treasury was unaware of the non-solicitation of RCV1 loans.

Relator focuses on the definition of "material" in the FCA, which it defines as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  Relator argues that his Second Amended

Complaint infers that a substantial number of borrowers was impacted due to his allegations concerning the number of loans in the RCV1 system and the Monitor's final report concerning Chase's loans reported eligible for modification under the National Mortgage Settlement.[8] Relator urges the Court to assume that HAMP compliance personnel had no notice of Chase's policies and procedures related to RCV1 loans.  His argument starts with his allegations that "Chase underreported to the Monitor" and concludes that Chase must also have underreported to HAMP.  Finally, Relator argues that the materiality of the violations can be presumed because the United States Trustee Program found that Chase violated a separate 2011 Consent Judgment with the Office of the Comptroller of the Currency (OCC).

The False Claims Act imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).[9]  There are three elements to FCA presentment under § 3729(a)(1)(A):  (1) the defendant presented a claim for payment or approval to the Federal Government; (2) the claim was "false or fraudulent"; and (3) the defendant acted knowing that the claim was false or fraudulent when he submitted it.  *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 198-99 (D.C. Cir. 1995).  A "claim," as relevant here, is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of

---

[8] Relator does not respond to Chase's argument concerning HAMP's materiality requirement, focusing instead on the Monitor's reports of compliance with the National Mortgage Settlement; he, thus, waives the argument.  *See Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d 29, 39 (D.D.C. 2010).

[9] 31 U.S.C. § 3729 was amended in May 2009, *see* Pub. L. 111-21, § 4(a), 123 Stat. 1621 (May 20, 2009), and § 3730 was amended in July 2010, *see* Pub. L. 111-203, Title X, § 1079 A(c), 124 Stat. 2079 (July 21, 2010).  The post-amendment versions apply to the allegations here, all of which took place in September 2010 or later.  *See* SAC ¶¶ 297-304.

the United States." 31 U.S.C. § 3729(b)(2)(A).  The term "knowing" means that a person either "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," but it does not require "proof of specific intent to defraud."  *Id*. § 3729(b)(1)(A), (B).

The FCA also provides a cause of action against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  *Id*. § 3729(a)(1)(B).  "Material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id*. § 3729(b)(4).   Thus, under the law, a plaintiff must allege that (1) the defendant made or used a "record or statement"; (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was "material" to a false or fraudulent claim.  *Id*. § 3729(a)(1)(B). Because Rule 9(b) applies, "the pleader must state the time, place and content of the false misrepresentations [and] the fact misrepresented."  *Joseph*, 642 F.2d at 1385 (interpreting prior section (a)(2)).

A plaintiff's task is to "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 133 (D.D.C. 2010), because "[w]hile . . . Rule 9(b) requires more particularity than Rule 8 . . . Rule 9(b) does not completely vitiate the liberality of Rule 8."  *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 269 (D.D.C. 2002).[10]  Chase contends that its HAMP disclosures to

---

[10] Rule 8 requires that every complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "[e]ach allegation . . . be simple, concise, and direct."  Fed. R. Civ. P. 8(a)(2), (d)(1).

Fannie Mae were not materially false because HAMP imposes a distinct disclosure requirement of "instances of noncompliance that [the servicer] believes have a *material effect on its ability to comply with MHA program requirements*." MHA Handbook at 38 (emphasis added). In light of the terms set by Treasury, noncompliance with HAMP would be shown only if Chase's non-solicitation of RCV1 loans for HAMP modification had a material effect on Chase's "ability to comply" with the Making Home Affordable program requirements. Relator makes no such allegations. His arguments concerning RCV1 loans eligible for modification focus on their eligibility under the National Mortgage Settlement, not HAMP. Although this is an FCA lawsuit, a violation of the certification prong of FCA can be found only if a party makes a "false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *SAIC*, 626 F.3d at 1266. Such has not been alleged.

Federal Rule of Civil Procedure 9(b) requires Mr. Schneider to allege "the time, place and content of the false misrepresentations [and] the fact misrepresented." *Joseph*, 642 F.2d at 1385. Section VI of Mr. Schneider's Second Amended Complaint identifies the "Documentation Containing False Claims" and notes the date of each document. SAC at 66. The Court identifies two instances of alleged false claims relevant to HAMP in the Complaint:

> On September 10, 2010, Chase filed a Certification of compliance with its "Commitment to Purchase Financial Instrument and Servicer Participation Agreement." This certification contained False Claims.

> On September 10, 2010, Chase's subsidiary, EMC, filed a Certification of compliance with its "Commitment to Purchase Financial Instrument and Servicer Participation Agreement." This Certification contained False Claims.

SAC ¶¶ 303-04.[11]  Both of these instances of alleged false claims occurred in 2010, before the

National Mortgage Settlement in 2012 and, therefore, any data about RCV1 loans discharged and

reported to the Monitor as a result of the National Mortgage Settlement in 2012 or later are

irrelevant to the falsity of the alleged claims made under HAMP in 2010.  Relator's Complaint

focuses on actions during the 3-year compliance period of the National Mortgage Settlement

period and provides no allegations identifying the "fact misrepresented" to the HAMP

compliance monitor in 2010.

Relator's argument that the 2011 Consent Judgment with the OCC also

demonstrates material false statements by Chase fares no better.  Relator does not allege that the

OCC Consent Judgment includes a determination that Chase violated HAMP or failed to comply

with the notice requirements of HAMP.  Additionally, Relator fails to allege that any part of the

OCC Consent Judgment was substantially similar to requirements under HAMP and could,

therefore, demonstrate material misrepresentations by Chase under HAMP.  Relator is

effectively asking the Court to assume that Chase's admission of wrongdoing in an unrelated

Consent Judgment is evidence that Chase made false statements to Fannie Mae regarding its

HAMP compliance.  Without facts specific to HAMP and allegations regarding the materiality of

any misrepresentations concerning Chase's HAMP-specific compliance obligations, Relator's

FCA claims under HAMP must be dismissed.

    **C.**    **State Claims**

Counts III through XXIII raise the following State law claims:

Count III:  California False Claims Act, Cal. Gov't Code
§ 12651(a)(7)

---

[11] All other paragraphs in Section VI of the Second Amended Complaint specify notices or reports submitted by Chase to Monitor Smith under the National Mortgage Settlement.

Count IV:   Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201(a)(7)

Count V:  District of Columbia False Claims Act, D.C. Code § 2-308.14(a)(7)[12]

Count VI:  Florida False Claims Act, Fla. Stat. § 68.082(2)(g)

Count VII:   Georgia False Claims Act, Ga. Code Ann. § 23-3-121(a)(7)

Count VIII:   Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a)(6)

Count IX:  Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/3(a)(1)(G)

Count X:  Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-2(b)(6)

Count XI:  Iowa False Claims Act, Iowa Code § 685.2(1)(g)

Count XII:  Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5B(a)(9)

Count XIII:   Minnesota False Claims Act, Minn. Stat. § 15C.02(a)(7)

Count XIV:  Montana False Claims Act, Mont. Code Ann. § 17-8-403(1)(g)

Count XV:   Nevada False Claims Act, Nev. Rev. Stat. § 357.040(1)(g)

Count XVI:  New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b(I)(e)

Count XVII:   New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-3(g)

---

[12] The District of Columbia False Claims Act has been recodified at D.C. Code Ann. § 2-381-02.

Count XVIII:  New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-3(A)(8)[13]

Count XIX:  New York False Claims Act, N.Y. State Fin. Law § 189(1)(g)

Count XX:  North Carolina False Claims Act, N.C. Gen. Stat. § 1-607(a)(7)

Count XXI:  Rhode Island False Claims Act, 9 R.I. Gen. Laws § 9-1.1-3(a)(7)

Count XXII:  Tennessee Fraud Against Taxpayers Act, Tenn. Code Ann. § 4-18-103(a)(7)

Count XXIII:  Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.3(A)(7)

Each State law count includes the same claim based on the National Mortgage Settlement, to which each of the States and the District of Columbia was a party and signatory.  Relator alleges:

> Chase knowingly, or acting in deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to an obligation to pay or transmit money or property to the State of California, and/or knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of California.  These false statements and false records include various reports to the Monitor and the IRG Assertions containing certifications that Chase had complied with the Servicing Standards and Consumer Relief Requirements of the Consent Judgment.

*E.g.*, SAC ¶ 317 (Count III).  Because Relator's State law claims rest on the same allegedly false allegations as the Federal FCA claim, dismissed above, the State law claims will also be dismissed.

---

[13] The Complaint cites to the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-5; but the Court interprets the Complaint as intending to reference the New Mexico Fraud Against Taxpayers Act.

**D.      Leave to Amend**

In Opposition, Relator asks for leave to file a third amended complaint should the Court find merit in the Motion to Dismiss.  "[T]he D.C. Circuit has cautioned that 'failure to plead fraud with particularity . . . does not support a dismissal with prejudice; to the contrary, leave to amend is almost always allowed to cure deficiencies in pleading fraud.'"  *Pencheng Si v. Laogai Research Found.*, No. 09-2388, 2013 WL 4478953, at *2 (D.D.C. Aug. 21, 2013) (quoting *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996)).  Relator has already filed two amended complaints.  He intimates no facts that could rescue his FCA allegations relating to the National Mortgage Settlement and the undisputed facts show that an amendment would be futile.  The Court will dismiss Relator's claims of Chase noncompliance with the National Mortgage Settlement with prejudice and his claims of Chase noncompliance with HAMP without prejudice.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss, Dkt. 105, will be granted.  Counts I and III through XXIII will be dismissed with prejudice.  Count II will be dismissed without prejudice.  A memorializing Order accompanies this Opinion.


Date: December 22, 2016                              _____/s/_____
                                                     ROSEMARY M. COLLYER
                                                     United States District Judge